# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:16-CR-00115-SJD-1 |
| v. | HON. JUDGE SUSAN J. DLOTT |
| RICHARD LEE DEVITO | Date:  May 21, 2019 |
| Defendant. | Time: 10:00 a.m. |
| | Place: Courtroom 7 |

**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**

/s/ *Sarah Thomas Kovoor*

Sarah Thomas Kovoor (0069223)
FORD, GOLD, KOVOOR & SIMON, Ltd.
8872 East Market Street Warren, OH 44484
P: (330) 856-6888 / F: (330) 856-7550
E: sarah.thomas.kovoor@gmail.com

*Counsel for Defendant Richard Lee DeVito*

1

<u>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**</u>

Defendant Richard Lee DeVito, by and through his attorneys of record, Sarah Kovoor, hereby submits his Sentencing Memorandum,[1] setting forth the factors the Court should consider in determining what type of sentence is sufficient, but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. §3553(a).

<u>**BACKGROUND**</u>

I.     **Richards's Background**
       a.  **Richard had a tumultuous childhood that left a life-lasting impression on him.**

Richard Lee DeVito was born on February 15th 1984 in Cincinnati to William, a Manager for an automotive manufacturer, and Cheryl, a Licensed Optician. While in many ways Richard was afforded a normal, middle-class upbringing, his formative years were plagued with emotional dysfunction. Dr. Ed Connor, a forensic psychologist who specializes in psychosexual disorders, evaluated Richard during a six-hour interview on June 6th, 2017. As part of the Psychological and Psychosexual Evaluation, Dr. Connor took a detailed history of Richard's personal and family background as part of the interview and provided an expert report. (Dr. Connor's Eval., p.1-13). As noted by Dr. Ed Connors, "His parents fought so often . . . there were incidents of domestic violence . . . so pronounced that police were summoned to the home." (Dr. Connor's Eval., p.1). Subsequently, Richard began struggling with anxiety at a young age.

Chronic anxiety became a natural part of Richard's childhood that caused emotional wear and tear on his body and prompted him to shy away from what one might call normal social interaction at this age. Given the frequently solitary nature of Richard's upbringing, he took to playing video games quite often. As he found it difficult to engage socially, they provided an escape from the day-to-day. This hobby remained prominent in Richard's life.

---

[1] Mr. Roger Pimentel, a sentencing consultant, assisted in the investigation and preparation of this filing. Mr. Pimentel's Curriculum Vitae is attached as Exhibit B.

However, at the age of eight, he was molested by his half-brother who also introduced Richard to pornography. As a result of these experiences, Richard began to have an abnormal focus on seeking out sexual material. Continuing from this molestation and into adolescence, Richard had an active interest in pornography and sexuality in general. Dr. Connor elaborates, "He learned at a very young age that when he turned to pornography, it decreases his agitation and stress levels, which became his drug of choice." (Dr. Connor's Eval., p.3).

This portion of Richard's life became divided. The emotional detachment he learned put him in a position of needing to be the 'perfect' kid. On the outside he is a person who attempted to please everyone to avoid conflict, who didn't experiment with drugs, alcohol, or tobacco because it was the 'right' thing to do. On the inside he is a highly emotional person who second guessed every action, who needed some sort of retreat and, unfortunately, would find it in a "drug" that could be just as destructive, if not more than any substance, and was far more accessible.

Richard had a few close friends that he enjoyed spending time with, but the majority of his young life was spent indoors. With the eventual discovery of the internet, he would spend, at times, hours isolating himself from his potentially volatile surroundings:

> His high level of anxiety and avoidant personality style exacerbate his tendency to withdraw socially and interpersonally from others into a mild but chronic state of depression. At times, his depression becomes even more pronounced and he "flees into cyberspace" as a means of dealing with depression and anxiety. Richard *desperately wants to have long-lasting intimate relationships*, but his social awkwardness, high level of anxiety, and depression compromise his ability to do so. Subsequently, "cyberspace" is his escape from himself.

(Dr. Connor's Eval, p.7). By the end of his preteen years, Richard was proficient in both his use of the internet and the internet's ability to provide copious amounts of pornography on demand for his sexual gratification.

Finally, at the age of twelve, Richard reached a culmination of problematic behavior. After learning how to "chat" with others on the internet, Richard viewed his first underage pornography which, at the time, depicted victims similar in age to himself:

> Given his age at the time, he was able to identify with the child pornography images. This is considered to be his "Kodak moment" whereby his initial exposure to sexual arousal was quite intense and stimulating. Oftentimes it is a person's first initial sexual arousal and moment that is ingrained in their mind as to what they find sexually stimulating. As such, it appears that Richard's arousal to child pornography was one of his first sexually stimulating experiences, which persisted throughout the rest of his life.

(Dr. Connor's Eval., p.4). On many occasions, though, Richard attempted to quit accessing all pornography, including child pornography. Feeling disgusted with himself, he would be able to quit for varied periods of time on his own, but left untreated, like many addicts, he would eventually relapse.

### b. Richard's repressed childhood emotions began to boil over into adulthood.

In his adult life Richard, on the surface, seemed to enjoy taking on the role of problem solver and caretaker. As noted by his wife, he wore it well (Pre-Sentence Investigation Report, p.46, ¶362), and it easily allowed him to find success in the workforce that would quickly promote him into many leadership roles. While it gave him the opportunity to stay busy fixing everyone else's problems, it did not address his own issues, and led to a bad balancing act of positive and negative behavior.

Masking his emotional deficits, Richard found his way in and out of mostly long-term relationships. In between relationships, Richard would retreat emotionally, tipping the scales toward negative behavior and isolation. Richard would often find himself back in the grips of online pornography. In 2010, Richard met his future wife, Elizabeth, and what started as a friendship, blossomed into a relationship. Independent and strong, Elizabeth made Richard want to be a better person. She gave him purpose, drive, and, most importantly, made him happy, minimizing the anxiety and depression that trigger his pornography use.

Unfortunately, as Richard's relationship and career were building, his father's health was failing. He was diagnosed with Parkinson's Plus, Multiple Myeloma (bone marrow cancer), and a continued struggle with Diabetes. Richard found himself, in ways, becoming a parent to his parent: getting meals, feeding him, taking him to doctors, and ensuring his medication for the remaining few years of his life. When his father was hospitalized in the winter of 2012, Richard

fought for his father's care almost daily, as those trusted with his care were giving up. Seven days after Richard's birthday, his father passed away at 68 years of age.

Without the time to properly grieve, Richard walked his father's path. He began to seclude himself from his problems by immersing himself in his job, where his rapid success validated his actions in his mind. While on the exterior Richard portrayed the picture-perfect example of control, on the inside he was anything but. Focusing everywhere but on himself, he would work 12+ hour days, and then be 'connected' via a terminal connection, phone, and email during home hours. As his grip tightened around everything that could produce tangible results, Richard achieved multiple promotions, got married, had his first child, cared for his mother and grandmother, while also remodeling two homes, in just three years.

Richard was spread too thin because he was undertaking too many activities at one time. Richard's relationships were unravelling; he was not being the best father he could be, or husband, or employee and he was rapidly burning out. As it seemed, he could no longer make anyone happy including himself. Rather than properly addressing these issues, Richard began fleeing to cyberspace, his coping tool of the past. Initially innocuous, his activities became increasingly deviant. As his love life suffered, he began to frequent pornography sites and adult webcam sites. Richard could not seem to repair this connection with his wife, though looking back, Richard admits his efforts were marginal. While this disconnect deeply hurt him, his focus would once again be pulled when his grandmother's health began to fail and his mother wound up in a legal battle of her own. Managing to hold together his outward appearance, Richard's alcohol consumption and online activity increased as he was caught in a downward spiral he couldn't escape.

## II. Offense Conduct
### a. Overview of Addiction

"Addiction is any behavior that you have difficulty controlling and that you continue to do despite negative consequences."[2] While mainstream media pushes the view that addiction only 'makes sense' when talking about substances like heroin, alcohol, or nicotine, the latest

---

[2] I Want to Change My Life: How to Overcome Anxiety, Depression & Addiction, Steven Melemis Phd.MD.

research on addictions contradicts this. One study found that, "methamphetamine and cocaine hijack the same reward-centre nerve cells that evolved to make sex compelling."[3] Just as drugs activate the 'sex' nerve cells and trigger a 'buzz' without actual sex, so can internet pornography. "Some 90 studies on internet addicts reveal the same core brain changes seen in substance addicts."[4] Only emerging as of 2014, though, are studies that isolate internet pornography addiction.

Given the private nature of the subject matter, its unknown how many people are being negatively affected by internet pornography addiction, but one poll of self-reporting adults found the number to be more than double that of addicts that use addictive substances (excluding nicotine).[5] "The fact is that the brain's reward center doesn't know what drugs or porn are; it only registers levels of stimulation through dopamine spikes."[6] Chronic overstimulation of this reward circuitry is at the root of all addiction. Charles O' Brien M.D., chair of the DSM-5 stated:

> The idea of a non-substance related addiction may be new to some people, but those of us who are studying the mechanisms of addiction find strong evidence . . . that addiction is a disorder of the brain reward system and it doesn't matter whether the system is repeatedly activated by gambling, or alcohol, or another substance.

Substantiating literature on internet pornography and addiction emphasizes that "pornography enters the brain like a needle, but comes out like a fish hook."[7] The addiction process itself can drive escalation, training our brains with or without our conscious participation, moving from genre to genre until porn users arrive at places that they find personally disturbing or confusing.

Only recently catching the eyes of some lawmakers, in February 2018, Florida's House of Representatives took action in passing a resolution that declared pornography a public health

---

[3] Karla S Frohmader Neuroscience 166/3 (2010): 771 – 784 doi 10,1016

[4] Internet – Videogame Addiction Brain Studies www.yourbrainonporn.com

[5] Y. Goto "The Yin and Yang of Dopamine Release: A New Perspective"

[6] Pornography Addiction Survey, http://www.provenmen.org/ 2014 porn survey

[7] Your Brain on Porn by Gary Wilson

risk. Calling for education, research, and policy changes to protect its citizens, the bill cites research has: "Found a correlation between pornography use and mental and physical illnesses, difficulty forming and maintaining intimate relationships, unhealthy brain development and cognitive function, and deviant problematic or dangerous sexual behavior."

Meanwhile, as the Sentencing Commission repeatedly requests that Congress reviews sentencing for child pornography cases, particularly the imposition of mandatory minimums, Congress ignores the growing problem. Refusing to act on the many attempts made by the Sentencing Commission to introduce empirical data and research, which could reduce the unduly harsh sentences that are growing exponentially, destroying lives, and barring some people with psychiatric disorders who are amenable to treatment from any effective assistance to overcome their addiction. As noted in the Sentencing Commissions report, stepping up for policy change regarding Federal internet pornography crimes is "the political equivalent to stepping on to the third rail."[8]

### i. Richard's Initial Exposure and Development

"Most users start watching pornography by puberty, when their brains are at their peak plasticity and most vulnerable to addiction and rewiring."[9] Fueled by evolution, learning about sex is a primary task for the highly malleable adolescent's brain. It wires to sexual cues in the environment. Novel, startling, and arousing stimuli can rock an adolescent's world in a way it won't an adult's brain, proven by brain scans of young porn users in a 2014 Cambridge study. Richard however did not stumble upon pornography. He was purposely exposed to it by his abuser, to aid in his molestation prior to entering puberty. As Richard revealed to Dr. Connor, this made him feel awkward and unsettled, but the link was formed. (Dr. Connor's Eval., p.4).

Richard entered adolescence already knowing what to look for and was aided by the emerging user-friendly internet that put the world and all its dark corners at his fingertips. Combined with his personality style, Richard had plenty of 'alone time' where repeated access

---

[8] USSC report 2009 – Federal Child Pornography Offenses: The History of Child Pornography at 320-31

[9] Your Brain on Porn by Gary Wilson pg. 65

strengthened the connection in his brain; driving the need for new material, to light up the reward circuitry of his brain, and keeping dopamine at artificially high levels for hours simply by clicking.

Dr. Connor noted Richard has always desperately wanted long-lasting intimate relationships with people; but struggles with his ability to do so. (Dr. Connor's Eval., p.3, 4). As a result, Richard has been stuck in a perpetual cycle of seeking more positive behavior or 'pleasure' from interacting with real people, but when these interactions fail and his anxiety and depression take hold, Richard would succumb to his addictions and slip back to his old habits. As Richard began growing a family of his own, it brought joy and a sense of satisfaction that all but snuffed out his addiction, but when his relationship with his wife felt as though it was failing, it sent a crack through his foundation.

### ii. Richard's Online Communications

Richard slid into his old habits for the last time in 2016. Seemingly unable to maintain his real relationships with friends and family, his social life became non-existent. With a plethora of social media applications available, Richard was creating a parallel existence online. Initially seeking friendships, Richard would download various apps, but finding they were mostly meant as dating apps, he would delete them.

Continuing to slide, one of Richard's peers introduced him to an adult webcam site that blended communication and nudity. An interactive pornography of sorts, Richard started to frequent the site, still initiating friendly conversations, but they could quickly become explicit. Allowing him to avoid facing up to his inability to sustain emotional connection and intimacy in real life, he attempted to fill that void on the internet.

Richard was becoming increasingly careless and his behavior reckless. Finding two specific applications like YouTube, he would watch videos being posted and 'mass' message people indiscriminately with a 'cut and paste' option. Speaking with anyone that would respond.

In July 2016, Minor Victim A had responded to Richard's message. As noted in the PSR, "initially the conversations were innocuous; however, they eventually turned sexual in nature." (PSR, p.5, ¶13). As charged, on August 6th of 2016, Richard, at rock bottom, made the inexcusable choice to involve Minor Victim A in these explicit exchanges. Exposing her to his sickness, Richard was now no better than his own abuser, and deeply regrets losing control to the point another victim was created.

### b. Assessment and Recovery

Dr. Connor performed multiple tests to assess Richard's mental condition and sexual tendencies and found that "Richard appears to be relatively "low-risk" to reoffend by accessing child pornography if he is "properly treated." (Dr. Connor's Eval., p.9-12). "His risks can be managed" and "they are manageable in the community via Probation and Treatment." *Id*. Dr. Connor also gave his professional opinion that "Richard holds himself accountable for his behavior… felt quite disgusted with himself … is an intelligent man … likely to comply with the Court…acknowledges the problem and appears to be motivated for treatment." *Id*.

Richard has tried to access rehabilitative treatment and set up treatment while incarcerated but has been met with adversity at each attempt. After Richard's bond was denied, prior counsel refused to argue for out-patient treatment with Connor and Associates, like many similarly situated defendants receive. Accepting this, Richard worked with his wife over the phone to find the Village Network, an adult in-patient facility for sex offender treatment in Wooster, Ohio. Again, prior counsel refused to propose this option to the court, even after evaluation yielded the low-risk determination to support such an option. Finally, Richard's family contacted Dr. Bassman of Cincinnati to make special visits to Butler County Jail, but upon arrival he was not permitted to see Richard.

There has been no evidence or indication Richard has ever tried to meet or abuse a minor, and to the contrary, clinical opinion marks him as "an appropriate candidate for specialized treatment in a community setting." (Dr. Connor's Eval., p.12). These remarks indicate that Richard's psychiatric conditions need to be treated as a psychiatric disorder. Richard has admitted many times over his conduct was wrong, he made a mistake, and *he wants help.*

Recently, "federal alternatives to incarceration have now began to sprout on their own, upon the initiative of individual districts" and attorneys have put forth arguments for a term of in-patient rehabilitation treatment rather than incarceration, because of the treatment benefits. *United States v. Leitch*, E.D.N.Y. No. 11-CR-00609 (JG), 2013 U.S. Dist. LEXIS 27796 (Feb. 28, 2013). Richard will wait at least the next decade to receive any treatment. Richard has taken to reading many "self-help" books on related topics (i.e., addiction, pornography addiction, depression, anxiety, PTSD, etc.) and engages in "group discussion" with both his family via the phone and a small group of inmates throughout his incarceration, demonstrating his commitment towards improvement and betterment.

### III.     The Defendant's Plea and Applicable Guidelines Range
####         a.   Procedural History

Richard is a 35-year-old male and citizen of the United States. Richard is charged by Indictment with two counts – Count 1: *Production of Child Pornography* a violation of 18 U.S.C. §2251(a),(e); Count 2*: Possession of Child Pornography* a violation of 18 U.S.C. §2252(a)(5)(B),(b)(2). Count 1, as indicated in the plea agreement and statement of facts, involve the defendant using a chat application to ask a minor victim to produce and transmit a sexually explicit video. The conduct did not involve intimidation, force, or coercion. Richard did not personally engage in illicit sexual conduct with the minor victim, meaning Richard did not touch,

fondle, molest, rape or bind any minor children during the course of his conduct. Nevertheless, the abhorrent conduct of Richard appears closely related to a deeply rooted psychological issue, in addition to pornography addiction.

On December 21, 2016, an Indictment was filed in the Southern District of Ohio alleging a single count of Production of Child Pornography and a single count of Possession of Child Pornography. On June 19, 2018, Richard entered a guilty plea to count 1: Production of Child Pornography. Sentencing in this matter is set for May 21, 2019 before this Honorable Court.

**b. Richard's Plea and Pre-Sentence Investigation Report**

Pursuant to a written plea agreement Richard entered a plea of guilty to Count 1: *Production of Child Pornography* a violation of 18 U.S.C. §2251(a), (e). In exchange, the Government is not opposed to recommendation of a three-level reduction for acceptance of responsibility and timeliness of guilty plea (Plea Agreement, ¶ 7). The statutory maximum range of imprisonment for Counts 1 is 360 months (PSR, p. 52, ¶ 396). A five year to lifetime period of supervised release is available (*Id*., ¶ 399). The Pre-Sentence Investigation Report (PSR), pursuant to U.S.S.G. § 2G2.1 finds that the Total Offense Level is 43 and the Criminal History Category I (*Id*., ¶¶ 338, 342). The resulting recommended Guideline range of imprisonment is Life (*Id*., ¶ 397).

Richard moves the court to sentence him to a fair, just, and reasonable sentence of 180 months followed by an appropriate period of supervised release. Up until the present matter, Richard was viewed as a law-abiding citizen, gainfully employed pillar of the community, a hard-working man, and loving husband, father and son. Richard, *a first-time offender*, now faces a potential guideline sentence that could incarcerate him for the majority of his remaining years. If the Court follows a presently flawed guideline, and the original sentencing calculation of the

probation office Richard faces a 30-year sentence. Indisputably, the production of child pornography is a very serious offense, as reflected by the potential penalties in such cases. However, as demonstrated below, on multiple levels, Richard deserves a reasonable sentence which will also be sufficient to promote the goals of sentencing.

## **DISCUSSION**

### I.     **Applicable Law**

Richard submits to this Court as a man who is deeply remorseful and demonstratively affected by the pain, suffering, and humiliation he has caused the victims in this case. Richard has had significant time to reflect on his actions and criminal conduct in this matter and is distraught over the anguish it has caused both to the victims, their families, and his own family.

Few legal principles are as deeply entrenched in our present jurisprudence as the concept of individualized sentencing. As the United States Supreme Court, has observed:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.

*Pepper v. United States, 131 S. Ct. 1229, 1239, 1240 (2011).* Thus, in each case a sentence should reflect an individualized assessment of a particular offender's culpability and potential success in the community rather than a mechanical application of given sentence to a particular category of crime.

    **a. The Sentencing Guidelines should not be applied in this case because it is inconsistent with 18 U.S.C. §3553.**

The reasonableness of any sentence is determined by a district court's individualized application of the statutory sentencing factors. Unfortunately, in this case the Court is working with a guideline that is fundamentally different from most in that, unless applied with great care, can lead to an unreasonably excessive sentence that is inconsistent with 18 U.S.C. §3553.

Sentencing guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. *United Sates v. Rita,* 551 U.S. 338, 349 (2007). However, the Commission was prevented from using the empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under §2G2.1 and 2.2 several times since their introduction in 1987, recommending increasingly harsher penalties each time.[10]

The sentencing guideline for production of child pornography-based offenses is §2G2.1, which was part of the original 1987 guidelines.[11] §2G2.1 initially provided for a base offense level of 25 and had a single specific enhancement for the age of the child being under 12 years appearing in the production.[12] Over the years to follow, the Sentencing Commission substantially increased the penalty for "production" offenses based primarily on congressional directives instead of any empirical data. For example, in 1996 the commission increased the base level to 27 and added the often criticized 2 level enhancement for the use of a computer.[13] In another

---

[10] United States Sentencing Commission, *The History of Child Pornography Guidelines,* Oct. 2009, available at http://www.ussc.gov/general.20091030_History_Child_Pornography _Guidelines.pdf.

[11] United States Sentencing Commission, *Federal Child Pornography, Full Report to Congress,* December 2012, at 249, available at http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

[12] USSC §2G2.1 (1987)

[13] Id.

example of a congressionally directed increase, the Commission was directed under the PROTECT Act to increase the base level from 27 to 32, also adding a number of additional separate enhancements.[14]

The statistics offered by the Sentencing Commission clearly show a substantial disapproval by the district courts of the guidelines in many instances. In fiscal year 2004, 84% of the production cases were sentenced within the guidelines.[15] By 2010 the number of production cases sentenced within the guidelines dropped to 56.8%.[16] By 2016 (most recent data available), the rate of offenders convicted of production charges that were sentenced within the guidelines dropped to 50.4%, with the average sentence coming in at 252 months.[17] Of the offenders convicted of production offenses, 38.1% received below range sentences, which did not include those receiving departure for substantial assistance.[18]

The child pornography guidelines have been the subject of intense scrutiny leading to a criticism of their application by district courts. Much of the criticism surrounds distribution cases as they are more prevalent. *However, the implications apply to production charges as well.* Judges across the country have been critical of the guidelines in child pornography cases, especially the fact that the increase in the guidelines are based on congressional directives as opposed to empirical evidence.[19]In fiscal year 2011 in production of child pornography cases

---

[14] Id.

[15] Id.

[16] Id.

[17] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190102_Sex-Offense-Mand-Min.pdf

[18] Id.

[19] See also *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop §2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress")

the average guideline minimum was 291 months, despite the fact that the average sentence

imposed was 274 months.[20] The fact that courts are increasingly sentencing below the minimum

applicable guideline range was stated very well by the sentencing commission:

> Thus, the growing gap in the difference between the average
> guideline minimums and average sentences imposed in fiscal
> years 2010 and 2011 is explained by the increased *rate* of below
> range sentences rather than by an increased *extent* of departures
> and variances.[21]

The Sentencing Commission is an agency like any other agency. The Commission's

guidelines lack the force of law, as the U.S. Supreme Court held in *Booker* that courts are no

longer bound to rigidly follow the Guidelines. But, in light of the Commission's relative

expertise, courts must take the Guidelines into account when sentencing. This deference to the

Guidelines is not absolute or even controlling; rather, like judicial review of any agency

determination, "[t]he weight of such a judgment in a particular case will depend upon the

thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency

with earlier and later pronouncements, and all those factors to which give it power to persuade, if

lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see Kimbrough v.*

*United States,* 552 U.S. 85 at 109, 128 S.Ct. 558 (citing the crack cocaine Guidelines as an

example of Guidelines that "do not exemplify the Commission's exercise of its characteristic

institutional role"). On a case-by-case basis, courts are to consider the "specialized experience

and broader investigations and information available to the agency" as it compares to their own

---

[20] United States Sentencing Commission, *Federal Child Pornography, Full Report to Congress,*
December 2012, at 257, available at http://www.ussc.gov/sites/default/files/pdf/news/congressional-
testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-
offenses/Full_Report_to_Congress.pdf

[21] Id

technical or other expertise at sentencing and, on that basis, determine the weight owed to the Commission's Guidelines. *United States v. Mead Corp.,* 533 U.S. 218, 234, (2001)(citing *Skidmore,* 323 U.S. at 139, 65 S. Ct. 161).

In keeping with the principles in *Kimbrough*, the Supreme Court held that it was not an abuse of discretion for a district court to conclude that the Guideline's treatment of crack cocaine convictions typically yields a sentence greater than necessary to achieve the goals of §3553(a), because those Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109-110, 128 S. Ct. 558. Much like *Kimbrough*, the guidelines and enhancements found in §2G2.1 and 2G2.2 do not reflect the empirical data and findings of the Sentencing Commission, but instead reflect the history of congressional mandates. It has been clearly established by the Sentencing Commission's report to Congress that on average district courts across the United States are sentencing below the minimum recommended guidelines in child pornography production cases. Therefore, the guidelines should be given minimal consideration in determining the appropriate sentence in this case.

### The Government is asking this Court to sentence Richard extremely above sentences given to Murders, Kidnappers, Hostage Takers, and those Physically Abusing Children. Such a request is unjust.

After review of the United States Sentencing Commissions Fiscal Year 2018 third quarterly data report, it is clear that the government wants to punish Richard more severely than those offenders punished for federal murder, kidnapping, hostage taking, and those physically abusing children hands-on.[22] According to this report (Table 6) and after reviewing 50,928 (N) cases, the following are the mean and median sentencing for the above offenses.

---

[22] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_3rd_FY18.pdf.

| OFFENSE | MEAN | MEDIAN | N (Cases of this type Reviewed) |
|---|---|---|---|
| Murder | 300 | 300 | 49 |
| Kidnap/Hostage Taking | 150 | 120 | 49 |
| Sexual Abuse | 135 | 120 | 457 |

The government is requesting this Court sentence Richard to 60 months over the mean/median sentence given to those convicted of federal murder. This request does not comport with the notions of just sentencing.

**b. Evaluation of the case under the guidelines of 18 U.S.C. §3553.**

18 U.S.C. §3553(a) provides a list of factors to be reviewed regarding sentencing an individual. The following factors help the Court to determine a balanced sentence: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed'; the kinds of sentences available"; "the kinds of sentence and the sentencing range"; "any pertinent policy statement"; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and "the need to provide restitution to any victims of the offense."

**i. Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

The first factor under 18 U.S.C. §3553(a) is "the nature and circumstances of the offense and the history and characteristics of the defendant." Richard recognizes the seriousness of the offenses to which he is pleading guilty to. In referencing the nature and circumstances of the offense, Richard in no way is minimizing the impact his conduct has had on the victims of this

case. However, the Third Circuit has offered an important caution when considering child

pornography offense conduct:

> It has often been stated that child pornography related offenses are
> very serious crimes that have a terrible impact on real victims. No
> one could sincerely disagree with that statement, and the seriousness
> of the crimes is reflected in the penalties that Congress has prescribed
> as well as in the Guidelines that are promulgated by the Sentencing
> Commission. However, revulsion over these crimes cannot blind us as
> jurists to the individual circumstances of the offenders who commit them.

*United States v. Olhovsky, 562 F.3d 530, 552 (3rd Cir. 2009).* There are several factors present

in this case that many courts have found to be strongly mitigating.

As noted earlier and in Dr. Connors assessment, this "early exposure to sexual

molestation and an introduction to pornographic material at such a young age was problematic in

his neurological development. "Youth is more than a chronological fact. It's a time and condition

of life when a person may be most susceptible to influence and to psychological damage." *Gall*

*v. United States*, 552 U.S. 38, 58 (2007), quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115

(1982). Richard was 8 years old when he first saw adult pornography and 12 years old when he

first saw child pornography which, at the time, involved girls similar in age to his own. "There is

thus a fundamental difference between [the defendant] whose conduct and resultant addiction

began during adolescence." *United States v. Stern*, 590 F. Supp. 2d 945, 952-953 (2008).  The

Court also stated that "there is a difference in culpability between one who *starts viewing*

pornography *as an adult* and one who *does not stop viewing* such material *[as an adolescent]*."

*Id*. at 954. The Court found Stern's age at the time he began his use, "weighs heavily in favor of

a deviation under 3553(a)" before imposing a "significant sentence" of 12 months 1 day. *Id*. at

953.

Struggling with this addiction for much of his formative years, Richard has still led a very productive life: A college graduate, gainfully employed, attaining leadership positions; a small but supportive family that remains by his side, including a young daughter who stands to be adversely affected by any sentence imposed. If given an opportunity, Richard can still go on to do much good. The last 29 months, while extremely painful to be away from his family, has provided a form of sobriety allowing Richard to climb from the hole he dug for himself and emerge no longer afraid to ask for help. No longer clouded, his focus is committed to being a better person so that he can be the best Son, Husband, Father, and Friend, enjoying a life that's no longer plagued with such demons.

Richard understands that his deviant behavior has harmed young girls and sincerely regrets the effects that these young girls will live with the rest of their lives. He is deeply remorseful that he harmed young girls, as well as his own family. He desperately wishes to show his daughter that he is more than these actions. It is a motivating force to ensure he never again jeopardizes being a part of her life and hopes the Court will take this into consideration when fashioning its sentence.

### ii. The Need for the Sentence Imposed

The Court looks also to "the need for the sentence imposed" and in doing so, evaluating the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §3553(a)(2). The purpose of Federal sentencing under 3553(a)(2) asks the Court to consider retribution, deterrence, incapacitation, and rehabilitation in

determining an appropriate sentence, thoughtfully considering the goals of criminal punishment.

See *United States v. Cole*, 622 F.Supp.2d 632 (2008). And as explained by the Third Circuit with

respect to child pornography sentences in particular:

> The hideous nature of an offender's conduct must not drive us to forget
> that it is not *severe* punishment that promotes respect for the law, it is
> *appropriate* punishment. Although there are clearly times when anything
> less than severe punishment undermines respect for the law, it is just as
> certain that unduly severe punishment can negatively affect the public's
> attitude toward the law and toward the criminal justice system. It is no
> doubt partly for that reason that jurists have referred to the responsibility
> of sentencing as "daunting." The power and responsibility of a sentencing
> court is, indeed, nothing short of "daunting." It requires a careful balancing
> of societal and individual needs, and an ability to determine a sentence based
> on dispassionate analysis of those often-competing concerns.

*United States v. Olhovsky*, 562 F.3d 530, 551-52 (3rd Cir. 2009).

Richard accepts responsibility and acknowledges the seriousness of the offense. He has

shown this by accepting a plea deal to spare the victims and their families from a trial and having

to testify. Thus far, Richard has been solemnly reflecting on the consequences of his actions

during his pre-sentencing incarceration and knows that he will have a significant amount of time

to further reflect.

Dr. Connor found him to pose a low-risk of recidivism. (Dr. Connor's Eval., p.9-10)

While the suggested course of community-based treatment combined with probation is no longer

an option in this case, many courts found in favor of "a below guidelines sentence [as]

appropriate in part because of the defendant's 'low risk of recidivism'." See *United States v.

Smith*, 275 Fed Appx 184, 187 (2008); *United States v. Martin*, 520 F.3d 87, 90 (2008); and

*United States v. Cherry*, 487 F.3d 366 (2007) (applying a 43% downward variance citing the

defendant poses a low risk).

While those who have engaged in this criminal behavior in the past are always

susceptible to it in the future, when defendants like Richard realize that their conduct "is not

anonymous, that it carries substantial penalties, and that even simply viewing it does substantial

harm to children, first-time offenders with no previous history of criminal or abusive conduct are

unlikely to repeat." *Stern*, 590 F.Supp. 2d at 958, quoting *United States v. Ontiveros*, 2008 U.S. Dist. LEXIS 58774. There is no suggestion that Richard would be more fully rehabilitated within the prison system. Indeed, there is great reason to think that Richard's rehabilitation might be negatively impacted by an excessively long prison stay.

It is also must be noted that scientific studies regarding deterrence suggest that it is the *fact* of a sentence, not its length, that has a deterrent impact.[23] This would seem particularly true in the case of offenders, like Richard, who are usually first-time offenders who have never been to prison before, and who feel punished not just by incarceration but also by the social embarrassment, the ongoing label resulting from having to register as a sex offender, and the continuing intrusion into their lives created by the supervised release which follows any term of imprisonment.

One of the goals of sentencing remains the rehabilitation of convicts. While the Probation Department suggests Richard participate in treatment in the BOP and encourages the Court to impose lengthy sentences to "ensure" its "completion," this is not the "most effective manner". What the PSR proposed sentence fails to recognize is that ***BOP sex offender treatment programs are confined to the last approximately 18-27 months of an offenders' sentence.*** *"*Inmates are prioritized for placement in programs based on their projected release date. A prisoner who has a shorter sentence…will be moved to the top of the waiting list." Therefore, Richard being low-risk does not qualify for the intensive program and may not receive treatment at all in the BOP. In *United States v. D.W.* a moderate to high-risk contact offender was sentenced to 15 years after experts testified at sentencing: "He is incarcerated for, let's say, another 10 years, what's going to happen? He's going to be in prison most of the time ***not receiving treatment***. He's going to have atrophy of his adaptive skills…negatively affecting any prospects of successful treatment upon release." 198 F. Supp.3d 18, 114 (2016).

---

[23] Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623,653 (2005)

A licensed medical professional has premised his clinical opinion of Richard's low-risk to recidivate, "*provided he is in treatment*" and the NCIA report at 44 notes "*studies support sex offender treatment… on probation* as opposed to treatment in prison, *is more effective* in reducing… recidivism." (Dr. Connor's Eval., p.9). Richard could receive proper, effective treatment (made mandatory by this Court) for a fraction of that amount it would cost to keep him incarcerated. After all, Richard's case is not a matter of if, but when he reenters society.

### iii.   The Kinds of Sentences Available

Under 18 U.S.C. §3553(a)(3), the Court should look at the types of sentences available in the case. In this case a sentence of imprisonment is required. However, a sentence above the mandatory minimum is not. In this Court's jurisdiction, other similar offenders as well as repeat offenders have receive sentences of less than 15 years. (see US Vs Norris-10 years; Stamper-10 years; Cusimano-5 years).

*** Add recent cases in that court/prosecutor

### i.   The Sentencing Guidelines and Any Pertinent Policy Statement

The Court should review the sentencing range that could be applied in the case under 18 U.S.C. §3553(a)(4). The next factor under 18 U.S.C. §3553(a) is to review relevant policy statements from the Sentencing Commission. "Sentencing for the exploitation of children under the guidelines is quite different than sentencing for other offenses.  In many cases the guidelines' recommendation for cases involving child pornography are 'illogical'." *United States v. Hanson*, 561 F.Supp. 2d 1004, 1011 (2008). The United States Sentencing Commission has voiced concerns with the current guidelines' ability to reflect varying degrees of culpability given the impact of recent technology changes. Issuing lengthy reports in 2009, 2012 and 2019, the Commission continues to observe that "all child pornography offenses are extremely serious", but that "revisions are needed to more fully differentiate among offenders." Absent these

revisions, the Commission argues that "*there is no real basis for applying the current sentencing guidelines* (US Sent. Comm'n 2012 report at 331) and criticizes the "lack of proportionality in sentence length compared to typical sentences for many 'contact' offenders." *Id*. at 13.

### ii.    The Need to Avoid Unwarranted Sentencing Disparities

The Court should review similar cases and sentences as to avoid sentencing disparities as a factor under 18 U.S.C. §3553(a). "Congress and the Commission recognized that there are **two distinct types of sentencing disparity.** The first, is the disparity found when two defendants who commit the same crime in identical circumstances receive different sentences. The second, exists when the same sentence is imposed on two people whose crimes or circumstances are significantly different." *United States v. Williams*, 78 F. Supp.2d 189, 190 (1999).

The minimum 15 year sentence for Mr. DeVito is in direct conflict with each of these two types of disparity. First, the most similarly situated defendant in the Southern District of Ohio is US v. Lowry 071715 OHSDC, 1:15-cr-043 (2015) (attached) *who "victimized **at least 25 minors via online solicitation*" but in addition to soliciting nude photos, presented aggravating circumstances by offering to pay said minors with money and/or drugs to meet and engage in 'actual sexual contact'.[24] While charged with 6 counts of Production and 1 Coercion count, Lowry was allowed to plea to the lesser count (*dismissing all Production counts*), which resulted in a sentencing range of 120-240 months and ultimately a 144 month sentence. *Three full years less than Richard's mandatory minimum for arguably more severe conduct by attempting to meet his victims.*

---

[24] Noting the Sentencing Commission states [production offenses] involve actual or intended sexual contact with a victim. See US Sent. Comm Mand. Min. Penalties in The Fed. Crim. Just. Sys. 295 (Oct, 2011).

Second, a significantly different case in the Southern District of Ohio is United States v. Damron (2017) who *had 'actual sexual contact'* with his 4 year old step-daughter, personally took photos of his conduct and distributed them to other adults online for them to respond in kind. For this conduct, he received an 11(C)(1)(c) plea offer to the 15 year mandatory minimum from this same prosecution, ignoring the fact that Damron has a prior juvenile sex offense, and therefore was a repeat sex offender, that committed his crime while being required to register as such until 7-7-2020. (see §2260A).

### iii. The Need to Provide Restitution to Victims of the Offense

Finally, 18 U.S.C. §3553(a)(7) addresses the potential for restitution, if needed. On December 20th 2018, restitution was introduced in the final version of the PSR-victim impact. Defense concedes that as Probation correctly notes, Richard agreed to pay restitution in paragraph 8 of the Plea Agreement, and that the plea penalties listed the potential for possible restitution under §§2248, 2259. *or 3663A*.

### c. If the Sentencing Guidelines and PSIR are applied, then it must be appropriately and fairly applied.
#### i. 4B1.5 – Repeat and Dangerous Sex Offender - *5 points*

The Sixth Circuit Appellate Court held that "4B1.5(b)(1) was directed towards *repeat offenders*." As noted in the PSIR, Richard has a criminal history of 0 and cannot by definition be a *repeat offender*. See *United States v. Brattain*, 539 F.3d 445 (2008); *United States v. Bastian*, 603 F.3d 460 (2010). Lastly, "the Sentencing Commission promulgated the repeat and dangerous sex offender guideline precisely to address the problem of *recidivist sex offenders." United States v. Poynter*, 495 F.3d 349 (2007).

### ii. 3B1.4 – Using a Minor to Commit a Crime – *2 points*

The Sixth Circuit Appellate Court held that "the District Court properly framed the application of 3B1.4 for the defendants use of the minor to operate the camera and *not* for his victimization of them appearing in pornographic photos." *United States v. Martin*, 291 Fed. Appx. 765 (2008). In addition, the Government concedes in their 10-4-18 response, this enhancement can be *"considered in two separate ways,"* (Govt. Resp. 10-4-18, p.2) admitting ambiguity and while neither examples of the conduct they cite apply to Richard's conduct, "where ambiguities such as this exist, the Rule of Lenity dictates that the ambiguities be resolved in favor of the defendant." *United States v. Pharis*, 176 F.3d 434 (1999).

### iii.  **2G2.1(b)(2)(A) – Commission of a Sex Act** – *2 points*

Specifically, pursuant to 18 USC § 2246(2)(c) (PSR, p.16 ¶69) the commission of a sex act is defined by the penetration . . . *of another,* and does "not apply to [a] defendant who caused [a] minor to produce home sex videos of herself masturbating as [the] defendant did not have physical contact with [the] minor." *United States v. Starr*, 486 F.Supp.2d 940 (2007). "In each of the sexual acts set forth in 18 USC § 2246, the statute *requires skin to skin contact* or touching of the body parts between the defendant and victim." *United States v. Hayward*, 359 F.3d 631 (2003). "Section 2246 defines sexual act as one of several *specific forms of physical contact* with either the victims or the defendant's genitalia." *United States v. Cochran*, 510 F.Supp.2d 470 (2007).

### iv.  **3D1.4 – Multiple Count Adjustment (Pseudo Counts)** - *5 points*

The Sixth Circuit Appellate Court has held in the creation of pseudo counts, "if [count 1] captured a broader time period beyond [August 6th to August 11th] there would be no question the disputed enhancement applies." *United States v. Schock*, 862 F.3d 563 (2017). As such, none of the pseudo count "sexual conduct occurred *during the commission of the conviction offense*"

and the pseudo counts "involved different victims, discrete, incidents, occurred at different times and were carried out by different means" and therefore are not relevant conduct. *United States v. Weiner*, 518 Fed. Appx. 358 (2013).

The Government relies on the stipulation of facts under § 1B1.2(c), however section "1B1.2 is not material in determining…relevant conduct. *1B1.3 determines the range of conduct that is relevant*." *United States v. Carrozza*, 4 F.3d 70 (1993). Section §1B1.2 commentary states "this section provides the basic rules for determining the guidelines applicable . . . and in the case of a plea agreement containing *a stipulation that specifically established a more serious offense* . . . the stipulated offense [guideline] is to be used." (App. Note 1).

**There is not a <u>more serious</u> offense listed in the stipulation.** Similarly, §1B1.2 Application Note 3 states "subsection (c) . . . addresses circumstances in which the provisions of Chapter 3 Part D (Multiple Counts) *are to be applied*." The PSIR states though "offenses involving the sexual exploitation of minors are explicitly excluded from § 3D1.2(d)'s multiple count grouping rule." (Govt. Resp. 10-4-18, p.3). The Court is still provided the ultimate decision making power and is not restricted to the PSIR or stipulations because § 6B1.4(d) "makes clear that the Court is not obliged to accept the stipulation."

> *v.* **In regards to the "factual" detail of the alleged 'pseudo victims,' there are many unknowns or ambiguities that seem to *have been resolved as certainties in favor of the Government.***

In each entry, the victims "*sent DeVito images*," implying Richard "*received*" the images. However, a production count was applied. Note that 'Minor Victim AG & AH' who also "*sent DeVito images*" did not result in a production count because Ohio FBI "agents were unable to determine if the defendant *produced* these images or *received* them." (PSR, p.13, ¶453). Also note all the images at issue were *"taken by the minors."* (PSR, p.7, ¶19).

26

In *United States v. Broxmeyer*, the Appellate Court found,

> Broxmeyer persuaded, induced, or enticed [the minor] to send sexually explicit pictures of herself to him…the evidence was insufficient as a matter of law to…find Broxmeyer had *solicited the production of, rather than simply received the images at issue*…as we have explained §2251(a) applies to the Production of Child Pornography only…In our analysis in Sirois 87 F.3d 34 (1996), we held that a defendant can be held to have 'used a minor' to produce Child Pornography if the minor serves as the subject of the illicit photos *taken by the defendant.*

616 F.3d 120 (2010). Here the photos were *taken by the [minor]* not the defendant, a 2251(a) conviction cannot be premised on the fact that a defendant persuaded, induced, or enticed the [minor] to send him her pornographic self portraits. In *United States v. Pattee*, the Appellate Court determined that "production does not cover one who possesses copies of *child pornography created by someone else*," and "it does not follow . . . that a pornographic image that was created by someone else is tantamount to producing child pornography." 820 F.3d 496 (2016). Absent these proposed enhancements, Richard's offense level after acceptance would be a 35, resulting in a guideline range of 168-210 months.

## <u>CONCLUSION</u>

We respectfully submit this memorandum on behalf of Richard DeVito to provide the Court with a fuller account. He has voluntarily entered a guilty plea to a single charge of Production of Child Pornography. Richard's guilty plea illustrates an individual who is truly ashamed and embarrassed of his conduct, but also of one who wholeheartedly accepts responsibility for his behavior. Richard is a first-time offender who with continued counseling and stringent supervised release conditions is not likely to become a repeat offender. Further, Richard must register as a sex offender in any community where he lives and works. Thus, a sentence below the advisory Guidelines should not be interpreted as leniency. Richard will live

with the stigma of his conviction for many years to come; a stigma that will dictate where he can live, work, or recreate.

Punishment must, of course, be imposed, but the sentence here should reflect the truly unique circumstances of this offense. Finally, the sentence should provide the Court with tools – and Richard with incentives – to continue on the path to wellness. Richard understands that part of taking responsibility for his conduct includes going to federal prison for a significant period of time, and he is ready to do so. An appropriate sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) is mandated. Richard respectfully submits that a downward variance is also warranted in this case. Richard, as a first-time offender, should not receive a greater sentence than the national average where 74% of the defendants perpetrated sexual offenses on their victims as part of the child pornography production. An appropriate and just sentence in this matter sits at 180 months with an appropriate period of supervised release, which is also a "substantial restriction of freedom," *Gall v. United States*, (2007)[25] – all of which is more than sufficient to constitute just and fair punishment.

**Richard respectfully asks the Court to make the following recommendations pursuant to USC §3621(b)(4)(B) and BOP Program Statement 5100.08:**

That he be incarcerated for a term of 180 months at FCI Ashland or FMC Lexington given the proximity to his family and medical history (PSR, p.48).

That the sentence of 180 months incorporate the *full 12 months* offered by the Second Chance Act to better prepare him for release after such a lengthy sentence … broken down (less "Good Conduct Time") as:

---

[25] This is especially true in the case of a child pornography offender, because the conditions imposed on such offenders are usually significantly more intrusive and demanding. In May of 2011, the Administrative Office of United States Courts issued national policy to federal probation officers outlining appropriate procedures in the community supervision of child pornography offenders. In addition, child pornography offenders must register as sex offenders and carry that public brand.

- 29 months (appx.) time served
- 112 months imprisonment
- 6 months half - way house pursuant to 18 USC §3624(c)(1)
- 6 months home confinement pursuant to 18 USC §3624(c)(2)

To be followed by 5 years supervised release.

Given Richard should have less than 10 years remaining, he asks the Court to consider recommending a minimum security (Camp) designation and access to the Trulincs electronic (e-mail and if available, video) communication system so that he may keep in good contact with his Mom, Wife, and Daughter. Neither of which he will be afforded without this Courts recommendation.

Lastly, Richard asks the Court to request it be notified if any recommendations are not honored by the BOP because "The Bureau no longer writes courts explaining why a recommendation is not followed unless the court specifically requests such notification." *United States v. D.W.*, 198 F.Supp.3d 18 (2016).

We therefore request that a sentence of 180 months followed by supervised release for 5 years is sufficient, but not greater than necessary.

Respectfully submitted on this 24th day of April, 2019.

*/s/ Sarah Thomas Kovoor*

Sarah Thomas Kovoor (0069223)
FORD, GOLD, KOVOOR & SIMON, Ltd.
8872 East Market Street
Warren, OH 44484
P: (330) 856-6888 / F: (330) 856-7550
E: sarah.thomas.kovoor@gmail.com

*Counsel for Defendant Richard Lee DeVito*

## LIST OF EXHIBITS

A.  PSYCHOLOGICAL AND PSYCHOSEXUAL EVALUATION OF RICHARD DEVITO
    COMPLETED BY DR. ED CONNOR, PSY.D.

B.  CURRICULUM VITAE OF SENTENCING CONSULTANT ROGER PIMENTEL