**Introduction:**

For charged conduct on the internet, over a period of 5 days, the defendant is facing a 15 year mandatory minimum and possibly up to 30 years of incarceration. This crime arose from the sad confluence of untreated addiction and abuse that has caused lifelong anxiety and suffering in silence which, when paired with more recent stressful events, were key in triggering, and all but assured, his self-destruction.

In 2016, Richard DeVito, at the depths of an uncontrolled sickness and sadness, was compulsively binging on all things sexual in the virtual world. The eventual discovery of a variety of social media applications led to online communication in which sexually explicit text and images were shared… conduct better known today as "sexting." [1]

**Relevant Facts:**

During August 6th to August 11th of 2016, Mr. DeVito engaged in this type of communication by **asking** Minor Victim A to send explicit images of herself (**See Exhibit A**)[2]. DeVito never sought physical contact with the victim, a common feature in cases of this sort, and he didn't engage in other predatory behaviors that are typically present in cases of this kind, such as threatening and/or extorting the victim to engage in explicit conduct. He did, however, with an addict's self-serving delusion, willfully ignore that there was a young person at the other end of the connection, hundreds of miles away, who could be damaged by these exchanges.

Accepting "that a human being is always more than the worst thing he or she has ever done," (US Vs Hawkins 380 F. Supp. 2d 143 (2005) Mr. DeVito submits the following comprehensive memorandum in support that the mandatory minimum sentence is more than sufficient when weighed against the pertinent 3553 factors.

**Personal Background:**

    **A) Childhood:**

Richard was born on February 15th 1984 in Cincinnati to William, a Manager for an automotive manufacturer, and Cheryl, a Licensed Optician. While in many ways Richard was afforded a normal, middle-class upbringing, his formative years were plagued with emotional dysfunction. As noted in Dr. Connors evaluation:

---

[1] Merriam-Webster defines sexting as "the sending of sexually explicit messages or images by cell phone." m-w. com

[2] It's important to note that while the Government and Probation have used many terms synonymously to describe the conduct in this case (i.e., persuaded, instructed, directed) the affidavit states the conduct as **asking**. US Vs Gagliardi 506 F.3d 140 (2007) differentiates between **persuading** which is criminalized and **asking** which is not. **"Asking** is not a Federal Crime." (See US Vs Spencer 060313 OHSDC 2:13-mj-12 (2013)).

> "His parents fought so often . . . there were incidents of domestic violence . . . so pronounced that police were summoned to the home."

Subsequently, Richard began struggling with anxiety at a young age. To offer an example, the first book Richard read with his family during his incarceration describes a household that is very fitting and provides insight to his environment and anxiety growing up:

> "You don't know one minute to the next what will happen. You spend a great deal of energy avoiding conflict or chaos. Even when everything is fine, you can't let your guard down because you remember when everybody was screaming at each other. Or worse, you remember when nobody was talking, and nobody would tell you why. You're waiting for the next bad thing to happen."

Chronic anxiety became a natural part of Richard's childhood that caused emotional wear and tear on his body and prompted him to shy away from what one might call normal social interaction at this age.

Given the frequently solitary nature of Richard's upbringing, he took to playing video games quite often. As he found it difficult to engage socially, they provided an escape from the day-to-day.

This hobby remained prominent in Richard's life. However, at the age of eight, he was molested by his half-brother who also introduced Richard to pornography. As a result of these experiences, Richard began to have an abnormal focus on seeking out sexual material.

### B) Adolescence:

Continuing from this molestation and into adolescence, Richard had an active interest in pornography and sexuality in general. Dr. Connor elaborates:

> "He learned at a very young age that when he turned to pornography, it decreases his agitation and stress levels, which became his drug of choice."

This portion of Richard's life became divided. The emotional detachment he learned put him in a position of needing to be the 'perfect' kid: On the outside, a person who attempted to please everyone to avoid conflict, who didn't experiment with drugs, alcohol, or tobacco because it was the 'right' thing to do... On the inside, a highly emotional person who second guessed every action, who needed some sort of retreat and, unfortunately, would find it in a "drug" that could be just as destructive, if not more, than any substance . . . and, as Richard would find, was far more accessible.

Richard had a few close friends that he enjoyed spending time with, but the majority of his young life was spent indoors. With the eventual discovery of the internet, he would spend, at times, hours isolating himself from his potentially volatile surroundings:

> "His high level of anxiety and avoidant personality style exacerbate his tendency to withdraw socially and interpersonally from others into a mild but chronic state of depression. At times, his depression becomes even more pronounced and he "flees into cyberspace" as a means of dealing with depression and anxiety. Richard *desperately wants to have long-lasting intimate relationships*, but his social awkwardness, high level of anxiety, and depression compromise his ability to do so. Subsequently, "cyberspace" is his escape from himself." **(See Exhibit B at 7).**

By the end of his preteen years, Richard was proficient in both his use of the internet and the internet's ability to provide copious amounts of pornography on demand for his sexual gratification.

Finally, at the age of twelve, Richard reached a culmination of problematic behavior. After learning how to "chat" with others on the internet, Richard viewed his first underage pornography which, at the time, depicted victims similar in age to himself:

> "Given his age at the time, he was able to identify with the child pornography images. This is considered to be his "Kodak moment" whereby his initial exposure to sexual arousal was quite intense and stimulating. Oftentimes it is a person's first initial sexual arousal and moment that is ingrained in their mind as to what they find sexually stimulating. As such, it appears that Richard's arousal to child pornography was one of his first sexually stimulating experiences, which persisted throughout the rest of his life." (**See Exhibit B at 4**).

Persist it did. On many occasions, though, Richard attempted to quit accessing all pornography, including child pornography. Feeling disgusted with himself, he would be able to quit for varied periods of time on his own, but left untreated, like many addicts, he would eventually relapse.

### C) Adulthood:

In his adult life Richard, on the surface, seemed to enjoy taking on the role of problem solver and caretaker. As noted by his wife, he wore it well (**see PSR at 46¶362**), and it easily allowed him to find success in the workforce that would quickly promote him into many leadership roles. **(see Exhibit C)**. While it gave him the opportunity to stay busy fixing everyone else's problems, it did not address his own issues, and led to a bad balancing act of positive and negative behavior.

Masking his emotional deficits, Richard found his way in and out of mostly long-term relationships. Hanging on past the point of an unhealthy relationship, Richard would frequently discover his partners' infidelities, and the relationship would end. Wounded, Richard would retreat emotionally, tipping the scales toward negative behavior and isolation. Richard would often find himself back in the grips of online pornography.

In 2010, Richard met his future wife, Elizabeth, and what started as innocent friendship, blossomed into a relationship that was better than he could have asked for. Independent and

strong, Elizabeth made Richard want to be a better person. She gave him purpose, drive, and, most importantly, made him happy, minimizing the anxiety and depression that trigger his pornography use.

Unfortunately, as Richard's relationship and career were building, his father's health was failing. He was diagnosed with Parkinson's Plus, Multiple Myeloma (bone marrow cancer), and a continued struggle with Diabetes. Richard found himself, in ways, becoming a parent to his parent: getting meals, feeding him, taking him to doctors, and ensuring his medication for the remaining few years of his life. When his father was hospitalized in the winter of 2012, Richard fought for his father's care almost daily, as those trusted with his care were giving up. Ultimately, Richard ordered his father be taken home, and assisted in carrying his dying father up the stairs to pass in his own bed. Seven days after Richard's birthday, his father passed away at 68 years of age.

Without the time to properly grieve, Richard walked his father's path. He began to silo himself in his job, letting his rapid success validate his actions. While on the exterior Richard portrayed the picture-perfect example of control, on the inside he was anything but. Focusing everywhere but on himself, he would work 12+ hour days, and then be 'connected' via a terminal connection, phone, and email during home hours. As his grip tightened around everything that could produce tangible results, Richard achieved multiple promotions, got married, had his first child, cared for his mother and grandmother, while also remodeling two homes, in just three years.

Beyond busy and unable to let go of the career he built for fear of failing his father now that he held the same role as an 'automotive manager,' Richard's relationship was unravelling; he was not being the best father he could be and he was rapidly burning out. As it seemed, he could no longer make anyone happy . . . including himself. Rather than properly addressing these issues, Richard began fleeing to cyberspace, his coping tool of the past. Initially innocuous, his activities became increasingly deviant. As his love life suffered, he began to frequent pornography sites and adult webcam sites. Richard could not seem to repair this connection with his wife, though looking back, Richard admits his efforts were marginal. While this disconnect deeply hurt him, his focus would once again be pulled when his grandmother's health began to fail and his mother wound up in a legal battle of her own. Managing to hold together his outward appearance, Richard's alcohol consumption and online activity increased as he was caught in a downward spiral he couldn't escape.

<u>Sickness and Offense Conduct:</u>

### A) Overview of Addiction:

"Addiction is any behavior that you have difficulty controlling and that you continue to do despite negative consequences."[3] While mainstream media pushes the view that addiction only

---

[3] I Want to Change My Life: How to Overcome Anxiety, Depression & Addiction, Steven Melemis Phd.MD.

'makes sense' when talking about substances like heroin, alcohol, or nicotine, the latest research on addictions contradicts this. One study found that, "methamphetamine and cocaine hijack the same reward-centre nerve cells that evolved to make sex compelling."[4] Just as drugs activate the 'sex' nerve cells and trigger a 'buzz' without actual sex, so can internet pornography. "Some 90 studies on internet addicts reveal the same core brain changes seen in substance addicts."[5] Only emerging as of 2014, though, are studies that isolate internet pornography addiction.

Given the private nature of the subject matter, its unknown how many people are being negatively affected by internet pornography addiction, but one poll of self-reporting adults found the number to be more than double that of addicts that use addictive substances (excluding nicotine).[6]

"The fact is that the brain's reward center doesn't know what drugs or porn are; it only registers levels of stimulation through dopamine spikes."[7] Chronic overstimulation of this reward circuitry is at the root of all addiction. Charles O' Brien M.D., chair of the DSM-5 stated:

> "The idea of a non-substance related addiction may be new to some people, but those of us who are studying the mechanisms of addiction find strong evidence . . . that addiction is a disorder of the brain reward system and it doesn't matter whether the system is repeatedly activated by gambling, or alcohol, or another substance."

Substantiating literature on internet pornography and addiction emphasizes that "pornography enters the brain like a needle, but comes out like a fish hook."[8] The addiction process itself can drive *escalation*, training our brains *with or without our conscious participation*, moving from genre to genre until porn users arrive at places they find personally disturbing or confusing.

Only recently catching the eyes of some lawmakers, in February 2018, Florida's House of Representatives took action in passing a resolution that declared pornography a public health risk.  Calling for education, research, and **policy changes** to protect its citizens, the bill cites research has:

> "Found a correlation between pornography use and mental and physical illnesses, difficulty forming and maintaining intimate relationships, unhealthy brain development and cognitive function, and deviant problematic or dangerous sexual behavior."

Meanwhile, as the Sentencing Commission repeatedly requests that Congress reviews sentencing for child pornography cases, particularly the imposition of mandatory minimums, Congress ignores the growing problem.  Refusing to act on the many attempts made by the

---

[4] Karla S Frohmader Neuroscience 166/3 (2010): 771 – 784 doi 10,1016
[5] Internet – Videogame Addiction Brain Studies www.yourbrainonporn.com
[6] Y. Goto "The Yin and Yang of Dopamine Release: A New Perspective"
[7] Pornography Addiction Survey, http://www.provenmen.org/ 2014 porn survey
[8] Your Brain on Porn by Gary Wilson

Sentencing Commission to introduce empirical data and research, which could reduce the unduly harsh sentences that are growing exponentially, destroying lives, and barring some people with *psychiatric disorders* who are *amenable to treatment* from any effective assistance to overcome their addiction. As noted in the Sentencing Commissions report, stepping up for policy change regarding Federal internet pornography crimes is "the political equivalent to stepping on to the third rail."[9]

### B) Richard's Beginning of Online Pornography Exposure:

"Most users start watching pornography by puberty, when their brains are at their peak plasticity and most vulnerable to addiction and rewiring."[10] Fueled by evolution, learning about sex is a primary task for the highly malleable adolescent's brain. It wires to sexual cues in the environment. Novel, startling, and arousing stimuli can rock an adolescent's world in a way it won't an adult's brain, proven by brain scans of young porn users in a 2014 Cambridge study.

Richard however did not stumble upon pornography. He was purposely exposed to it by his abuser, to aid in his molestation prior to entering puberty. As Richard revealed to Dr. Connor, this made him feel awkward and unsettled, *but the link was formed*.

Richard entered adolescence already knowing what to look for and was aided by the emerging *user- friendly* internet that put the world and all its dark corners at his fingertips. Combined with his personality style, Richard had plenty of 'alone time' where repeated access strengthened the connection in his brain; driving the need for new material, to light up the reward circuitry of his brain, and keeping dopamine at artificially high levels for hours simply by clicking.

### C) Richard's Pattern of Viewing Pornography:

Dr. Connor noted Richard has always desperately wanted long-lasting intimate relationships with people; but struggles with his ability to do so. As a result, Richard has been stuck in a perpetual cycle of seeking more positive behavior or 'pleasure' from interacting with real people, but when these interactions fail and his anxiety and depression take hold, Richard would succumb to his addictions and slip back to his old habits.

As Richard began growing a family of his own, it brought joy and a sense of satisfaction that all but snuffed out his addiction, but when his relationship with his wife felt as though it was failing, it sent a crack through his foundation, and he got careless.

### D) Richard's Online Communication with Strangers:

Richard slid into those old habits for the last time in 2016. Seemingly unable to maintain his real relationships with friends and family, his social life became non-existent. With a plethora of social media applications available, Richard was creating a parallel existence

---

[9] USSC report 2009 – Federal Child Pornography Offenses: The History of Child Pornography at 320-31
[10] Your Brain on Porn by Gary Wilson pg. 65

online. Initially seeking friendships, Richard would download various apps, but finding they were mostly meant as dating apps, he would delete them. After all, he was not trying to cheat on his wife or be with anyone else physically.

Continuing to slide, one of Richard's peers introduced him to an adult webcam site that blended communication and nudity. An interactive pornography of sorts, Richard started to frequent the site, still initiating friendly conversations, but they could quickly become explicit. Allowing him to avoid facing up to his inability to sustain emotional connection and intimacy in real life…he attempted to fill that void on the internet.

**E) Richard's Online Communication with the Minor(s):**

Richard was becoming increasingly careless and his behavior reckless. Finding two specific applications like YouTube, he would watch videos being posted and 'mass' message people indiscriminately with a 'cut and paste' option. Speaking with anyone that would respond.

In July 2016, Minor Victim A had responded to Richard's message. As noted in the PSR, "initially the conversations were innocuous; however, they eventually turned sexual in nature." **(See PSR at 5 ¶13).** As charged, on August 6th of 2016, Richard, at rock bottom, made the inexcusable choice to involve Minor Victim A in these explicit exchanges. Exposing her to his sickness, Richard was now no better than his own abuser… and deeply regrets losing control to the point another victim was created.

**<u>Assessment and Recovery:</u>**

**A) Experts:**

Dr. Ed Connor, a forensic psychologist who specializes in psychosexual disorders, evaluated Richard during a six-hour interview on June 6th, 2017. Dr. Connor took a detailed history of Richard's personal and family background as part of the interview and provided an expert report.

**B) Assessment and Diagnosis:**

Dr. Connor performed multiple tests to assess Richard's mental condition and sexual tendencies and found that "Richard appears to be relatively **"*low-risk*"** to reoffend by accessing child pornography if he is **"*properly treated.*"** *"His risks can be managed"* and *"they are manageable in the community* via *Probation and Treatment."* Dr. Connor also gave his professional opinion that "Richard holds himself accountable for his behavior… felt quite disgusted with himself … is an intelligent man … likely to comply with the Court…acknowledges the problem and appears to be motivated for treatment.

What this Court has not seen is the struggle Richard has experienced as he tried to obtain rehabilitative treatment while incarcerated … After Richard's bond was denied, counsel refused to argue for out-patient treatment (with Connor and Associates) like many similarly situated defendants receive. Accepting this, Richard worked with his wife over the phone to

find the Village Network, an adult in-patient facility for sex offender treatment in Wooster, Ohio.  Again, counsel refused (based on personal opinion) to propose this option to the court, even after evaluation yielded the low-risk determination to support such an option. Finally, Richard's family contacted Dr. Bassman of Cincinnati to make special visits to Butler County Jail, but on arrival he was not permitted to see Mr. DeVito.

While the Government continues to ignore that DeVito could be anything except a monster.[11] There has been no evidence or indication Richard has ever tried to meet or abuse a minor, and to the contrary, clinical opinion marks him as "an appropriate candidate for specialized treatment *in a community setting*." Stating Richard's psychiatric conditions need to be treated as "a psychiatric disorder," Richard has admitted many times over his conduct was wrong, he made a mistake, and *he wants help*… while the Government portrays him as the worst of the worst, undeserving of a second chance.

Accordingly, Richard acknowledges that while "federal alternatives to incarceration have now began to sprout on their own, upon the initiative of individual districts." (US Vs. Leitch 11-CR-00609 (2013)) and that attorneys have "argued for a term of in-patient rehabilitation [stating] treatment is a better option than incarceration." (US Vs Hicks (2017))., this will not be the case for him. Richard will wait at least the next decade to receive any treatment, let alone quality treatment.

Attempting to help himself, though, Richard has taken to reading many "self-help" books on related topics (i.e., addiction, pornography addiction, depression, anxiety, PTSD, etc.) and engages in "group discussion" with both his family via the phone and a small group of inmates throughout his incarceration…demonstrating his commitment to be better.

**The Plea:**

On June 19th, 2018, for what was scheduled to be a motion hearing, the defendant appeared before this Court and pled guilty to count one of the two count indictment, forced to forgo his motions.

Mr. DeVito raised a constitutional challenge to the procedures by which evidence was obtained, **(see Motions to Suppress and Confront Accuser)** and other challenges **(see Motion to Dismiss)** However, without notice, and just hours before, the Government shifted its focus from motion response, to a renewed threat of a superseding indictment based on information that was known previously. A presumptively retaliatory response to the defendant's request for a hearing on these motions. ("threatening punitive action in order to punish the defendant for standing on his legal rights." see US Vs Ogbazion 3:15-CR-104 (2017)).

---

[11] https://www.wcpo.com/news/local-news/hamilton-county/cincinnati/how-online-predators-coax-children-into-sending-photos-to-strangers

Here the Government informed Richard's counsel and his family that if he had this hearing and would not plea to the agreement that the Government had already rescinded on the record at the April 13th 2018 conference; they would make sure that Richard left prison in a coffin. **(See Exhibit G—Character Letters from Cheryl and Elizabeth recapping).**

For fear of retaliation and the unfounded accusation that he lacks remorse for his actions, Richard abandoned his quest for a "fair and appropriate" sentence and subsequently entered his plea of guilty to Production of Child Pornography.

**<u>Argument:</u>**

"Under our current laws with the advent and prevalence of sexting and virtual behavior, many, many citizens are engaging in behavior that could make them felons … while law constantly trails crime, in the context of sexual behavior and technology the problem is particularly clear – the old laws will not do." (US Vs Taylor 640 F.3d 255 (2011)). While Richard's conduct was inappropriate, it was also unimaginable when the Production statute was put into effect in 1977. "Regardless of the appropriateness of engaging in such virtual conversations [there are] doubts that this behavior is the land that Congress was targeting when it passed child pornography laws." (US Vs Nash 1 F.Supp. 3d 1240 (2014)).

A defendant "who in the course of his activities, associates with [minors] who engage in sexually explicit conduct as defined in 18 USC § 2256(2)(E) 'lascivious exhibition of the genitals or pubic area,' *but who neither has physical contact with them, nor photographs them . . . this offender should <u>not</u> be sentenced under § 2G2.1* (production guideline)." (US Vs Chapman 60 F.3d 894 (1995)).

The Government's application of the Production statute where "the defendant intended to induce the *minor to create and send* sexually explicit images (a circumstance that . . . occurs in virtually all sexting cases) . . . is already accounted for by the 7-point enhancement under USSG § 2G3.1(b)(1)(E)" (See US Vs Weiner 1:17-cr-00307 (2017)), and was strictly punitive. They "imposed the more severe charge without engaging [the defendant] in any of the 'give and take' compromise through which [the defendant] could negotiate a concession or benefit" (See Bordenkircher Vs Hayes 434 US 357 (1978)). [Note DeVito was not charged with a § 2G3.1 offense (§ 1470 with a 0-10 year statutory range) or able to plea to his lesser § 2G2.2 offense (§ 2252A with a 0-20 statutory range).]

For the offense of Producing child pornography, Congress opened a considerable range of 15 to 30 years. *This statutory range calls for calibration according to the severity of the offense*.

The assumption that any offense other than the most innocuous deserves a sentence above the mandatory minimum, runs counter to the Sentencing Commissions approach. "For many child pornography offenses, the commission sets the base offense level below the mandatory minimum" (knowing that the usual enhancements will raise the guideline range

to the minimum…See US Sent'g Comm'n, The History of the Child Pornography Guidelines 2009 Pg 45-46).

Accordingly, "the mandatory minimum is not reserved only for the minimal offense, but includes a considerable range of bad conduct that certainly includes [the defendants] offense of conviction" [which] "amounts to a single act of sexting." (See US Vs Broxmeyer 699 F.3d 265 (2012)).

### A) Applicability of the Statute:

Sister Circuit Appellate Courts have characterized 18 USC § 2251 as Congress's endeavor "to criminalize the enticement of a minor to engage in *sexual activity*" **(See Motion to Dismiss).** This circuit has treated "*sexual activity*" as a synonym for "sexual acts" (US Vs Lee 502 F.3d 447 (2007)). "Which Congress, as we know, defined "sexual act" as excluding sex acts that do not involve physical contact between two people" (e.g., the defendant and victim) (See US Vs Taylor 640 F.3d 255 (2011)).

Furthering this notion, the Sentencing Commission's recent report to Congress reiterated that they "treated child pornography production offenses as 'sexual abuse' offenses" stating "such bifurcation is appropriate because . . . *production offenses involve actual or intended sexual contact with a victim.*" (see US Sent'g Comm'n on Fed Crim. Jus. Sys. 2011) (see also 2019 report on Mandatory Minimums of Sex Offenses – same definition).

Richard's actions, while deplorable, do not amount to *actual or intended sexual contact* with a minor. (See US Vs Reynolds 720 F.3d 665 (2012) - in which the court held it "*does not consider sexual online chat with an underage female to constitute an attempt to engage in sexual contact*, (an attempt requires a 'substantial step'.) (see also US Vs Goetzke 494 F.3d 1231 (2007) noting "initiating conversation **and** *proposing a rendezvous is a sufficient substantial step.*"; US Vs Meek 366 F.3d 705 (2004) "*online sexual dialogue* **and** *travel to meet at a local school is a sufficient substantial step.*"; US Vs Brand 467 F.3d 179 (2006) "*increasingly sexually explicit conversations arranging meeting* **and** *travel to prearranged meeting place is sufficient evidence of substantial step.*"

### Sentencing Law:

### A) Discretion of Sentencing Judges in Determining Appropriate Punishment:

In US Vs Booker 543 US 220 125 S. Ct. 738 160 L.ed. 2d 621 (2005) The Supreme Court held that the sentencing guidelines are advisory, *not mandatory*, and that District Courts have discretion in fashioning a sentence under 3553(a). The later cases Rita, Gall, and Kimbrough, as well as numerous Sixth Circuit decisions confirm that District Courts have flexibility and discretion to fashion an appropriate sentence based on individual facts of a given case (see US Vs Marshall 870 F.Supp. 2d 489 (2012)).

In this case however, the mandatory minimum sentencing scheme of section 2251(a) is in direct conflict with the mandate under section 3553(a) to fashion an appropriate sentence. It's well

understood that defendants who are sentenced under statutes with mandatory minimums receive higher sentences than they would have, had they been sentenced under a statute that did not have a mandatory minimum.

***"An individual with a low-risk of recidivism does not need a lengthy incarceration,"*** . . . (US Vs Marshall 870 F.Supp.2d 489 (2012). Richard, however, stands to be imprisoned at a minimum 2.5 times longer than the average Federal case and 10 times longer than the average State case for similar conduct **(see Exhibit F)** based on prosecutorial discretion and not the discretion of the sentencing Judge. As Justice Kennedy expressed:

> "Under the Federal mandatory minimum statutes, a sentence can be mitigated by a prosecutorial decision not to charge certain counts. There is debate about this, but in my view, a transfer of sentencing discretion from a Judge to an Assistant US Attorney is misguided. Often these attorneys *try in good faith to be fair* in the exercise of discretion. The policy, nonetheless, gives the decision to an assistant prosecutor not trained in the exercise of discretion and takes discretion from the trial Judge. The trial Judge is the one actor in the system most experienced with exercising discretion in a transparent, open, and reasoned way. Most of the sentencing discretion should be with the Judge, *not the prosecutor*."

More recently, "prosecutors charging decisions are frequently far removed from how Congress intended the mandatory minimums to be used." (US Vs Diaz 012813 11-cr-00821-2).

Here there was no "good faith to be fair." Quite to the contrary and against the agents suggested pertinent statue in the affidavit (2252(a)(2)), this Prosecution invoked the more punitive statute (2251(a)), and has actively sought a sentence at the statutory maximum, without ever providing the reasons why the sentencing range . . . is appropriate (see USSG § 6B1.4(a) and commentary) while also offering his other sex offense cases **with prior sex offenses** the mandatory minimum in 11(C)(1)(c) agreements. (See US Vs Damron (2017) and US Vs Cusimano 2018)).

This lack of transparency and reasoning is why Richard concedes, but would like it noted, that he did try to cooperate and reach an agreement early on. From the consent documents (signed 3-24-17) that led to the discovery of 60 potential suspects, that Richard received no credit for . . . . to Richard's attempt to negotiate a plea to his lesser charge, based on several mitigating factors . . . as well as a plea to the agent's uncharged recommendation of 2252(a)(2) **(See Exhibit D--Crouse email)** which received no response. Unlike the majority of cases that plea to a reduced charge, Richard, a first-time offender, will receive a sentence that equates him to many contact offenders and some repeat offenders, while also barring him from much needed and wanted treatment for at least the next decade.

**B) Application of Law to the Facts:**

The total offense level calculated by the Probation Department was 49 or 43 pursuant to Chapter 5 Part A. The criminal history is 0 therefore I, yielding a guideline imprisonment range of Life bound by § 5G1.1 (a) to 30 years. This draconian result for a first-time, non-contact offense was calculated as follows:

- **Base offense level of 32**
  - **4 points were added** pursuant to USSG § 2G2.1(b)(1)(A) because material involved a minor under 12 years old.
  - **2 points were added** pursuant to USSG § 2G2.1(b)(2)(A) for commission of a sex act under 18 USC § 2246(2)(c).
  - **2 points were added** pursuant to USSG § 2G2.1(b)(6) for use of a computer/misrepresentation.
  - **2 points were added** pursuant to USSG § 3B1.4 for using a minor to commit a crime.
  - **5 points were added** pursuant to USSG § 3D1.4 for multiple groups of pseudo counts.
  - **5 points were added** pursuant to USSG § 4B1.5(b)(1) for repeat and dangerous sex offenders.
  - **2 points were removed** pursuant to USSG § 3E1.1(a).
  - **1 point was removed** pursuant to USSG § 3E1.1(b).

As a result the Probation Department recommended a proposed sentence of 360 months and Lifetime supervision stating "such a sentence is consistent with the kinds of sentences established for the ***category of offense."*** While 360 months may correlate to the *offense level*, it is **NOT** a sentence consistent with similar *offense conduct*.

### C) Misleading Facts or Information:

This is a case where the sentencing guideline range should carry virtually no weight. Setting aside that the guidelines as applied in this case are more representative of a one-way ratchet, escalating Mr. DeVito's sentence to those of repeat contact offenders ... It's been repeatedly held that the guideline ranges employed by the US Sentencing Commission for child pornography-related offenses, are not based on empirical evidence, lead to irrational outcomes, and are therefore entitled less deference. Thus, they should not be accepted without significant judicial scrutiny.

**Mr. DeVito challenges many of the enhancements applied by the Probation Department:**

- **4B1.5 – Repeat and Dangerous Sex Offender** - *5 points*
  - First, the Government took no position on this enhancement at the time the PSR was issued. (See § 6A1.2(b)).

    The Government failed to take a position or object to the applicability of this enhancement again in their 10-4-18 response to defense counsel's objections,

therefore, pursuant to Fed.R.Crim. P 59(b)(2) the Government forfeited further review of this enhancement.

- The Sixth Circuit Appellate Court held that "4B1.5(b)(1) was directed towards *repeat offenders*." As Probation correctly noted, Mr. DeVito has a criminal history of 0 and cannot by definition be a *repeat offender* (see US Vs Brattain 539 F.3d 445 (2008); see also US Vs Bastian 603 F.3d 460 (2010) (same).

- Lastly, "the Sentencing Commission promulgated the repeat and dangerous sex offender guideline precisely to address the problem of *recidivist sex offenders."* (see US Vs Poynter 495 F.3d 349 (2007)).

- **3B1.4 – Using a Minor to Commit a Crime** – *2 points*
  - The Sixth Circuit Appellate Court held that "the District Court properly framed the application of 3B1.4 for the defendants use of the minor to operate the camera and *not* for his victimization of them appearing in pornographic photos." (See US Vs Martin 291 Fed Appx 765 (2008)).

  - In addition, the Government concedes in their 10-4-18 response, this enhancement can be *"considered in two separate ways,"* **(See govt. resp. 10-4-18 at Page 2)** admitting ambiguity and while neither examples of the conduct they cite apply to Mr. DeVito's conduct, "where ambiguities such as this exist, the Rule of Lenity dictates that the ambiguities be resolved in favor of the defendant." (See Us Vs Pharris 176 F.3d 434 (1999)).

- **2G2.1(b)(2)(A) – Commission of a Sex Act** – *2 points*
  - Specifically, pursuant to 18 USC § 2246(2)(c) **(see PSR at 16 ¶69)** the commission of a sex act is defined by the penetration . . . *of another,* and does "not apply to [a] defendant who caused [a] minor to produce home sex videos of herself masturbating as [the] defendant *did not have physical contact with [the] minor."* (See US Vs Starr 486 F.Supp.2d 940 (2007)).

  - "In each of the sexual acts set forth in 18 USC § 2246, the statute *requires skin to skin contact* or touching of the body parts between the defendant and victim." (See US Vs Hayward 359 F.3d 631 (2003); see also US Vs Shafer 537 F.3d 267 (2008)).

  - "Section 2246 defines sexual act as one of several *specific forms of physical contact* with either the victims or the defendant's genitalia." (See US Vs Cochran 510 F.Supp.2d 470 (2007)).

- **3D1.4 – Multiple Count Adjustment (Pseudo Counts)** - *5 points*
  - The Sixth Circuit Appellate Court has held in the creation of pseudo counts, "if [count 1] captured a broader time period beyond [August 6th to August 11th] there would be no question the disputed enhancement applies" (See US Vs Schock 862 F.3d 563 (2017)).

- As such, none of the pseudo count "sexual conduct occurred *during the commission of the conviction offense*" and the pseudo counts "involved different victims, discrete, incidents, occurred at different times and were carried out by different means" and therefore are not relevant conduct (See US Vs Weiner 518 Fed. Appx 358 (2013)).

- The Government relies on the stipulation of facts under § 1B1.2(c), however section "1B1.2 is not material in determining…relevant conduct. *1B1.3 determines the range of conduct that is relevant*." (See US Vs Carrozza 4 F.3d 70 (1993)).

  - Section §1B1.2 commentary states "this section provides the basic rules for determining the guidelines applicable . . . and in the case of a plea agreement containing *a stipulation that specifically established a more serious offense* . . . the stipulated offense [guideline] is to be used." (App. Note1).

    o **There is not a <u>more serious</u> offense listed in the stipulation.**

  - Similarly, §1B1.2 Application Note 3 states "subsection (c) . . . addresses circumstances in which the provisions of Chapter 3 Part D (Multiple Counts) *are to be applied*."

    o The Government correctly states though "offenses involving the sexual exploitation of minors *are explicitly excluded* from § 3D1.2(d)'s multiple count grouping rule" **(See govt. resp. 10-4-18 at page 3)**

- Lastly, it should be noted that Mr. DeVito disagreed with multiple portions of the stipulation, but the Government would not agree to more than striking a single aspect on 6-19-18, threatening the superseding indictment if not signed "as is". (see 6B1.4(b)).

  - Fortunately though, while the Government relies heavily on this document, § 6B1.4(d) "makes clear that **the Court is not obliged to accept the stipulation."**


- **In regards to the "factual" detail of the alleged 'pseudo victims,' there are many unknowns or ambiguities that seem to *have been resolved as certainties in favor of the Government.***

- In each entry, the 'victims' "*sent DeVito images*," implying DeVito "*received*" the images. However, a production count was applied.

  - Note that 'Minor Victim AG & AH' who also "*sent DeVito images*" did not result in a production count because Ohio FBI "agents were unable to determine if the defendant *produced* these images or *received* them." **(See PSR at 13 ¶453).**

  - Also note all the images at issue were "*taken by the minors."* **(See PSR at 7 ¶19)**

    o In US Vs Broxmeyer 616 F.3d 120 (2010) - The Appellate Court found, "Broxmeyer persuaded, induced, or enticed [the minor] to send

sexually explicit pictures of herself to him…the evidence was insufficient as a matter of law to…find Broxmeyer had *solicited the production of, **rather than simply received the images at issue***…as we have explained §2251(a) applies to the Production of Child Pornography only…In our analysis in Sirois 87 F.3d 34 (1996), we held that a defendant can be held to have 'used a minor' to produce Child Pornography if the minor serves as the subject of the illicit photos **taken by the defendant.** Here the photos were **taken by the [minor]** not Broxmeyer…accordingly, **a 2251(a) conviction cannot be premised on the fact that Broxmeyer persuaded, induced, or enticed the [minor] to send him her pornographic self portraits.** For these reasons, we reverse conviction on counts 1 & 2."

- o In US Vs Pattee 820 F.3d 496 (2016) - The Appellate Court determined that "production does not cover one who possesses copies of *child pornography created by someone else,*" and "it does not follow . . . that **a pornographic image that was created by someone else is tantamount to producing child pornography.**"

- Production counts were also applied in instances where Ohio "FBI agents are still trying to determine her age," "but ***the probation officer verified** she was at least 12 but less than 16.*"

- Similarly, while Ohio FBI agents had difficulty determining the above aspects, when it came to Maryland FBI agents that *"did not believe the images rose to the level of child pornography,* the agents in Ohio disagreed with this assessment."

- The Ohio FBI also advised there "could be 10 more victims" but "no additional information is available regarding the victims."

  - o The lack of clear, concise allegations make it clear the goal was to throw as much as possible at the proverbial wall to see what sticks. One might as well say "Richard could be a murderer," but "there is no evidence available."

If the evidence supported these pseudo counts, then the Government had ample time to charge the actual counts in a superseding indictment at any point over the last two years. However, even though this intention was stated at nearly every court appearance, the fact remains that the charges were never filed… and there is no information in the PSR or stipulation of facts that alludes to any of this conduct taking place *during the duration of the offense of conviction.*

**Absent these erroneous enhancements, Mr. DeVito's offense level after acceptance would be a 35, resulting in a guideline range of 168-210 months.**

Next, the Government contends that "the criticism of child pornography guidelines has not been directed at the production of child pornography offenses." **(See govt resp. 10-4-18 at 2)**.

Quite the opposite, many courts have done just that, though not as frequent as 2G2.2 offenses, presumably due to the clandestine nature of 2G2.1 production charges.

- **US Vs Sawyer 672 Fed. Appx. 63 (2016)**
  - "discussing the irrational sentence produced by the application of **2G2.1** to a *non-contact production offense."*
- **US Vs Brown 826 F.3d 51 (2016)**
  - "Although Dorvee did not produce child pornography, much of the Dorvee Courts criticism of the Child Pornography Guidelines applies to the guidelines for **production offenses** as well."
- **US Vs Price 775 F.3d 828 (2014)**
  - "**2G2.1** The guideline for Production of Child Pornography presents some of the same problems as 2G2.2. Both guidelines are vulnerable to … critique … both guidelines call for enhancements that apply in nearly every case."
- **US Vs Crisman 39 F.Supp.3d 1189 (2014)**
  - "**2G2.1** for Production of Child Pornography as procedurally and substantially unreasonable because the guideline is defective."
- **US Vs Grigsby 749 F.3d 908 (2014)**
  - *"the defendant may be correct* when he says the Child Pornography Production Guideline **2G2.1** suffers from the same apparent defect as 2G2.2. See 2012 comm report at 247."
- **US Vs Almazon 908 F.Supp.2d 963 (2012)**
  - "even if I didn't reject **2G2.1** on categorical policy grounds, in every case, its application yielded an excessive sentence."

- **US Vs Jacob 631 F.Supp.2d 1099 (2009)**
  - "**USSG 2G2.1,** like 2G2.2 was not crafted pursuant to the Sentencing Commissions National Empirical Study of Criminal Sentencing, but instead much like policy making in the area of drug trafficking.  Congress has used a mix of mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses." and *"thus contrary to the prosecutions contentions USSG 2G2.1 has some of the same flaws . . . 2G2.1(b)(1)* based on *age . . . and 2G2.1(b)(6)* for *use of a computer .  . . conduct present in nearly every case."*

Adjusting Richard's offense level for these two enhancements that are "applicable in nearly every case" and do *not* "differentiate between least and worst offenders," the guideline sentence would not exceed 108 months. However, pursuant to USSG § 5G1.1(b), Richard must serve an additional 72 months apart from his family, because of the application of a mandatory minimum in his case.

Finally, Mr. DeVito objects to Probation's determination that his supervised release be set at life. The guideline by statute provides a range of 5 years *up to life.* While policy statement recommends the maximum, it's just that, a recommendation. USSG § 5D1.1 cmt 3 notes *"in*

general, the more serious the defendant's criminal history, the greater the need for supervised release." Lifetime supervision, when combined with the required registration requirements, results in a *de facto* life sentence and only ensures that Richard as a first-time offender will never be truly free again.

This Court has recently seen a case requiring lifetime supervised release. US Vs Fletcher (2017). Sentenced February 20th 2019, Probation noted in that case it: *"believed this an appropriate amount of time based on his prior criminal history,* including *his convictions for a prior sex offense, his hands-on participation* related to his sexually related convictions, and because *he was on active supervision* at the time he committed the instant offense." **Richard has none of these factors,** yet mechanical application of the guidelines and charging practices have equated these two defendants.

"It's a mistake to lump together different types of sex offender." (US Vs Garthis 652 F.3d 715 (2011)).

**D) 3553(a) Factors:**

The factors the Court must consider under 18 USC § 3553(a) demonstrate that any sentence above the mandatory minimum 15 year sentence would result in punishment greater than necessary to achieve the goals of sentencing.

**1.) Nature and Circumstances of the Offense:**

Richard's offense conduct was illegal and wrongful; but amounts to a single count of "sexting" with a minor. Counsel urges this Court to consider the rampant nature of sexting in today's society. While the scale of Richard's behavior was unique, the fact that he sexted – i.e., engaged in sexually explicit chats and image sharing online – is not uncommon.[12] Also as previously mentioned, his behavior was absent *three aggravating circumstances* typically present in sexting offenses (citing US Vs Weiner 1:17-cr-00307 (2017)):

- **Actual or Attempted Physical Contact With a Minor:**
  - A large subset of sexting cases are essentially child enticement cases, where the exchange of explicit images serves as preparation or "grooming" for the planned (and tragically often completed sexual abuse of a child). [see e.g.,US Vs Klykken (2016) *sentenced 78 months,* the defendant engaged in sexually explicit internet messages with a minor whose bedroom he could look into from his own home and discussed meeting before being caught; US Vs Christy (2014) *sentenced 108 months,* the defendant engaged in hundreds of chats with minors aged 9-15 and met 3 of the minors who he then engaged in sex acts with; **see also Exhibit F]**

---

[12] the Kinsey Institute found 74% of Americans surveyed reported exchanging explicit electronic messages with others (Aug 9th 2017). Another study in Pediatrics & Adolescent Medicine found 31% of students under the age of 18 have engaged in the same.
See also-https://motherboard.vice.com/en_us/article/j5zbmx/tiktok-the-app-super-popular-with-kids-has-a-nudes-problem

- **Predatory Behaviors:**
  - Often these defendants engage in "sextortion" by threatening to release the ill-gotten images to the public if the minor does not provide additional images [see e.g., US Vs Warren (2014) *sentenced 48 months,* the defendant threatened to disseminate images unless the minors created more images; US Vs Garneau (2016) *sentenced 192 months,* the defendant *threatened the minor* with arrest if they did not send images . . . *similar conduct with 20 additional minors*.
- **Position of Trust or Authority Over Children:**
  - Such cases include prosecution of teachers, coaches, etc. whom abused a relationship of trust to obtain images. [see e.g., US Vs Cruz (2015) *sentenced 84 months,* the defendant was a teacher and coach that convinced minors to send photos in exchange for money or gifts; US Vs Lyckman (2000) *sentenced 95 months,* the defendant was a Texas teacher and coach contacting minors over the internet.]

Often cases will involve conduct overlapping one or more of these categories and receive significant sentences as a result. [see e.g., US Vs Delaura (2017) *sentenced 35 years,* the defendant, a tennis coach threatened to make photos public when multiple minors would not meet him for sex. When he was able to arrange a meeting, he sexually abused them; US Vs Acosta (2016) *sentenced 25 years,* the defendant hacked and blackmailed minors and threatened to send the images to friends, family, and schools unless they sent additional images and/or money. In one case, he blackmailed the minor to steal $600 from her father and travel to meet him; US Vs Broxmeyer (2012) *sentenced 30 years,* the defendant, a field hockey coach, in addition to sexually explicit internet exchanges with his players, he raped 5 minor players, sodomized 1 and was in a sexual relationship with another.]

Sometimes, though, as in Mr. DeVito's case, none of these factors are present, which usually results in much lighter sentencing. These defendants **did** engage in sexually explicit internet exchanges with minors, but intentionally **did not** progress past these online exchanges. [See e.g. US Vs R.V. (2016) *sentenced to 5 days times-served,* the defendant posed as a teenage boy to engage girls in a sexual manner and admitted to watching and recording minor females performing sex acts-**(See Exhibit E)**; US Vs Hughes (2015) *sentenced 18 months,* the defendant sent MV1 an image of his penis to persuade her to produce child pornography and send it to him; US Vs Maldonado (2008) *sentenced 24 months,* the defendant *received multiple images from multiple victims;* US Vs Schofield (2015) *sentenced 24 months,* the defendant instructed the girl how to masturbate and send him images; US Vs Sutton (2012) *sentenced 96 months,* this defendant's offense "*was particularly serious because his actions bordered on production of child pornography.*" He engaged in numerous online conversations with children and parents of children encouraging them to engage in bizarre sex acts and send him nude photos.]

> "When a Court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the Court may consider whether a departure is warranted." See USSG Chap 1 Part A 4(a)

Nothing excuses Richard from the criminal behavior he engaged in with Minor Victim A, but he accepted full responsibility during his plea (to a charge virtually never pled to for his conduct and that the Sentencing Commissions Report acknowledges *is a subset, of a minority of the typical production offender*.[13] ) and the fact remains that Richard's misconduct is yet a further subset that demands calibration to the degrees of culpability. Compared to the charges, conduct, and sentences of similar offenses . . . the proposed sentence in this case lies in a different world entirely.

### 1.) History and Characteristics of the Defendant:

There are several factors present in this case that many courts have found to be strongly mitigating.

First, Richard has lived most of his life as a victim of sexual abuse. As noted earlier and in Dr. Connors assessment, this "early exposure to sexual molestation and an introduction to pornographic material at such a young age was problematic in his neurological development. (See US Vs Gall US 128 S.Ct. 586 (2007) "Youth is more than a chronological fact. It's a time and condition of life when a person may be most susceptible to influence and to psychological damage.")

Richard was *8 years old* when he first saw adult pornography and *12 years old* when he first saw child pornography which, at the time, involved girls similar in age to his own. "There is thus a fundamental difference between [the defendant] whose conduct and resultant addiction began during adolescence." (Citing US Vs Stern 590 F. Supp. 2d 945 (2008) "there is a difference in culpability between one who *starts viewing* pornography *as an adult* and one who *does not stop viewing* such material *[as an adolescent]*" the court found Stern's age at the time he began his use . . . "weighs heavily in favor of a deviation under 3553(a)" before imposing a "significant sentence" of 12 months 1 day.)

Struggling with this addiction for much of his formative years, Richard has still led a very productive life: A college graduate, gainfully employed, attaining an $80,000 base salary in leadership positions; a small but supportive family that remains by his side, including a young daughter who stands to be adversely affected by any sentence imposed. If given an opportunity, Richard can still go on to do much good. While a series of traumatic events triggered his resort to dangerous and deviant behavior … Richard's secrets are free. Frequently described as a "grateful addict" are those forced to confront their behavior. The last 29 months, while extremely painful to be away from his family, has provided a form of sobriety allowing Richard to climb from the hole he dug for himself and emerge no longer afraid to ask for help. No longer clouded, his focus is committed to being a better person so that he can be the best Son, Husband, Father, and Friend, enjoying a life that's no longer plagued with such demons.

Despite the current disarray of his life, Richard is devoted to repairing his life and, most importantly, the relationship with his daughter that he has not seen in over two years…and sadly has had to listen to her grow and reach various milestones through a telephone. Deeply

---

[13] see USSC Report on CP at 330 – Findings and Recommendations Concerning Production Cases.

ingrained in him is a need to show his daughter that he is more than this mistake. Painfully aware of the things he has missed with her, this insight is the motivating force to ensure he never again jeopardizes being a part of her life and hopes the Court will take this into consideration when fashioning its sentence.

**2) The Need for the Sentence Imposed:**

The purpose of Federal sentencing under 3553(a)(2) asks a court to consider retribution, deterrence, incapacitation, and rehabilitation in determining an appropriate sentence, "thoughtfully considering the goals of criminal punishment" (see Us Vs Cole No5:08-cr-00327 (2008)).

In 2013, Attorney General, Eric Holder emphasized that mandatory minimums may not contribute to public safety:

> "We need to ensure that incarceration is used to punish, deter, and rehabilitate, ***not merely to convict, warehouse, and forget***… Mandatory minimum sentences breed disrespect for the system. *When applied indiscriminately,* they do not serve public safety. They have had a disabling effect on communities and *they are ultimately counterproductive."*

**A) The Sentence Must Reflect the Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment:**

There is no question that Richard has committed a serious offense.

"Respect for the law, though, is promoted by punishments that are *fair,* not those that simply punish for punishments sake." (US Vs Cernik No 07-20215(2008)). "A sentence may work to promote not respect, but derision for the law, if law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances." (citing US Vs Gall US 128 S.Ct.586 (2007)).

"There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly; any more than there is reason to believe that respect for the law will increase if a defendant who deserves harsh punishment receives a slap on the wrist." (See Us Vs Zavala No 07-14851(2008)).

That being said, *"5 years is not the proverbial 'slap on the wrist'", especially for someone who has never spent a day in jail."* (See US Vs Marshall 870 F.Supp.2d 489 (2012)). Richard, who had never spent a day in jail prior, *serving a minimum of 3 times that, **is** a* considerable punishment.

Richard has already experienced significant punishment, some of it unfair. Unlike the majority of offenders guilty of similar conduct, Richard was not afforded pre-trial release. As a result, Richard has already been subjected to a lengthy period of punitive time imprisoned in a *maximum security setting.*

The Protect Act, put into effect in 2003 (and widely criticized for its drastic increased penalties) under section 203 states "No pretrial release for those who rape or kidnap children." Despite Richard's having *never* attempted to or actually met a child for the means of sexual contact, the charge of 2251(a) under § 3142(e)(2) dictated his release be denied.

Richard has subsequently been incarcerated at the Butler County Jail for *888 days*. (It's important to note that Richard has already served more time in the county jail than some similar conduct offenders' entire Federal sentences.) Confined to a 75 sq. ft. double-bunked, 'two-man' cell for more than 20 hours a day and deprived of natural sunlight and fresh air… Richard has only briefly experienced these (to and from court) on 8 of those 888 days. These conditions are more comparable to the Federal ADX,[14] than to that of the low-security facility Richard is likely to end up at, or the minimum security camp this court could recommend (See US Vs Parker Holt sentencing transcript Jan, 26th 2017 1:35pm- where Judge Black recommended the defendant convicted of a sex offense be placed in a Camp facility, noting the BOP has a mechanism to "back off" the low security requirement for sex offenses.

Thus, as a pre-trial inmate (subject to the least restrictive conditions) and never having experienced the confines of jail, Richard has been subjected to oppressive conditions that Amnesty International has deemed harsh and/or inhumane:

| Federal ADX Admin-Max | Butler County Jail |
|---|---|
| Confined to cell 22+ hrs./day | Confined to cell 20+ hrs./day |
| Eat meals in cell | SAME |
| Toilet in cell | SAME |
| In-person visits separated by glass | No-contact (video visit only) |
| Outdoor recreation | NONE (no outside access) |
| Clear cell windows (visibility) | Fogged cell windows (no visibility) |
| Inmates control in-cell lighting | No control over single, dim, in-cell light |

While prisoners at the Federal Administrative Maximum facility are sent there "only after it is determined they would pose a serious risk to themselves or the safety of other inmates, staff, or the public if placed in a less secure setting"… Richard was placed in a similar (and in some ways worse) setting while technically innocent for years. Contributing to additional psychological and physical harm as he remains confined to poor lighting conditions, forced to eat in close proximity to an open toilet, unable to experience natural light or fresh air, and denied contact with his family.

A just sentence for Richard is one that will go beyond a perfunctory application of the guidelines, to balance the severity of the conduct in this case with the individual circumstances that counsel in favor of leniency.

---

[14] Entombed: Isolation in the US Federal Prison System July 2014

**B) The Sentence Must Afford Adequate Deterrence:**

"We as a society have found unfortunately no better way to deal with this serious problem other than to incapacitate or remove individuals from the community for a period of time as … a form of deterrence." (See US Vs McIlrath 512 F.3d 421 (2008)). "Importantly, much of the market [for child pornography] is driven by compulsive behavior… whether such behavior can be deterred is doubtful" (See US Vs Goldberg 2008 WL 4542957 at 5 (2008)).

Given the individual factors unique to Richard, the specific deterrent value of any sentence is limited. However, "a below guidelines sentence may in some cases provide *more* deterrence." (US Vs Desmond No. 05-cr-792-F 2008 WL 686779) (See US Vs Richards 659 F.3d 527 (2011) - the court after determining an offense level of 48 and CH 1 with an advisory range of Life on 11 counts including 2251(a) and 2252A as the result of a jury trial … departed downward to a sentence of 16 years and 8 years supervised release. The court stated the sentence "should provide *adequate deterrence* on the part of *the defendant who has no criminal record*)."

**C) The Sentence Must Protect the Public From Further Crimes of the Defendant:**

There is no suggestion that Richard need be incapacitated. Dr. Connor found him to pose a low-risk of recidivism. While the suggested course of community-based treatment combined with probation is no longer an option in this case, many courts found in favor of "a below guidelines sentence [as] appropriate in part because of the defendant's 'low risk of recidivism'." (see US Vs Smith 275 Fed Appx 184 (2008)); US Vs Martin 520 F.3d 87 (2008)(same); US Vs Camiscione No 5:04-cr-00594 (same); US Vs Cherry 487 F.3d 366 (2007) applying a 43% downward variance citing the defendant poses a low-risk.)

While those who have engaged in this criminal behavior in the past are always susceptible to it in the future, when defendants like Richard realize that their conduct "is not anonymous, that it carries substantial penalties, and that even simply viewing it does substantial harm to children, first-time offenders with no previous history of criminal or abusive conduct are unlikely to repeat" (see US Vs Ontiveros 2008 WL 2937539 (2008)).

**D) The Sentence Must Provide the Defendant With Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner:**

There is no suggestion that Richard would be more fully rehabilitated within the prison system. Indeed, there is great reason to think that Richard's rehabilitation might be negatively impacted by an excessively long prison stay.

One of the goals of sentencing remains the rehabilitation of convicts. While The Probation Department suggests Richard participate in treatment in the BOP and encourages the Court to impose lengthy sentences to "ensure" its "completion," this is not the "most effective manner". The Supreme Court held that §3582(a)… "precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation (see US Vs Robinson 970 F.Supp.2d 725 (2013).

What Probations proposed sentence fails to recognize is that ***BOP sex offender treatment programs are confined to the last approximately 18-27 months of an offenders' sentence.*** "Inmates are prioritized for placement in programs based on their projected release date. A prisoner who has a shorter sentence…will be moved to the top of the waiting list." Therefore, Richard being low-risk does not qualify for the intensive program and may not receive treatment at all in the BOP. (see US Vs D.W. 198 F. Supp.3d 18 (2016) – a moderate to high-risk contact offender sentenced to 15 years--experts testified at sentencing:

> "He is incarcerated for, let's say, another 10 years, what's going to happen? He's going to be in prison most of the time ***not receiving treatment***. He's going to have atrophy of his adaptive skills…negatively affecting any prospects of successful treatment upon release" (see pg. 80-82.)

Seeing that a licensed medical professional has premised his clinical opinion of Richard's low-risk to recidivate, "*provided he is in treatment*" **(see Exhibit B at 9)** and the NCIA report at 44 notes "*studies support sex offender treatment… on probation* as opposed to treatment in prison, *is more effective* in reducing… recidivism." It seems counter-intuitive to pursue lengthy incarceration and effectively doom Richard's rehabilitation. While costing taxpayers between $544,500 - $1,089,000 to warehouse Mr. DeVito out of sight and out of mind…when he could have received proper, ***"effective"*** treatment (made mandatory by this Court) for a fraction of that amount. "In fact, there is a very real risk that placing an individual into the prison system for the term urged by the government would have long term negative consequences for the defendant as well as society" (US Vs Camiscione No 5:04-cr-00594). *Afterall, Richard's case is not a matter of **if**, but **when** he reenters society.*

**3) The Kinds of Sentences Available:**

In this case a sentence of imprisonment is required. *A sentence above the mandatory minimum is not.* Given the opportunity to be housed with other sex-offense cases in this jurisdiction, Richard has seen first-hand that many repeat and/or contact offenders receive sentences *under 15 years.* (see US Vs Norris-10 years; Stamper-10 years; Cusimano-5 years).

Therefore, while the Court **could reject Mr. DeVito's plea** and dictate the parties present better alternatives to satisfy 3553(a) as Judge Weinstein recommended in US Vs D.W., the Court does not need to extend the sentence. Through the 15 year sentence, this Court can provide an extremely firm "line in the sand" that threatens even the slightest further criminal activity could become a life sentence.

**4) The Sentencing Guidelines:**

"Sentencing for the exploitation of children under the guidelines is quite different than sentencing for other offenses. In many cases the guidelines' recommendation for cases involving child pornography are 'illogical'." (US Vs Hanson 561 F.Supp.2d 1011).

The United States Sentencing Commission has voiced concerns with the current guidelines' ability to reflect varying degrees of culpability given the impact of recent technology changes. Issuing lengthy reports in 2009, 2012 and 2019, the Commission continues to observe that "all child pornography offenses are extremely serious", but that "revisions are needed to more fully differentiate among offenders"

Absent these revisions, the Commission argues that "*there is no real basis for applying the current sentencing guidelines* (see US Sent. Comm'n 2012 report at 331) and criticizes the "lack of proportionality in sentence length compared to typical sentences for many 'contact' offenders." id at 13.

**5) Any Pertinent Policy Statement: (N/A)**

**6) The Need to Avoid Unwarranted Sentencing Disparities:**

"Congress and the Commission recognized that there are ***two distinct types of sentencing disparity.*** The first, is the disparity found when two defendants who commit the same crime in identical circumstances receive different sentences. The second, exists when the same sentence is imposed on two people whose crimes or circumstances are significantly different." (See US Vs Williams 78 F. Supp.2d 189 (1999)).

One doesn't have to travel far (i.e., even outside this courthouse) to determine that the minimum 15 year sentence for Mr. DeVito is in direct conflict with each of these two types of disparity.

First, the most similarly situated defendant in the Southern District of Ohio is US Vs Lowry 071715 OHSDC, 1:15-cr-043 (2015)(**see Exhibit H**) *who "victimized* **at least 25 minors** *via online solicitation*" but in addition to soliciting nude photos, presented aggravating circumstances by offering to pay said minors with money and/or drugs to meet and engage in 'actual sexual contact'.[15] While charged with 6 counts of Production and 1 Coercion count, Lowry was allowed to plea to the lesser count (***dismissing all Production counts***) which resulted in a sentencing range of 120-240 months and ultimately a 144 month sentence. ***Three full years less than Mr. DeVito's mandatory minimum for arguably more severe conduct by attempting to meet his victims.***

Second, a significantly different case in the Southern District of Ohio is US Vs Damron (2017) who *had 'actual sexual contact'* with his 4 year old step-daughter, personally took photos of his conduct and distributed them to other adults online for them to respond in kind. For this conduct, he received an 11(C)(1)(c) plea offer to the 15 year mandatory minimum ***from this same prosecution***...ignoring the fact that Damron has a prior juvenile sex offense, and

---

[15] Noting the Sentencing Commission states [production offenses] involve actual or intended sexual contact with a victim. See US Sent. Comm Mand. Min. Penalties in The Fed. Crim. Just. Sys. 295 (Oct, 2011).

therefore was a repeat sex offender, that committed his crime while being required to register as such until 7-7-2020. (see §2260A)

Here the Government chooses to introduce disparity by justifying a proposed sentence it knows is illegally disparate when measured in degrees of culpability and the 'Parsimony' aspect of 3553. It "threatens a top of the range sentence, for what is not a top of the range offense," (US Vs Aleo 681 F.3d 290 (2012)).

Being that the Sixth Circuit *"is not concerned* with disparities between one individual's sentence and another individual's sentence." (US Vs Gessa 944 F.2d.265 (1991), Mr. DeVito turns to a wider analysis in that this circuit concluded "3553(a)(6) *is concerned* with national disparities among the many defendants with similar criminal backgrounds convicted of similar conduct*." (See US Vs Simmons 501 F.3d 620 (2007), see also US Vs Poynter 495 F.3d. 349 (2007); US Vs Lasalle 948 F.2d 215 (1991); US Vs Parker 912 F.2d. 156 (1990)).

Performing a case study of similar conduct offenses, "the defendant [has] cited a number of cases in… this circuit and others" (an exercise this Court encouraged in US Vs Stall 581 F.3d 276 (2009)). Mr. DeVito presents **(Exhibit F)** as a demonstrative sample of cases of this type, to display a national landscape and summarize fair sentencing in relation to the actual conduct of this case.

Further dissecting the largest subset of these sexting offenses, **(Exhibit F)** is separated by three categories: The first, are cases like Mr. DeVito's that were confined to '*online communication without an intent to meet a minor'* **(see Exhibit E at 5);** (See also US vs R.V. 157 F.Supp. 3d 207 (2016)) referencing Judge Weinstein's Degrees of Culpability). The second, are cases like *US Vs Lowry,* where the defendant engaged in online communication in attempt to meet a minor. The third, are cases that the online communication resulted in actually meeting a minor.

While it may not be possible to identify every case of this kind prosecuted nationally, *Mr. DeVito has tried.* Scouring each circuit yielded (144) cases at the Federal level (and 159 similar cases nationally at the State level that averaged a 19 month sentence-for general comparison only). The result is clear. For Mr. DeVito's conduct, regardless if defendants are charged with Production (2251(a)), they virtually never plea to it. Rare cases have been convicted at trial (of multiple counts), and received sentences of 188 months or less (See US Vs Blum 404 Fed.Appx.89 (2010)); but the majority plea to DeVito's lesser charge 2252A, 2252, or 1470 (charges that are eligible for additional "good time" through The First Step Act of 2018…unlike 2251). **As depicted, the National average sentence for Richard's conduct at the Federal level is *77 months*. The Sixth Circuit Federal average is *81 months*.** Yet Mr. DeVito faces at a minimum *180 months* in this case, as a result of the charging decision and an unwillingness to communicate or negotiate. (Noting this AUSA [new to sex offense cases] making repeated statements of "disliking" DeVito to each and every counsel that has represented him).

Despite DOJ directives, particularly that "punishment should be commensurate with the crime." Its "troubling irony [that] an individual who, sitting alone, obtained images…could receive a

higher sentence than the guidelines would recommend for an offender who actually rapes a child." (See US Vs Burns NO. 07-cr-556 (2009) WL 3617448) **(See Exhibit I)** (See also US Vs Wise 447 F.3d 440 (2006) – in which the defendant, a 37 year old man traveled from Iowa to Lubbock, TX, where he met and had sex with a child he met on the internet.  He was indicted on 15 counts and he received a sentence of 168 months.)

**7) The Need to Provide Restitution to Victims of the Offense:**

On December 20th 2018, and for the first time in two years, restitution was introduced in the final version of the PSR-victim impact.  "While the district court [has] discretion to consider the testimony of the [pseudo] victim's mother." (see US Vs Weiner 518 Fed Appx 358 (2013)), counsel contests the proximate causation of Minor Victim P's losses. Defense concedes that as Probation correctly notes, Richard agreed to pay restitution in paragraph 8 of the Plea Agreement, and that the plea penalties listed the potential for possible restitution under §§2248, 2259. *or 3663A.* However, the Government has not met its burden of proving these losses.

A "restitution packet" or other "sufficient information," in regard to 'Minor Victim P' has not been provided. (See Fed. Rule Crim. Proc. 32(c)(1)(B) and (d)(2)(D)) (See also US Vs Williams 612 F.3d 500 (2000)). Little is known beyond the alleged age and six images that may or may not constitute child pornography **(see PSR at 10 ¶36)** and without any reference as to how or why they were created **(see PSR at 13 ¶53).** (See also discussion in this memo Pg. 14-15).

What *is* known is that Probation specifically cited this request "pursuant to § *3663A*, restitution [is] owed in this case." **(See PSR at 53 ¶409)** The Supreme Court in *Paroline* found "3663A [was] not designed specifically for child pornography offenses; they are part of the Mandatory Victim's Restitution Act of 1996 and supply general restitution guidelines for many Federal offenses. Therefore, restitution is required "to be tied to the losses caused by *the offense of conviction*" and "the burden of demonstrating the amount of loss sustained by a victim as a result of *the offense* shall be on the attorney for the Government." (see US Vs Paroline 572 US 434 134 S.Ct. 1710 (2014)).

The offense of conviction which Richard admitted guilt to was the victimization of Minor Victim A *during Aug. 6, 2016 to Aug. 11, 2016.* To date, the Government has not approached the topic of restitution, let alone how the victimization of Minor Victim A during this 5-day period establishes causation of Minor Victim P's losses.

Given Minor Victim P is not a victim of *the offense of conviction*;  the Government has taken no position on restitution; and Probation rather than the AUSA is advocating for this 'victim'… restitution is not germane and counsel asks the Court to decline to order restitution on the grounds that "3663A of the MVRA allows the Court to decline … if it determines that restitution would complicate or prolong the sentencing process (see 18 USC § 3663A(c)(3)(B).

**Conclusion:**

We respectfully submit this memorandum on behalf of Richard DeVito to provide the Court with a fuller account – beyond the slanderous media headlines[16] and stifled motions – both of Richard's crime and the broader context of a remarkable life, overcoming setbacks, that has resulted in much good. Punishment must, of course, be imposed, but the sentence here should reflect the truly unique circumstances of this offense, one lacking much of the typical behavior exhibited in similar cases across the country.

The sentence should also reflect the specifics of Richard's sickness, for which he should receive proper quality treatment that is simply not available in Federal Prison. Finally, the sentence must provide the court with tools – and Richard with incentives – to continue on the path to wellness. We therefore request that a sentence of 180 months followed by supervised release for 5 years is sufficient, but not greater than necessary.

---

[16] https://nypost.com/2018/06/20/married-perv-admits-convincing-dozens-of-young-girls-to-send-him-sex-videos/

**Mr. DeVito respectfully asks the Court to make the following recommendations pursuant to USC §3621(b)(4)(B) and BOP Program Statement 5100.08:**

That he be incarcerated for a term of 180 months at FCI Ashland or FMC Lexington given the proximity to his family and medical history (See PSR at 48).

That the sentence of 180 months incorporate the *full 12 months* offered by the Second Chance Act to better prepare him for release after such a lengthy sentence … broken down (less "Good Conduct Time") as:

- 29 months (appx.) time served
- 112 months imprisonment
- 6 months half - way house pursuant to 18 USC §3624(c)(1)
- 6 months home confinement pursuant to 18 USC §3624(c)(2)

To be followed by 5 years supervised release.

Given Mr. DeVito should have less than 10 years remaining, he asks the Court to consider recommending a minimum security (Camp) designation and access to the Trulincs electronic (e-mail and if available, video) communication system so that he may keep in good contact with his Mom, Wife, and Daughter. Neither of which he will be afforded without this Courts recommendation.

Lastly, Mr. DeVito asks the Court to request it be notified if any recommendations are not honored by the BOP because "The Bureau no longer writes courts explaining why a recommendation is not followed unless the court specifically requests such notification." (See US Vs D.W. 198 F.Supp.3d 18 (2016) citing Vasquez & Bussert at 22).

Thank you.