1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4                     - - -

5    UNITED STATES OF AMERICA,      :
                                     :
6              Plaintiff,      : CRIMINAL NO. 1:16-CR-115
                                     :
7       -vs-                   : Sentencing
                                     :
8    RICHARD LEE DEVITO,       : Tuesday, May 21, 2019
                               : 10:03 a.m.
9              Defendant.      : Cincinnati, Ohio

10                    - - -
                TRANSCRIPT OF PROCEEDINGS
11       BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE
                      - - -
12

13   For the Plaintiff:   Kyle J. Healy
                          Assistant United States Attorney
14                        221 East Fourth Street, Suite 400
                          Cincinnati, Ohio  45202
15

16   For the Defendant:   Sarah Thomas Kovoor
                          Ford, Gold, Kovoor & Simon, Ltd.
17                        8872 East Market Street
                          Warren, Ohio  44484
18

19

20   Law Clerk:           Karla Hall

21   Courtroom Deputy:    William Miller

22   Court Reporter:      Julie A. Wolfer, RDR, CRR
                          100 East Fifth Street
23                        Cincinnati, Ohio  45202

24                    - - -

25

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

<u>PROCEEDINGS</u>

1                                 

2    (In open court at 10:03 a.m.)

3        COURTROOM DEPUTY:  <u>United States of America versus</u>

4   <u>Richard Lee DeVito</u>, Case Number 1:16-CR-115.

5        Could counsel and defendant please approach the

6   podiums?

7        THE COURT:  Good morning to everyone.

8        Let me ask counsel to please enter their appearances

9   for the record and introduce anyone you have with you at

10  counsel table as well.

11       MR. HEALEY:  Thank you, Your Honor.  Good morning.

12  Kyle Healey on behalf of the United States.  At counsel table

13  with me is Special Agent John Jones with the FBI.

14       THE COURT:  Thank you, Mr. Healey.

15       MS. KOVOOR:  Good morning, Your Honor.  Sarah Thomas

16  Kovoor for the defendant, Richard DeVito, and Mr. DeVito stands

17  before me.

18       Also in the courtroom I have two witnesses, Dr. Connor

19  and Mr. Roger Pimentel who are planning to testify, as well as

20  the family members of Mr. DeVito.

21       THE COURT:  All right.  Are you Richard Lee DeVito?

22       THE DEFENDANT:  Yes, I am.

23       THE COURT:  And are you represented in this proceeding

24  by Sarah Kovoor, an attorney who's present here in court with

25  you today?

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  Since you've got witnesses, do we want

 3    them to testify first so that we don't have to keep them here

 4    all day?

 5              MS. KOVOOR:  That would be wonderful, Your Honor, if

 6    we could do that.

 7              THE COURT:  Okay.  Why don't we go ahead and do that.

 8    Let's take their testimony.

 9              So you can be seated.

10              MS. KOVOOR:  Okay.

11              THE COURT:  And call your first witness.

12              MS. KOVOOR:  Your Honor, we'd be calling Dr. Ed

13    Connor.

14              COURTROOM DEPUTY:  Step up there and raise your right

15    hand and be sworn in.

16         (Witness complied.)

17              COURTROOM DEPUTY:  You do solemnly swear that the

18    testimony you're about to give in this case will be the truth,

19    the whole truth, and nothing but the truth, so help you God?

20              THE WITNESS:  I do.

21              COURTROOM DEPUTY:  Thank you.

22              You can be seated, and the microphone bends.

23              THE WITNESS:  Thank you.

24              Good morning.

25              THE COURT:  Good morning.
```

1            You may proceed, Ms. Kovoor.

2               EDWARD JOSEPH CONNOR, PSY.D

3                 DIRECT EXAMINATION

4    BY MS. KOVOOR:

5    Q.  Good morning, Dr. Connor.

6    A.  Good morning.

7    Q.  Could you state your full name for the record?

8    A.  Edward Joseph Connor.

9    Q.  What is your educational background, Dr. Connor?

10   A.  I was first trained in psychotherapy by the Institute of

11   Psychotherapy in Malmö, Sweden from 1982 to 1986.  I graduated

12   from Thomas More College with my bachelor's degree in 1989.  I

13   went to the University of Denver in Colorado where I earned my

14   doctorate degree in 1992.  And I was with the University of

15   North Carolina and FCI Butner where I did my internship in

16   1993.

17   Q.  Okay.  Have you had any other training regarding dealing

18   with sexual offenders?

19   A.  I have.

20   Q.  What are that -- what is that?

21   A.  Well, when I was at FCI Butner in North Carolina, I was on

22   the sex offender treatment unit and assessment unit.

23   Throughout the course of my career, I've attended different

24   trainings and sex offender risk assessments.  I also conduct

25   the screenings for the Catholic Church and the Rabbi Union

1    College for candidates into the seminary.

2    Q.   Okay.  Have you testified before in federal court?

3    A.   I have.

4    Q.   Where?

5    A.   In Kenton County, Kentucky.  Here in Hamilton County, yes.

6    Q.   Have those been recent?

7    A.   Approximately a half a year ago I think I was in Hamilton

8    County federal court.  About a year ago, I was in Kenton County

9    federal court.

10   Q.   And you testified as an expert?

11   A.   I have, yes.

12   Q.   Okay.  Have you published any articles in your field?

13   A.   I co-authored a study using the Millon Clinical Multiaxial

14   Inventory in child custody evaluations, and also when I was at

15   FCI Butner, we -- I co-authored an article on identifying

16   malingering in criminal defendants that was published in the

17   Journal of Law and Human Behavior.

18   Q.   Have you interviewed Mr. DeVito in this matter?

19   A.   I have.

20   Q.   Okay.  And for what reason?

21   A.   I was contacted by his attorney at that time to conduct a

22   psychosexual evaluation of him, which I did in June of 2017.

23            MS. KOVOOR:  Your Honor, there was a stipulation by

24   the government regarding Dr. Conner's expertise, but I also ask

25   you to move -- I move that Dr. Connor be declared an expert in

1   this.

2           THE COURT:  Any objection, Mr. Healey?

3           MR. HEALEY:  No, Your Honor.

4           THE COURT:  The Court will recognize Mr. -- I'm sorry,

5   Dr. Connor as a witness who is entitled to give an opinion.

6   Q.  Dr. Connor, you've prepared a report in this matter;

7   correct?

8   A.  Correct.

9   Q.  Okay.  And that was based on your evaluation of Mr. DeVito

10  on -- in 2017?

11  A.  Correct.

12  Q.  Okay.  When did you see him and for how long and where?

13  A.  I saw him at the Butler County Jail in Hamilton, Ohio on

14  June the 6th of 2017 for approximately three-and-a-half hours.

15  Q.  Okay.  And that is a different set amount of time than

16  what's stated in your report?

17  A.  That is a mistake in the report.  It says six, and it

18  should be approximately three-and-a-half, yeah.

19  Q.  Okay.  Now, you've reviewed your report?

20  A.  I have.

21  Q.  Prior to testifying today?

22  A.  I have.

23  Q.  Is there any other amendments that need to be made in this

24  report?

25  A.  No.  There's maybe a couple typos, but nothing that of

CONNOR - DIRECT

1    significance.

2    Q.   Could you tell the Court what material were provided for

3    you to prepare this report?

4    A.   Yes.   I was provided the criminal complaint by his attorney

5    at that time.

6    Q.   Okay.   And did you have any other material besides what was

7    prepared -- given to you by the attorney?

8    A.   That was the only document provided to me.

9    Q.   When you interviewed Mr. DeVito, did he make any statements

10   to you that you found important in evaluating him in terms of

11   being a sex offender and his recidivism rate?

12   A.   Yes, he did.

13   Q.   Okay.   What did you find important?

14   A.   First of all, he was very disgusted with himself.   He felt

15   that he had let down his family, himself, and he talked about

16   how he started to be involved in pornography in general at a

17   very young age, probably around age ten.   He became obsessed

18   with pornography throughout his adolescent years and into his

19   adult years.

20        He tried to stop himself on a number of occasions due to

21   the self-disgust that he experienced, but, unfortunately, to no

22   avail.   He was apprehensive about getting help because he was

23   afraid that if he went and sought help for this problem, that

24   he could be reported to the authorities because by that time,

25   he had also viewed underage pornography.

1  Q.  Okay.  Let me just back up a little bit here.  You said he

2  had viewed child pornography when he himself was a child;

3  correct?

4  A.  Correct.

5  Q.  Could you describe that?

6  A.  When he started to look at internet pornography at around

7  the age of 10 to 12, it was around that same time that he had

8  looked at underage pornography which would be consistent with

9  his age.  He had a half-brother who had exposed him to this;

10  this is what he reported to me.  But regardless, he had been

11  looking even at that time during those adolescent years.  I

12  find this significant because of his age and looking at child

13  pornography that is consistent with his biological age set, I

14  think, in this trend of looking at a lot of underage

15  pornography as well as general pornography.

16  Q.  Okay.  Did he also report any abuse by the half-brother?

17  A.  He did.  He said that there was an incident of molestation

18  by the brother.

19  Q.  He never reported that at the time; correct?

20  A.  Correct.

21  Q.  Okay.  And he said no force was used?

22  A.  That is correct.

23  Q.  Okay.  This was something that caused him embarrassment?

24  A.  Yes.

25  Q.  Okay.  Did he also mention to you, admit how many

```
 1    individual -- other individuals besides the victim that was
 2    identified in the complaint was involved, that he was involved
 3    with?
 4    A.   He did.
 5    Q.   What did he state?
 6    A.   He said that he had -- he estimated approximately 21
 7    children that he had contacted online for sexually explicit
 8    chat and exchange.
 9    Q.   Okay.  And you said he was disgusted by his actions?
10    A.   Yes.
11    Q.   What did he state to you?
12    A.   Well, he realized that he had a problem with not just
13    pornography but underage pornography, the explicit chats that
14    he engaged with other children, and it was a issue he felt he
15    couldn't really control.  He felt like he didn't really
16    understand it, why he felt so compelled to engage in such
17    activity.  So it seemed to be something that was rather
18    tormenting to him for quite some time.
19    Q.   Okay.  Is he a loner in terms of personality?
20    A.   I think he is in the sense that one of the personality
21    assessments I gave him, he comes -- he's very elevated on what
22    we call an avoidant personality type.  In other words, he seeks
23    relationships, but relationships cause him anxiety so he
24    withdraws from relationships, then he seeks again and then he
25    withdraws.  So it's avoidance approach type relationships that
```

1  he seems to struggle with.

2  Q.  Okay.  But he had -- I mean, his family is in the courtroom

3  today.  He has his mother and his wife here.  Are you aware of

4  that?

5  A.  That's my understanding, yes.

6  Q.  Did he express any remorse as to what he was putting them

7  through?

8  A.  Well, he did.  As I stated earlier, he felt very disgusted

9  with himself that he let down his family and embarrassed his

10  family.

11  Q.  You mentioned some tests that you did.  Was there any

12  evidence of narcissistic personality?

13  A.  No.

14  Q.  Sociopathic personality?

15  A.  No.

16  Q.  Psychopathic personality?

17  A.  No.

18  Q.  What tests did you do?

19  A.  I administer in terms of testing the Child Abuse Potential

20  Inventory because he is a -- he is a parent.  And what we're

21  looking for here is character traits that we typically find in

22  people who are abusive toward children.  And he responded in an

23  open and forthright manner, and it was interesting to note that

24  he's aware of how agitated he can get.  When he gets stressed

25  out, he gets agitated.  This is a trait that he would need to

1  be treated for to ensure that, you know, this type of agitation

2  would not be manifested with a hands-on type offense with his

3  child or any child.

4       The Millon Clinical Multiaxial Inventory, the Fourth

5  Edition, this is a psychometric-based assessment where we're

6  looking at the different types of personality disorders,

7  whether it's the avoidant personality disorder that I discussed

8  previously, the antisocial personality, the narcissistic

9  personality, the schizoid.  So this is significant because men

10  who engage in this type of hands-on type behavior, if they go

11  that far, you're going to see more of a narcissistic,

12  antisocial type typically.  But he was more elevated on the

13  dependent personality scale, so he tends to be more of a

14  passive type of offender.

15       There was nothing in his profile that had to do with

16  severe psychopathology such as psychosis or schizophrenia or

17  anything where there would be a concern about self-control or

18  self-management.

19       The other test I gave was the Abel Assessment for

20  sexual interest, the Third Edition.  And this is an assessment

21  where the defendant is showed a total of 320 images.  These are

22  four different age categories with both genders, and we're

23  measuring their visual response time unbeknownst to them.  And

24  the theory is if we as a group were to walk through an art

25  museum, every individual would stop and look at a piece of

1    artwork based on what they find interesting, and then we can

2    measure how long they're looking at each piece of artwork, so

3    to speak.  So that's the basic theory of the instrument.  And

4    so we're measuring visual response time to four age categories,

5    both genders.

6             And on this instrument, he did come up very elevated

7    on an attraction to 6- to 13-year-old females.  Now, this is

8    consistent with his history of viewing child pornography.  And

9    based on the history and based on the test results, there are

10   indications of pedophilia.

11   Q.  Were there any other age groups that he was attracted to?

12   A.  There was a hebephilia interest, which is the adolescent

13   females, and there was also adult females.  There was an

14   interest in adult females.  So there were no interest in males.

15   There was the highest elevation was the young females, and then

16   the adolescent females, and then the third was the adult

17   females.

18   Q.  To get his history and background, who did you speak to

19   besides Mr. DeVito himself?

20   A.  His wife and his mother.

21   Q.  Okay.  How long did you speak to them?

22   A.  I don't recall.  It was on the telephone.  I don't recall

23   how long.

24   Q.  What was your understanding of his childhood?

25   A.  Well, his mother talked about him being a good boy; that

1   she said that he did have a lot of anxiety even as a child, and

2   that would be consistent with his personality disorder that I

3   saw as an adult.  And she said that he was exposed to a lot of

4   domestic violence which undoubtably exacerbated his anxiety

5   even as a child.

6   Q.  Can I stop you there?

7   A.  Sure.

8   Q.  Where did the domestic violence come from?

9   A.  His father.  His father perpetrated domestic violence

10  against his mother.

11  Q.  And did that happen for a considerable period of time?

12  A.  I don't recall how long that it did occur.

13  Q.  Okay.  Go on.

14  A.  Well, she felt that if he were given the opportunity to

15  really seek the treatment that he had needed for many, many

16  years, that she believes that he would be okay and he could

17  overcome this problem that he has had since his adolescent

18  years with pornography.

19  Q.  Do you concur with that opinion?

20  A.  I'm sorry?

21  Q.  Do you agree with her in that opinion?

22  A.  I do in the sense that in my work within this field since

23  the mid '80s, when the internet came on into our society, what

24  we have seen is an explosion of people who have high levels of

25  anxiety and personality problems flee into cyberspace where

1    they sort of sedate themselves, if you will, with cyber -- in

2    cyberworld and they withdraw from contact with people.

3        Now, if you combine this with someone who has a trait of

4    pedophilia, now they're also going to spiral into the whole

5    pornography world and spiral down into the underage

6    pornography.  So it's a combination of factors that in my work

7    with men who have been convicted and incarcerated, then

8    released for child pornographic possession, they work very well

9    in therapy.  They seem to benefit from therapy.  If it's a

10   prolonged therapy, group therapy, individual therapy, for at

11   least two years, then they can come to terms with the anxiety.

12   If they do have pedophilia, it's like giving someone a cancer

13   diagnosis but they know that they have it and they know they

14   have to control it, and we can teach them how to control it.  I

15   can't say we can cure it, but I do say that we can teach them

16   how to control this.

17   Q.  How do you teach them that?

18   A.  Well, first of all, it has to be an acceptance of the fact

19   that they have pedophilia.  This is something that they have

20   and they cannot act on it.

21   Q.  And did Mr. DeVito accept that?

22   A.  In my opinion, I believe he did.  But I don't know for sure

23   because I only saw him the one time.

24   Q.  Okay.

25   A.  So I -- he -- I believe -- the reason I say I believe he

1    did is because he talked about how much he struggled with the

2    problem and how often he wanted to get help but felt that he

3    was hampered by the threat of being reported.

4    Q.  Okay.  Were there particular stressors in his life when

5    this happened because he was age 33 when -- when he was charged

6    with this conduct?

7    A.  What he reported was that his father was very ill at the

8    time and that he assisted in the care of his father which

9    exacerbated his anxiety as well as his grief.

10   Q.  Did his father pass away in the interim?

11   A.  I believe he did, yes.

12   Q.  Were there any other stressors, work, home?

13   A.  He seemed to have a rather stressful life in general with

14   they had a baby recently, and then, of course, incarceration

15   and/or this case here.  But he seemed to have -- be an

16   individual who often was easily stressed into high levels of

17   anxiety.

18   Q.  Okay.  What I'm referring to particularly is at the time

19   that he was involved in this conduct of reaching out to young

20   girls, was he going through any particular stressors at that

21   time because prior to 2016, he's never been charged with any

22   such conduct; correct?

23   A.  That's my understanding, Yes.

24   Q.  He's a first-time offender?

25   A.  Yes.

1    Q.  So what do you know, if you do, what particular stressors

2    were going on at that time when he was involved in that

3    conduct?

4    A.  Other than his father's illness, I'm not aware of anything.

5    Q.  The phone.  The phone was the tool that was used here.

6    During your years of working in the Federal Government and in

7    programs regarding sex offenders, what is your understanding of

8    the use of the phone, the availability, and how that can affect

9    a person's treatment?

10   A.  One of the things that we teach our patients about about

11   this is we call it the triple A factor.  You have

12   accessibility.  Pornography in the zeitgeist is so incredibly

13   accessible; it's just a click of a button away.  We also have

14   affordability, which it's incredibly affordable.  There's

15   essentially no cost at times to access any type of pornography.

16   And the third and most powerful variable in this type of

17   obsessive, addictive behavior is anonymity.  So in other words,

18   no one knows who you are when you're doing this.  You can do it

19   in the closet or in the bedroom, the bathroom, wherever, and no

20   one knows who you are.  So when you combine these three

21   variables with the preexisting addictive behavior, it becomes

22   incredibly powerful and difficult to overcome.

23   Q.  So if that phone is taken away or it's monitored, can that

24   affect an individual's behavior?

25   A.  Yes.  In my treatment program with sex offenders, we work

1    very, very closely and very well with the federal probation

2    officers and the state probation officers, and they monitor any

3    phones, if they're even allowed to have a phone.  I don't allow

4    them to have a phone until they've been in treatment for some

5    time until I feel like they've reached a level of

6    self-regulation where they can responsibly even have a cell

7    phone.  If they have any type of internet access through a

8    computer, that is monitored by the federal or the state

9    probation officers.

10        So we have a lot of monitoring availability now that we

11   didn't have maybe five or six years ago, certainly back in the

12   '90s.  The technology has evolved, and I'm certainly not a

13   technological person by any means, but the technology has

14   evolved to the point where we can closely monitor men who have

15   been convicted of these types of offenses who have no hands-on

16   offense.

17   Q.  And what is the recidivism rate in general for child

18   pornographers?

19   A.  Well, a meta-analysis of nine different studies recently

20   suggests that it's about 5 percent.  Now, that's if they're

21   treated.  And all my estimates about recidivism are based on if

22   a person is in treatment.  If a person is not in treatment, of

23   course, they will be high risk.  But if a person is in

24   treatment and is committed to treatment, then we could have

25   anywhere from 5 percent.  Some research would say higher.  But

1    it's difficult to say exactly, but certainly anywhere from the

2    5 probably up to about the 18 percent range.

3    Q.  And I'm going to just refer to your report.  You felt that

4    Mr. DeVito was a candidate to have in fact even community

5    treatment?

6    A.  Yes.  Based on my training and experience with men who have

7    been convicted of this type of offense, and his profile, I

8    believe that he would be a candidate for a community-based

9    treatment program with proper probationary guidelines and

10   monitoring by the Probation Office.

11   Q.  Okay.  Now, in your report you specifically stated that,

12   and this was in June of 2017, that Mr. DeVito did not blame

13   anybody else for his actions; correct?

14   A.  That's correct.

15   Q.  What did he state to you?

16   A.  Well, I talked with him, like I do with many of or all of,

17   I should say, the individuals I evaluate or treat about

18   responsibility and if they accept responsibility for their

19   offense, and he didn't blame anyone but himself.  He didn't try

20   to blame it on his stress.  He did not try to blame it on the

21   abuse he reportedly sustained by the half-brother.  He didn't

22   try to say anything except he was responsible and he needed

23   help for this problem.

24   Q.  Okay.  The abuse by his half-brother, did he state to you

25   that that just gave him more of an interest in pornography?

1    A.  He didn't seem to connect the physical abuse by his brother

2    or the sexual abuse by his brother and the pornography.  It was

3    more so that that's how he was introduced to pornography, by

4    the brother or half-brother.  But he didn't -- he didn't -- I

5    didn't get the impression that he was trying to connect the

6    abuse with pornography.

7    Q.  Does he have any obsessive compulsive traits?

8    A.  Well, certainly with pornography.  He would masturbate

9    sometimes up to two or three times a day during his adolescent

10   years and spend a couple hours a day on pornographic websites,

11   and this persisted sometime into his adulthood too with a

12   obsessive-compulsive behavior in that regard.

13   Q.  Is he an intelligent man?

14   A.  I think he is, yes.

15   Q.  Is he college educated?

16   A.  I believe so, yes.

17   Q.  Was he working at the time of the offense?

18   A.  He was.

19   Q.  And in a management position?

20   A.  Yes.

21   Q.  What was your understanding of his drug and alcohol

22   history?

23   A.  Let me just double-check.

24       He never reported having an alcohol problem.  And I checked

25   with his wife to make sure, and to her knowledge, he had never

1   had any kind of an alcohol problem.  They would have a mixed

2   drink once in a while.  He never used any type of illegal drug,

3   including marijuana, and which was -- or he never abused

4   prescription medications or inhalants, and these statements

5   were also independently confirmed by his wife.

6   Q.  What about his mental health history besides what you've

7   stated already?

8   A.  Well, unfortunately, he never received any type of mental

9   health treatment, which he should have as an adolescent, but he

10  was never properly medicated, he never received psychotherapy.

11  And as I stated previously, he knew he needed help, but he

12  didn't -- never went.

13  Q.  Did he undergo chronic depression?

14  A.  Yes.

15  Q.  Was he ever treated for that?

16  A.  No.  He was never treated for any of his psychiatric

17  disorders.

18  Q.  His neurological history?

19  A.  There was no head traumas.  There were no incidents of

20  traumatic brain injury.

21  Q.  Okay.  His psychometric test results besides what you've

22  stated today, is there any other information that you feel that

23  is important to provide to this Court?  And we can go over it

24  quickly, if you'd like, the -- there's a Child Abuse Potential

25  Inventory that you used.

1    A.  No, I think everything we've said so far has pretty much

2    summed up his profile, if you will.

3    Q.  You did four tests; correct?

4    A.  Well, the Child Abuse Potential Inventory, the Millon, and

5    then the Abel Assessment would be three actual tests.  And then

6    the guidelines, the risk guidelines, are nothing more than just

7    a guideline to follow.  They're not actual tests per se.

8    Q.  Okay.  And your conclusion was he's a low risk to reoffend.

9    Could you explain that to the Court?

10   A.  Sure.  If he was properly treated in a treatment program or

11   properly monitored by the federal Probation Office, I believe

12   that he is at low risk to reoffend.  And I base that opinion

13   not only on the research but also on the fact that he

14   acknowledged that he needs help.  He acknowledged that he has a

15   severe problem.  He acknowledged that he had a sexual interest

16   in minors, females; that he was disgusted by himself.  So

17   there's a lot of factors in just that that suggest that he

18   would be a good candidate.

19       The other thing that's important to look at is there is no

20   history of criminality.  We don't see a pattern of criminality

21   here other than the repeated same behaviors, the

22   obsessive-compulsive behaviors of pornography use and underage.

23   That could in and of itself maybe constitute a pattern, but

24   there's not a diversity of criminality that we see with men who

25   typically reoffend.

1    There's no severe psychopathology, such as I said earlier,

2 there's no psychosis, there's no schizophrenia, there's no

3 bipolar disorder, things like this, and there's no drug or

4 alcohol issue that we have to deal with.  It's pretty much a

5 targeted item here with his treatment.

6 Q.  Does the supportive family affect how an individual's

7 treatment proceeds?

8 A.  Absolutely, yes.

9 Q.  How is that?

10 A.  Well, in the research on men who commit different types of

11 sex offenders -- offenses, one of the things that we're looking

12 at is attachment deficits.  When they have attachment deficits,

13 when they have poor relationships, they're more likely to act

14 out sexually.  They're more likely to reoffend.  So if you have

15 a patient who has a lot of family support, that compromises the

16 attachment deficit, so that increases the probability of

17 successful treatment.

18 Q.  Okay.  So all of the opinions you stated today as well as

19 in your report you can state to a reasonable degree of

20 psychological certainty?

21 A.  Yes.

22 Q.  Okay.

23      MS. KOVOOR:  One moment, Your Honor.

24   (Ms. Kovoor conferring with the defendant.)

25      MS. KOVOOR:  Thank you.

```
 1              THE COURT:  Thank you, Ms. Kovoor.

 2              Mr. Healey, would you like to cross-examine?

 3              MR. HEALEY:  Thank you, Judge.

 4              THE COURT:  You may proceed.

 5                         CROSS-EXAMINATION

 6    BY MR. HEALEY:

 7    Q.  Good morning, Doctor.

 8    A.  Good morning.

 9    Q.  So how long did you speak with Mr. DeVito?

10    A.  Probably about three-and-a-half hours.

11    Q.  And was this in person or over the phone?

12    A.  In person.

13    Q.  In person.  What was his demeanor when you spoke to him?

14    A.  Very somber.  Remorseful.  Ashamed.

15    Q.  And prior to meeting with him, you said you reviewed the

16    criminal complaint in this case?

17    A.  Correct.

18    Q.  Did you review any of the other evidence in the case as far

19    as his other conduct?

20    A.  No, sir.  That was the only information given to me.

21    Q.  And so the criminal complaint involved approximately four

22    days of conduct with one minor, is that what you recall?

23    A.  I believe so, yes.

24    Q.  And you had indicated that Mr. DeVito acknowledged that he

25    had engaged in such conduct with up to as many as you believe
```

```
 1    21 other minors?

 2    A.  That was his estimate, yes.

 3    Q.  Did he say the age of those minors?

 4    A.  They varied from, I believe, as low as eight to early

 5    teens.

 6    Q.  And you mentioned that this behavior consisted of being in

 7    chat rooms?

 8    A.  Yes.

 9    Q.  What do you understand that to mean?

10    A.  Well, he would make explicit chats to these minors, and

11    there was also like images being viewed where he would talk to

12    them about engaging in different activity.

13    Q.  Did he tell you that he actually did live Facetime videos

14    with these minors?

15    A.  That would be the correct term, yes.

16    Q.  So it's not actually chatting, I mean, it's a face-to-face

17    conversation through the screen?

18    A.  Yes.

19    Q.  So it's much different than just sending a text message to

20    someone; right?

21    A.  That's right, yes.

22    Q.  Did he explain what he would show the minors to you?

23    A.  He would talk about wanting to show them his genitalia,

24    asking them to show theirs, and get them to engage in different

25    sexual acts.
```

1   Q.  Did he explain to you how he would show them pornography as

2   well?

3   A.  I don't recall how he did it technically, but there were

4   some comments to that.

5   Q.  And you explained that showing pornography to someone, in

6   your report, I think, showing pornography to someone at a very

7   young age, that can be detrimental to their sexual development

8   later in life?

9   A.  Yes, sir.

10  Q.  I mean, that's exactly what happened to Mr. DeVito; right?

11  He claims that he was subjected to child pornography at the age

12  of eight?

13  A.  At ten, I believe.

14  Q.  Ten?

15  A.  Yes.

16  Q.  And so that conduct creates a lot of problems later in life

17  based on your research or based on research that you're

18  familiar with?

19  A.  Absolutely, yes.

20  Q.  Did he tell you who he pretended to be when he was online?

21  A.  A female, I believe 13-year-old female.

22  Q.  Did he tell you how many communications he'd typically have

23  with a minor?  Was this just a one-day thing, a one-chat thing?

24  A.  No.  This went over on a -- over a period of time.  He

25  estimated approximately 21 different interactions with a

1   person.

2   Q.  And how long were those interactions, though?

3   A.  I don't know.

4   Q.  Would it change your assessment at all to find out that

5   Minor Victim A he interacted with for four weeks?

6   A.  It wouldn't change my opinion in terms of his risk level.

7   But, again, that's premised upon if in fact he's in treatment.

8   Now, if he were not in treatment, then yes.

9   Q.  If he exchanged 2,400 messages with an eight-year-old in

10  that -- with the victim in that case over the four weeks, would

11  that change your assessment at all?

12  A.  If he were in treatment, no, sir.

13  Q.  If he got 37 videos of sexual exploitation from that minor

14  during that four-week span, would that change your evaluation

15  at all?

16  A.  If he were in treatment, no, sir.

17  Q.  Do you look at their offense conduct at all as far as what

18  they're attempting to get these minors to do?  Does that matter

19  at all in your evaluation?

20  A.  Yes, it does.

21  Q.  Did he explain to you that he tried to use the minors to

22  recruit their relatives?

23  A.  No, he did not.

24  Q.  Why would that be significant to you?

25  A.  Well, it would go beyond just interacting with the minor.

1    Then he would be putting the minor in a position where they are

2    going to exacerbate his own deviancy and put them in a very

3    uncomfortable situation to try to recruit people to do the same

4    thing.

5    Q.  And how would that affect your evaluation?

6    A.  I would have to consider that more and I would have to talk

7    with him more about that, and it could, but I can't say at this

8    time.

9    Q.  What if he encouraged the minor to perform oral sex on her

10   father so he could see it?

11   A.  That would, of course, be very concerning, yes.

12   Q.  I'd like to talk to you a little bit about what you

13   reference in your report as the cognitive distortion score.

14   A.  Yes.

15   Q.  Can you explain what that is?

16   A.  Men who are sexually involved with children have distorted

17   thinking patterns.  In other words, they don't always fully

18   understand the degree of devastation emotionally,

19   psychologically that this can have on a child, and they use

20   these thought patterns as a way to justify or minimize or

21   rationalize their behaviors.  These are defense mechanisms that

22   they use to engage in a behavior.

23       And on his cognitive distortion score, it was in, I

24   believe, the problematic range.  So this is a area of treatment

25   that needs to be targeted.  In fact, it was at 31 percent, and

 1   scores between 26 and 39 percent are considered problematic.

 2   So it's a way to justify the behavior.

 3   Q.  And so that justification of a behavior, that's a potential

 4   problem going forward, is that what you're --

 5   A.  Yes, sir.

 6   Q.  -- saying?

 7   A.  Yes.

 8   Q.  Can we just talk briefly just the dynamics between a

 9   30-year-old man having a conversation with an eight-year-old.

10   I mean, you would agree logic dictates that, I mean, the

11   30-year-old is effectively in control of that conversation?

12   A.  I agree.

13   Q.  Is it a justification, I guess would it raise the

14   distortion score if you knew that Mr. DeVito wanted the minor

15   victim to come because he felt that he didn't actually induce

16   her to make those photos?

17   A.  Well, the discortion -- the distortion score is based on

18   his responses to the various questions about the impact the

19   child molestations or sexual activity with a child and an adult

20   can have on the child, so those are his scores.  I don't apply

21   the score myself.

22   Q.  I guess what I would ask, then, is is blaming the

23   eight-year-old conduct that would be consistent with that

24   cognitive distortion score, right, you're effectively --

25   A.  I understand, yes.  Yes, it would be.

1  Q.  Now, you had indicated that Mr. DeVito admitted and

2  seemingly tested that, you know, he's attracted to minors from

3  the ages of 16 seemingly all the way up to 17?

4  A.  Well, that was his secondary attraction.

5  Q.  The primary attraction was, I'm sorry?

6  A.  With children between the ages of six and 13.

7  Q.  And that this started at a young age with him?

8  A.  Yes.

9  Q.  And so in layman's terms, it's females between the ages of

10  six and 13 that sexually stimulate him, that he fantasizes

11  about; is that correct?

12  A.  Correct.

13  Q.  Now, the treatment that's available, it doesn't actually

14  like rewire the defendant's thought process, like he's not in

15  the future going to not be attracted to those women through

16  treatment; it just manages it?

17  A.  I think that's a fair way of saying it.  We can't take away

18  an attraction per se, but we certainly can help people learn

19  how to manage the attraction.

20  Q.  Now, you had also mentioned in your memo, you've actually

21  worked, I believe, in the Bureau of Prisons for a while; is

22  that correct?

23  A.  Yes, I did, in FCI Englewood, Colorado and then in FCI

24  Butner, North Carolina.

25  Q.  The time you were at Butner, I mean, that was the Bureau of

CONNOR - CROSS                                    30

1    Prisons' largest mental health facility; is that correct?

2    A.  Yes.

3    Q.  The Bureau of Prisons, I think you even wrote in your memo,

4    I mean, they're perfectly capable of providing adequate

5    treatment to Mr. DeVito, in your estimation?

6    A.  Absolutely.

7    Q.  You had referenced as part of what your treatment plan for

8    him would include polygraphing.  Why?

9    A.  Why would it?

10   Q.  Yes.

11   A.  Yes.  Well, it's another level of safety; that the

12   probation officers will ask me if there's any questions that I

13   want to have the examiner or the polygrapher ask the defendant

14   or the probationer in the polygraph.  If you can work together

15   with the probation officers about what needs to be targeted, it

16   provides another level of safety primarily for the community.

17   Q.  To your knowledge, has Mr. DeVito been polygraphed yet

18   about his conduct?

19   A.  I do not know.

20   Q.  You're familiar with some of the studies that have come out

21   about the results of polygraphing admitted sex offenders;

22   right?

23   A.  I do.

24   Q.  And the studies generally show that after a polygraph

25   examination, they tend to admit to multiple -- or more victims

1    than they initially admitted to?

2    A.   Well, the what's referred to as the sexual disclosure

3    polygraph?

4    Q.   Yes.

5    A.   In the initial stages of treatment, that does seem to be

6    accurate, yes.

7    Q.   Are you familiar with the studies that indicate they also

8    tend to overstate their own sexual victimization?

9    A.   I am not familiar with that study.

10       That they overstate their own sexual victimization, is that

11   what you're saying?

12   Q.   Yes.

13   A.   On the polygraph?

14   Q.   Yes.

15   A.   I am not familiar with that study.

16   Q.   One of the things that you noted was that you wouldn't

17   allow Mr. DeVito to have access to a cell phone during

18   treatment?

19   A.   Absolutely not in the initial stages anyway.

20   Q.   Why would that be the case?

21   A.   Well, because of the, as I said earlier, the -- we call it

22   the Triple A engine, the affordability, the accessibility, and

23   the anonymity of accessing pornography.  It would be like

24   having an alcoholic go into a bar and say don't have a drink.

25   It's just not clinically appropriate.

 1   Q.  And I want to word this question artfully, Doctor, but --

 2   A.  Sure.

 3   Q.  -- what I'm asking is, you know, you put a pretty big

 4   caveat in your report which is this isn't an exact science, is

 5   that a fair way to say, the work that you do?

 6   A.  I think it's absolutely fair, yes.

 7   Q.  So he could do well with treatment, he could not do well

 8   with treatment, you just don't know until you start; is that

 9   correct?

10   A.  That's correct.

11           MR. HEALEY:  Just a second, Your Honor.

12           I have nothing further.  Thank you, Your Honor.

13           THE COURT:  Thank you, Mr. Healey.

14           Do you have any redirect examination, Ms. Kovoor?

15           MS. KOVOOR:  Yes.

16           THE COURT:  You may proceed.

17                        REDIRECT EXAMINATION

18   BY MS. KOVOOR:

19   Q.  Dr. Connor, you mentioned your work with the Federal Bureau

20   of Prisons?

21   A.  Yes.

22   Q.  When would an individual who is charged and convicted of a

23   sex offense start getting treatment?

24   A.  In my opinion, as soon as I possibly can.  I would prefer

25   that as soon as they're arrested, that the next day they start

1    treatment because they're emotionally quite raw at the time and

2    filled with a lot of angst, and so that makes them prime to

3    really start to open up about the problems they've been having.

4    Q.  Is that the general practice in federal prisons today?

5    A.  My under -- well, I can only speak when I was at Butner.

6    It was the last two years of their sentence that they were

7    accepted into our treatment program.

8    Q.  Okay.  So the longer the sentence, the longer the delay in

9    treatment; is that correct?

10   A.  Yes.

11   Q.  Which is counterproductive to the person's progress?

12   A.  Well, I can only speak clinically.  Clinically speaking,

13   the longer you wait, the more the defense mechanisms start to

14   seat back into the psyche.  So as soon as they are able to get

15   in treatment, as soon after the offense, is when I prefer to

16   start treatment.

17   Q.  Okay.  Now, we mentioned -- Mr. Healey mentioned

18   pedophilia.  Mr. DeVito didn't choose to have an attraction to

19   young females?

20   A.  Well, the research is emerging that this is not as much of

21   a choice as maybe what we once thought.  Dr. Klaus Beier at the

22   Berlin Institute of Sexology is leading some of this research

23   in Berlin, Germany that it's -- it -- I've never had a patient

24   tell me that they wanted to be a pedophile.  That's something

25   that, like I said earlier, it's like giving a cancer diagnosis;

1    it's not something they want.

2    Q.  But somebody who accepts the conduct would be a better

3    candidate for successful treatment; correct?

4    A.  Well, acceptance of the conduct is imperative to the first

5    step of treatment.

6    Q.  And, Mr. DeVito, while he was talking to you, even

7    mentioned spontaneously that there were approximately 21 other

8    girls that he had contacted?

9    A.  Yes.

10   Q.  Okay.  He expressed to you the remorse he had as to his

11   actions and what he did to these girls?

12   A.  The remorse and the self-disgust.

13   Q.  And he also expressed remorse as to what he did to his

14   family?

15   A.  Correct.

16   Q.  Now, regarding polygraphs, did you ever get any

17   investigator's files regarding polygraphs?

18   A.  I did not.

19   Q.  Okay.  Did you get any evidence from the prosecutor

20   regarding chats?

21   A.  No.

22   Q.  Okay.  So you're going by the complaint and the affidavit

23   provided by the investigator; correct?

24   A.  Correct.

25   Q.  That was submitted to you as well?

1   A.  Yes.

2   Q.  Okay.

3   A.  Well, not the affidavit.  The criminal complaint.

4   Q.  Together with the affidavit of --

5   A.  With that, yes.

6   Q.  -- Agent Jones?

7       Okay.  And that delineated the steps of the investigation

8   and the ultimate arrest of Mr. DeVito; correct?

9   A.  Correct.

10  Q.  Okay.  When you were referring to polygraphs, were you

11  referring to the probation officer's ability to use polygraph

12  as a tool?

13  A.  As a treatment tool, yes.

14  Q.  Is that correct?

15  A.  Yes.

16  Q.  Okay.  And that would be a way to monitor somebody who is

17  no longer incarcerated?

18  A.  Correct.

19  Q.  Okay.  And that also registration also helps; is that

20  correct?

21  A.  Yes.

22  Q.  Okay.  'Cause you know where the person's whereabouts is?

23  A.  Correct, yes.

24  Q.  What other tools do they use at the federal prison level?

25  A.  Well, we are frequently in contact with one another about

1    the person's behavior and conduct with the Probation Office,

2    their engagement in treatment, their progress in treatment.

3    Again, the polygraphs.  We have face-to-face meetings with the

4    officers.  So it's a very tightly monitored, I think,

5    combination of Probation and treatment.

6    Q.  So basically they do a very good job of monitoring

7    ex-convicts who are sex offenders?

8    A.  I think they do an excellent job.

9    Q.  Okay.  Now, regarding sexual abuse and reoffending, do you

10   find that specifically boys are less apt to tell if they've

11   been abused by another male?

12   A.  I do.

13   Q.  Are they more ashamed of being a victim in that situation?

14   A.  If they are abused by a male, yes.

15   Q.  Why is that?

16   A.  Boys who get sexually molested by another male have a fear

17   that that could make them homosexual.  They have a fear that if

18   they had any type of arousal during the molestation from a

19   male, that that means that they have an attraction to male when

20   essentially that is nothing more than a physiological response

21   to tactile stimulation.  So there's a lot more shame

22   associated.  And we teach boys to not tell, to be strong,

23   whereas I think we socialize females that if someone touches

24   you, to make sure you tell us, but that doesn't always work

25   either.

1      But to answer your question, boys have a much more, I

2    think, difficult time with this because if it's a male

3    perpetrator.

4    Q.  Does the fact that the perpetrator here was an older

5    half-brother have any effect on an individual's -- if it's a

6    family member who's the offender, does that affect the person's

7    ability to tell?

8    A.  If it's a family member, it affects their willingness to

9    tell more because they don't want to cause the family problems

10   so they tend to keep it to themselves.

11   Q.  So there's nothing unusual about Mr. DeVito keeping his

12   abuse secret?

13   A.  No.  And I would add that at no time did I get the sense

14   that Mr. DeVito was using his own molestation as some type of

15   explanation or excuse for what he did.  I think those are two

16   separate factors.

17   Q.  And did you ever find any malingering or -- in interviewing

18   Mr. DeVito for three-and-a-half hours?

19   A.  No, not in my interviews.  And the tests that we give have

20   what we call social desirability scales where they -- where we

21   can look and see if they are being forthright.

22   Q.  Okay.  And you found him forthright?

23   A.  I did.

24   Q.  And you found him willing and wanting treatment?

25   A.  Absolutely.

```
 1   Q.  Thank you.

 2              THE COURT:  Mr. Healey, any recross examination?

 3              MR. HEALEY:  Just one quick point.

 4                        RECROSS EXAMINATION

 5   BY MR. HEALEY:

 6   Q.  Doctor, you had said you got evidence from myself and Agent

 7   Jones.  You didn't actually get it from us?

 8   A.  No, sir.

 9   Q.  You got it from DeVito's lawyers?

10   A.  That's correct.

11   Q.  You've never spoken to us prior to today?

12   A.  No, sir.

13   Q.  Okay.  Thank you.

14              THE COURT:  Thank you.

15              Anything further, Ms. Kovoor?

16              MS. KOVOOR:  No, Your Honor.

17              THE COURT:  Dr. Connor, the Court appreciates your

18   coming here and testifying.  You are excused.

19              THE WITNESS:  Thank you, Your Honor.

20              THE COURT:  You have one more witness, Ms. Kovoor?

21              MS. KOVOOR:  I have one more professional witness and

22   I have one lay witness, Your Honor.

23              THE COURT:  All right.  Why don't we hear from the

24   professional witness.

25              MS. KOVOOR:  Your Honor, I call Roger Pimentel.
```

```
 1              THE COURT:  Would you spell the last name?

 2              MS. KOVOOR:  P-I-M-E-N-T-A-L.

 3              THE COURT:  P-I-M --

 4              MS. KOVOOR:  -- E-N --

 5              THE COURT:  -- E-N --

 6              MS. KOVOOR:  -- T-A-L.

 7              THE COURT:  -- T-A-L.

 8              COURTROOM DEPUTY:  Step up there, raise your right

 9    hand, and be sworn in.

10         (Witness complied.)

11              COURTROOM DEPUTY:  You do solemnly swear that the

12    testimony you're about to give in this case will be the truth,

13    the whole truth, and nothing but the truth, so help you God?

14              THE WITNESS:  I do.

15              COURTROOM DEPUTY:  Thank you.  Please be seated.

16                        ROGER PIMENTEL

17                      DIRECT EXAMINATION

18    BY MS. KOVOOR:

19    Q.  Good morning, Mr. Pimentel.

20    A.  Good morning.

21    Q.  Could you state your name?

22    A.  Yes.  Name is Roger Pimentel.  And I'd like to correct the

23    spelling.  It is P-I-M-E-N-T-E-L.

24    Q.  I apologize.

25         Mr. Pimentel, could you tell the Court why you're here
```

1    today?

2    A.  I am a mitigation investigator and sentencing consultant,

3    and I've been retained by your office.

4    Q.  Okay.  Could you tell the Court your educational

5    background?

6    A.  I have a master's degree in public policy with a emphasis

7    in criminal justice policy.

8    Q.  What about your work history?

9    A.  I was a United States Probation and Pretrial Officer for

10   over ten years.  Prior to that, I was a local county probation

11   officer.

12   Q.  Okay.

13   A.  So over 20-plus years of work in probation and corrections.

14        My expertise over those 20 years, especially in the federal

15   system, was with sexual exploitation offenders, child

16   pornography offenders.  That expertise included creating,

17   helping, and co-chairing a work group that created national

18   policies for sex offender management, also creating policies

19   for the American Probation and Parole Association, training

20   Federal Courts in the Northern District of California and also

21   in the Central District of California, and hundreds and perhaps

22   even thousands of probation officers throughout the country.

23   Q.  Okay.  Let me specify where you've testified.  Have you

24   testified before the United States Sentencing Commission?

25   A.  I have.

1  Q.  In what capacity?

2  A.  In my role as on the sex offender management work group, we

3  provided great guidance and consultation to the Sentencing

4  Commission on sex offender management issues.

5  Q.  Okay.  Have you taught at seminars?

6  A.  Yes.

7  Q.  What kind?

8  A.  I have taught at seminars for the American Probation and

9  Parole Association, the Federal Probation and Pretrial

10  Officers' Association, for judges at annual seminars.

11  Q.  Federal judges?

12  A.  Yes.  Local judges as well.  For the National Pretrial

13  Association, for the California Coalition on Sexual Offending,

14  also for the Association of Treatment of Sexual Abusers, ATSA.

15  So quite a bit of training and education.

16  Q.  How about the Bureau of Prisons or the Department of

17  Justice?

18  A.  Bureau of Prisons, we did provide some guidance and worked

19  with them.  It was more on a one-on-one basis while in

20  Washington, D.C. working for the work group, the work group

21  which was commissioned by the Administrative Office of the

22  United States Courts.

23  Q.  Okay.  And the Department of Justice?

24  A.  My work with the Department of Justice is related to

25  training seminars sponsored by the Federal Bureau of

1    Investigation and the United States Marshal Service, mostly in

2    the Central District of California.

3    Q.   Okay.   Have you published any articles?

4    A.   I've co-authored three articles.   One on the -- on the

5    containment approach to sexual defendants in the community, one

6    on the sentencing processes facing sexual offenders, and an

7    article on suicide prevention for indicted pretrial defendants.

8    Q.   Okay.   Have you testified in any courts as an expert?

9    A.   I've testified in every federal circuit in the country

10   throughout a variety of different District Courts.

11           MS. KOVOOR:   Your Honor, I would move that Dr. -- I

12   mean Mr. Pimentel be declared an expert in this matter.

13           THE COURT:   Any objection?

14           MR. HEALEY:   What is the matter that he's being

15   declared an expert in?

16           MS. KOVOOR:   Just regarding the guidelines sentencing.

17           MR. HEALEY:   Regarding the sentencing guidelines,

18   that's fine, Your Honor.

19           THE COURT:   All right.   The Court will recognize

20   Mr. Pimentel under Federal Rule of Evidence 702 as an expert

21   qualified to talk about the sentencing guidelines.

22           MS. KOVOOR:   Thank you, Your Honor.

23   Q.   Could you tell -- well, first of all, you said you were

24   retained by Mr. DeVito; correct?

25   A.   Yes.

1  Q.  Okay.  Could you tell the Court what you did once you were

2  retained?

3  A.  The first step was to review all of the discovery that was

4  provided by your office which included the charging documents,

5  investigative reports, the presentence report, items -- almost

6  everything with the exception of any images or anything like

7  that.

8  Q.  Okay.  Did you have an opportunity to interview any

9  individuals?

10  A.  Yes.  I had the opportunity to speak to Mr. DeVito by

11  phone.  I had the opportunity to speak to his mother and also

12  his wife briefly.

13  Q.  Okay.  Did you get background information?

14  A.  Yes.

15  Q.  What information did you get?

16  A.  I compiled his complete social history, his employment

17  history, his education history, medical issues, and essentially

18  the type of work that a presentence investigator would do.  And

19  this information was used in support of the sentencing

20  memorandum that was submitted.

21  Q.  So you helped prepare or gave input to the sentencing

22  memorandum that was filed with this Court?

23  A.  Yes.

24  Q.  Okay.  Tell me a little bit of background that Mr. DeVito

25  had prior to being charged.

1    A.  Well, I mean, his background, it is stated in the papers,

2    but, I mean, it's -- he's a first-time offender.  He was

3    employed.  He was a family man.  He is college educated.  And I

4    also learned about his addiction to pornography which

5    correlated or led to his sexual offending in this case.

6    Q.  Okay.  Now, based on your experience and training, how do

7    the Sentencing Guidelines impact Mr. DeVito's case?

8    A.  Well, the guidelines are -- have been criticized for many

9    years, and at the basis of the criticism is the fact that the

10    guidelines are not supported by empirical evidence.  And what

11    typically happened with guidelines or a set of guidelines is

12    that Congress would submit their recommendation to the

13    Sentencing Commission, the Sentencing Commission would then

14    feather this out to a group of experts, research it, make their

15    recommendation.

16        With child pornography guidelines, since the early '90s

17    Congress has directly imposed the guidelines without seeking

18    research or support by the Sentencing Commission.  And, in

19    fact, in the most recent addendums to the Sentencing

20    Guidelines, the PROTECT Act and the Adam Walsh Act, the

21    Sentencing Commission was opposed to the increases to the

22    penalties in these provisions because the issues were not

23    properly researched.

24    Q.  Could you explain to the Court what you mean by problems

25    with the guidelines in child pornography cases?

1  A.  Well --

2  Q.  First of all, you've got people who are running for elected

3  office dictating guidelines; is that correct?

4  A.  Yes.  The guidelines for sexual offenders are often

5  politically motivated.  It is not uncommon for congressmen to

6  submit Bills during an election year encouraging the increase

7  in penalties for sexual offenders.

8      And, you know, unfortunately, what has happened is that

9  things get researched and things get looked at a lot closer

10  down the road, and Congress doesn't -- they don't back things

11  up once -- once things happen.  For example, sexual offender

12  registration which is now available in the federal system,

13  there's much -- there's much study and debate about this issue

14  that it actually increases potential recidivism for sexual

15  offenders because it limits where they can live, it limits

16  where they can work, it limits where they can recreate, and

17  this creates, generally speaking, a higher-risk offender

18  potentially.

19  Q.  Well, let me go to specifically to Mr. DeVito's presentence

20  report.

21  A.  Yes.

22  Q.  You reviewed it?

23  A.  Yes.

24  Q.  You reviewed the objections to it?

25  A.  Yes.

PIMENTEL - DIRECT

1   Q.   And the responses by the government?

2   A.   Yes.

3   Q.   Okay.  Could you specify what problems you found?

4   A.   Well, in Mr. DeVito's case, the -- some of the challenges,

5   you know, in his case have to do with the enhancements.  For

6   example, the underage 12 enhancement.  This is an enhancement

7   that, according to the Sentencing Commission, is used in 96

8   percent of cases.  It's almost an element of the offense.  It's

9   almost double counting.  So that is an issue that stacks the

10  enhancement or stacks the potential range.

11       Similarly, the use of a computer which adds two additional

12  levels, that is a -- in today's world, every -- almost every

13  single child pornography case is a -- is with the use of a

14  computer.  And, you know, there's a local -- or there's a

15  District Court, I believe, that indicated in disagreeing with

16  the computer policy or the computer enhancement, they indicated

17  that it's the equivalent of giving an individual a speeding

18  ticket and then giving them an additional fine for using a

19  vehicle.  It's an element of the offense.  So that is an issue.

20       The enhancements for the number of images; 600 images

21  now creates a five-level bump.  That is -- when that was

22  originally created, it took a lot of work for an individual to

23  actually collect 600 images.  In today's world with technology,

24  that is a single click of the mouse.  So the guidelines have

25  not kept up with the technology.

1  Q.  So you're saying that somebody clicking a mouse once may be

2  less culpable than somebody who's going out there and

3  retrieving pictures and mailing it or doing the work for 600

4  images --

5  A.  Yes.

6  Q.  -- to be produced?

7  A.  It is much easier to collect vast amounts of child

8  pornography in today's world which is a factor in terms of the

9  enhancements because the original idea of the enhancements was,

10  you know, 600 images was either very slow dial-up internet or

11  was the actual physical pursuit of child pornography images,

12  whether that's going by mail order or, you know, some other

13  nefarious way.

14  Q.  Okay.  What about the use of sadomasochistic images?

15  A.  Yeah.  "Sadomasochistic images" has a very broad definition

16  which essentially encompasses all types of child pornography.

17  It's described in the Federal Code with penetration and

18  sexually explicit conduct, and that exists in almost every

19  image of child pornography that's out there.

20  Q.  So in essence, what are you saying to this Court regarding

21  the enhancements?

22  A.  Well, the enhancements have been criticized, as the

23  guidelines have been, and --

24  Q.  By whom?

25  A.  By, well, in general by Courts just based on the degree --

1    the rate that they are not sentencing within the guidelines.

2    Q.  What do you mean by that?

3    A.  For example, in production cases, across the country Courts

4    are sentencing defendants at a rate of about 52 percent only

5    within the guidelines.  So 48 percent are varying from the

6    guidelines.  Within that 52 percent, it being 52 percent that's

7    being sentenced within the guidelines, a large majority of

8    those individuals are what's called remote producers of child

9    pornography which is exactly the case with Mr. DeVito.

10   Q.  What do you mean by that, remote producers?

11   A.  What I mean is that Mr. DeVito did not -- he was not

12   engaged in hands-on offending with the victims.  That in no way

13   minimizes his conduct which is -- but he did not -- he did not

14   fondle, he did not rape, he did not sodomize, he did not

15   conduct any hands-on offending in this case.  So he meets the

16   criteria of a non-hands-on offender.

17   Q.  Did he even attempt to contact any of the victims in this

18   case, to your knowledge?

19   A.  To my knowledge, no.

20   Q.  You mentioned aggregate sentencing guidelines.  We will

21   talk about the particular enhancements here.

22   A.  Yes.

23   Q.  What is his base offense, if you know?

24   A.  His base offense level here is 32.

25   Q.  And how is that increased specifically?

1    A.   Well, with the enhancements, they, I believe, rocket up to

2    49.

3    Q.   Okay.

4    A.   So they almost -- they increase dramatically.

5    Q.   Okay.   And as you said, he's a first-time offender;

6    correct?

7    A.   Yes.

8    Q.   So, what, his criminal offense category is what?

9    A.   One.

10    Q.   Okay.   And based on this 49 --

11    A.   That is right.   That is a life sentence according to the

12    guideline range.

13    Q.   And is child pornography a life sentence charge under the

14    federal criminal statutes?

15    A.   The statutory maximum is 30 years for a production in child

16    pornography.

17    Q.   Okay.   So based on the fact that when you take his offense

18    level, which is I, having no prior charges, arrests, or

19    anything of that sort, and then add all these enhancements,

20    you're basically telling the Court that the recommendation is a

21    life sentence for a non-life charge?

22    A.   It just illustrates how unreasonable the guidelines are and

23    how each of these enhancements work to just absolutely stack

24    and aggravate the offense.   And the problem with these

25    enhancements is that each of them, the ones we talked about,

1    have significant issues and challenges and have been debated in

2    court and have been tossed out in court.  Other Courts have

3    accepted them, obviously.  But there are -- there are issues

4    and challenges.  And it's probably the greatest contributing

5    factor to the disparity in child pornography sentencing.

6    Q.  Could you explain that to the Court regarding disparity?

7    A.  Well, I mean, it's -- I believe in just regular child

8    pornography cases where you would see all of these

9    enhancements, Courts are varying at like a 62, 63 percent rate,

10   and it's -- it is -- the Sentencing Commission views that as a

11   problem, and they're trying to address it and it's been a

12   challenge.

13   Q.  Has law kept up with the technology?

14   A.  No.

15   Q.  Explain that.

16   A.  I mean, as I previously discussed, the 600-image

17   enhancement is Exhibit A.  That is use of a computer.

18   Q.  Now, we've seen these disparities in sentencing in cocaine

19   cases; correct?  I'm just thinking an analogy.

20   A.  The crack cocaine disparity, the Kimbrough case, and that

21   was -- that was a watershed kind of case that definitely gives

22   the Court discretion to get away from the guidelines.

23   Q.  And now legislation has even changed regarding sentencing

24   between cocaine and crack cocaine?

25   A.  Yes.

1    Q.  Okay.  Could you explain to the Court why you think the

2    guidelines should not even be used in this case?

3    A.  Well, because there is such debate about them, that the

4    guidelines are unreliable.  And there's case law that infers

5    that the guidelines are not presumed to be reasonable.  And I

6    think that Mr. DeVito -- I think that issue has weight in this

7    case.

8    Q.  Would 15 years suffice to deter somebody's individual

9    conduct, including based on your experience?

10           MR. HEALEY:  Objection, Your Honor.  That has to be

11   out of the scope of his expertise.

12           THE COURT:  Sustained.

13   Q.  Okay.  Are you familiar with a case United States versus

14   Dorvee out of the Second Circuit, D-O-R-V-E-E?

15   A.  Yes.

16   Q.  Okay.  And that's basically stating exactly what you said,

17   that these can lead to -- the guidelines can lead to

18   unreasonable sentences inconsistent with 3553; correct?

19   A.  That's correct.

20   Q.  Okay.  Are you familiar with any of the other cases that

21   follow?

22   A.  Yes.  In particular, the cases that we noted in the

23   sentencing memorandum which I could refer to, but, yes, I am

24   familiar with them.

25   Q.  Is there any other information that you want to provide

1    this Court with?

2    A.  Yes, thank you.

3        Something that's, I think, important for the Court to

4    consider is that in this case or in all cases, the Court has

5    many tools available, and, for example, sexual offender

6    registration is now available.  This was not available to the

7    Court when the guidelines were originally created.  Lifetime

8    supervision is also now a tool that the Court has available;

9    also a factor that was not considered when the guidelines were

10   originally created.

11       I mentioned that Probation now has the tools and resources

12   available to work.  Since 2012, they have national policy that

13   dictates how a sexual offender will be supervised in the

14   community.  Special conditions now exist.  Search conditions

15   now exist.  Collateral contacts.

16       When Dr. Connor was speaking about polygraph and working

17   with Probation, and what he was describing was the containment

18   model which is a practice of sexual offender management.  U.S.

19   Probation is mandated to use the containment model in the

20   supervision of its sexual offenders.

21       So Mr. DeVito will be subject to more supervision and more

22   conditions than any other type of federal offender, so he will

23   be closely watched.

24       Also available to the government is civil commitment.  If

25   Mr. DeVito were to reoffend or even violate his probation in a

1    sexually dangerous way, he could be civilly committed.  This

2    was a tool -- this, again, is a tool that was not available

3    when the guidelines were created.

4        So I shared this with you because it's a different -- it's

5    a different scenario for Mr. DeVito today than it would have

6    been several years ago when these policies and practices

7    weren't in place.

8    Q.  Okay.

9    A.  Ultimately, what these policies and practices do is they

10   make the communities safer and allow Mr. DeVito to eventually

11   reintegrate back into society.

12   Q.  And as a probation officer, are you involved with assisting

13   in the treatment of defendants charged with child porn?  Have

14   you had that experience?

15   A.  Yeah.  In working within the containment model, probation

16   officers work closely with the therapists, also the polygraph

17   examiner.  It's not uncommon for probation officers to sit in

18   groups with mental health providers.  It's not uncommon for

19   probation officers to develop questions for the polygraph exam

20   based on supervision, based on treatment.

21       Now, earlier -- let me clarify something.  Earlier, there

22   was discussion of Mr. DeVito not being polygraphed prior to

23   sentencing.  Polygraph tool is in the federal system in the

24   containment model is used as a tool for treatment.  So that may

25   also be a reason why Mr. DeVito was not polygraphed at that

1   point.

2   Q.   Okay.

3          MS. KOVOOR:   One moment.

4      (Ms. Kovoor conferring with the defendant.)

5   Q.   Could you go through the specific enhancements that you

6   find problematic?   Just quickly.

7   A.   Yes.   The age enhancement, the 12 and under.   The number of

8   images, 600-plus.   The use of a computer.   And there's one

9   more.

10  Q.   The masochistic?

11  A.   The sadomasochistic, yes.

12      Those are the four enhancements that really skyrocket his

13  level and that are redundant in a lot of ways or no longer --

14  no longer useful given the double nature of things.

15  Q.   Okay.   You had a little opportunity to discuss Mr. DeVito's

16  background with him; correct?

17  A.   Yes.

18  Q.   Could you describe to the Court what you learned?   You also

19  spoke to his mother and wife?

20  A.   Yes.   In what regards?

21  Q.   Just his general background.

22  A.   Well, you know what, he was always a hardworking guy,

23  always worked, provided for his family, was -- loves his

24  mother.   That was very evident.   Loves his daughter.   Was a

25  good -- by all reports, a good family man.   Hardworking.

1  Q.  Was there domestic violence in the home?

2  A.  Yes.  In speaking with his mother, he was exposed to

3  domestic violence at a very young age, domestic violence

4  between his mother and his father, a father who has since

5  passed, and Mr. DeVito saw a lot of that.

6  Q.  I also want to mention first-time offender, okay.  He, by

7  definition, cannot be considered a repeat offender; correct?

8  A.  This is his first offense.

9  Q.  Okay.  Thank you.

10          THE COURT:  Mr. Healey, do you wish to cross-examine?

11          MR. HEALEY:  Yes, please.

12          THE COURT:  You may proceed.

13          MR. HEALEY:  Thank you.

14                       CROSS-EXAMINATION

15  BY MR. HEALEY:

16  Q.  How many presentence reports would you say you've reviewed

17  in your career?

18  A.  Probably 40 to 50.

19  Q.  How many did you work on when you were in the Probation

20  Office, forty or -- I mean, it has to be more than that, right,

21  if you spent ten years in Probation?

22  A.  Yeah.

23  Q.  How many did you work on when you were in the Probation

24  Office?

25  A.  As a Pretrial officer, there was many more opportunities to

1    work versus a presentence.  My assignment was not necessarily

2    in presentence.  It was more as a program administrator for the

3    sex offender management program.

4    Q.  So after the defendant was sentenced is when you were

5    typically involved, is that what you're saying?

6    A.  No, usually prior.

7    Q.  So you worked with Pretrial Services?

8    A.  Pretrial Services, yes, and also U.S. Probation.

9    Q.  And how long did you work with U.S. Probation?

10   A.  Well, see, at the end -- Probation and Pretrial were

11   separate agencies at one time, and then they merged so there

12   was crossover.

13   Q.  So you would do Probation work and you would also be doing

14   Pretrial work?

15   A.  My work with Pretrial -- my work was primarily with

16   Pretrial.

17   Q.  So I guess back -- you've only reviewed about 50 PS --

18   presentence reports in your career, is that what you're

19   testifying to?

20   A.  That's correct.

21   Q.  Of those 50, how many defendants had offense level 49s?

22   A.  It was rare, very rare.

23   Q.  Like any?

24   A.  No, I cannot think of any.  But, however, in my private

25   practice, I have had clients with that level.

1   Q.  How many cases have you reviewed where the defendant

2   produced child pornography with 30 minors or over 30 minors?

3   A.  I have one case in my private practice with those numbers.

4   Higher numbers.

5   Q.  Now, you had talked about a lot of the criticism of the

6   guidelines in this case, but isn't the criticism of the

7   guidelines mainly to Section 2G2.2, the possession and

8   distribution offenses?

9   A.  Well, they do cross over to the production side.  For

10  example, I mean, in this case.  I mean, the enhancements all

11  apply to -- or apply to Mr. DeVito at this point.  So there is

12  a -- an issue of cross-reference.

13  Q.  The criticism in this case is only coming from Mr. DeVito,

14  though, it's not coming from other Courts across the country;

15  isn't that right?

16  A.  Well, based on the way that cases are being varied, I mean,

17  even in the production cases they're being varied.  So I would

18  infer that they don't accept the guidelines and they are

19  varying as a result.

20  Q.  Let's talk about some of the enhancements that you

21  complained about.  The under-12 enhancement, you find that one

22  problematic, you said it applies in every case?

23  A.  According to the Sentencing Commission, it applies in about

24  95, 94 percent of the cases.

25  Q.  For Mr. DeVito, it didn't apply in all of his pseudo

1   counts, did it, actually?

2   A.  I believe it did apply in his primary count.

3   Q.  His primary, but the other counts it didn't apply because

4   the victims were over 12?

5   A.  I'd have to take a look at it.

6   Q.  In your experience in life, is someone under 12 a little

7   easier to manipulate than someone over 12?

8   A.  I would agree with that, yes.

9   Q.  Let's talk about the use of the computer enhancement.  You

10  keep only referring to the use of the computer part, but the

11  actual two-level enhancement encompasses more conduct than

12  that, doesn't it?

13  A.  It may.

14  Q.  It actually encompasses producing sexually explicit

15  material for the purpose of transmitting such material live and

16  misrepresenting the participant's identity to persuade and

17  induce the minor.  So there's a misrepresentation of identity

18  part, there's using a live transmission part, and that all

19  has -- that gets you the enhancement right there.  It has

20  nothing to do with the computer.  Would you agree with that?

21  A.  That sounds accurate.

22  Q.  You talked about the 600 images in this case, but that

23  doesn't actually apply to the production offense, does it?

24  A.  I believe it's involved in this case, isn't it?

25  Q.  It doesn't apply to any of his production counts?

1  A.  But it's being applied to Mr. DeVito.

2  Q.  In through grouping, it effectively drops off, doesn't it?

3  I mean, his guidelines don't even encompass his possession of

4  child pornography; isn't that correct?  I mean, there's no

5  enhancement for his possession of that; isn't that right?

6  A.  Well, they're still used to stack.

7  Q.  Well, his production offenses stack him to the maximum;

8  isn't that right?

9  A.  Well, his production is a 32, which the production base

10 offense level originally was a 25.

11 Q.  Okay.  Let's go to page 42 of the PSR.  Do you have that in

12 front of you?

13 A.  I'm sorry, page 40?

14 Q.  42, please.

15 A.  Okay.

16 Q.  Do you see Pseudo Count 2?  Would you agree that that is

17 the possession of child pornography offense?

18 A.  Adjusted offense level 31?

19 Q.  Yes.

20 A.  Well, Count 2 is the possession of child pornography

21 charge, so yes.

22 Q.  And how many units are assigned to that count?

23 A.  Zero.

24 Q.  So how does that factor into his sentence?

25 A.  It does not.

1  Q.  Now, you had mentioned that a defendant could get 600

2  images of child pornography with a click of the mouse.  You

3  would agree it takes a lot more work to solicit 30 minors to

4  create child pornography; right?

5  A.  Yes.

6  Q.  In this case it took DeVito months, weeks to do this?

7  A.  Yes.

8  Q.  You also indicated there's a problem with the

9  sadomasochistic enhancement.  Could you go through the PSR and

10  let me know where that applies to Mr. DeVito's offense?

11      I can save you some time and give you the answer, if you'd

12  like.

13  A.  Sure.

14  Q.  It's not in there.

15  A.  Okay.

16  Q.  You indicated that Mr. DeVito's not a first-time offender;

17  is that right?

18  A.  That he --

19  Q.  Or he is a first-time offender rather?

20  A.  Yes, he is.

21  Q.  That means that this is the first time he's been convicted

22  of an offense?

23  A.  That's correct.

24  Q.  You would agree, though, there's a difference between

25  someone who commits an offense on one day of his life and

1  someone who commits an offense for over a year?

2  A.  Yes.

3  Q.  There's certainly a duration of criminality that's much

4  longer; right?

5  A.  Yes.

6  Q.  With Mr. DeVito's, while you still have page 42 in front of

7  you, his adjusted offense level at the end of page 42 or starts

8  actually at a level 42; is that right?

9  A.  Yes.

10  Q.  And then he jumps up another five levels from there; is

11  that correct?

12  A.  That's correct.

13  Q.  And that's really attributed to the number of units he has

14  which is the number of victims --

15  A.  Correct.

16  Q.  -- in this case?

17  A.  Correct.

18  Q.  So that's one of the largest jumps he makes is the number

19  of victims; right?

20  A.  That's right.  And I believe Mr. -- and I'm not sure if the

21  issue has been resolved, but I believe Mr. DeVito objected to

22  the use of pseudo counts.

23  Q.  We'll leave that one for the Judge.

24      You had indicated that the Court shouldn't use the

25  guidelines in this case.  I think I got what you were saying.

PIMENTEL - CROSS

```
 1  What you're saying is, you know, the guidelines don't come from

 2  the same base of empirical evidence that perhaps the other

 3  guidelines do?

 4  A.  That's correct.  In my opinion, the guidelines push

 5  Mr. DeVito's potential sentence beyond the scope of fair and

 6  just punishment that's required.

 7  Q.  So you're actually then getting into the 3553 factors; is

 8  that right?

 9  A.  That's correct.  Yes.

10  Q.  Which you would agree includes, I mean, this isn't just

11  treatment, a sentencing hearing for a defendant; right?  There

12  is punishment as a portion of this?

13  A.  Of course.

14  Q.  Deterrence is a portion of this?

15  A.  Absolutely.

16  Q.  Promoting respect for the law is part of this?

17  A.  Yes.  And that's why a 15-year sentence is here.

18  Q.  That's why Congress put the minimum at 15?

19  A.  That's right.

20  Q.  How many victims of child pornography have you spoken with?

21  A.  A handful.  Through training and education.

22  Q.  So these are ones that were --

23  A.  Like at a conference.

24  Q.  Seemingly participating in the conference?

25  A.  That's right.
```

1  Q.  Did you speak to any of the victims in this case?

2  A.  No.

3       MR. HEALEY:  I have no further questions, Your Honor.

4  Thank you.

5       THE COURT:  Thank you, Mr. Healey.

6       Do you have any redirect examination, Ms. Kovoor?

7       MS. KOVOOR:  Just briefly.

8                    REDIRECT EXAMINATION

9  BY MS. KOVOOR:

10 Q.  The charged conduct here which Mr. DeVito pled to

11 knowingly, voluntarily was conduct on the internet for a period

12 of five days with Victim A; correct?

13 A.  Yes.

14 Q.  Okay.  You looked through all of the chats that we provided

15 you; correct?

16 A.  Yes.

17 Q.  And it was a binder full?

18 A.  Yes.

19 Q.  Okay.  Were you able to decipher the ages of the

20 individuals in the pseudo counts?

21 A.  No.

22 Q.  Were you provided any specific information regarding the

23 pseudo counts victims?

24 A.  No.

25 Q.  So all you know -- we know is that Mr. DeVito during the

1  plea agreement stated that he agreed to similar acts with 25 or

2  so other victims?

3  A.  That is my understanding, yes.

4  Q.  There was no information about where these acts took place?

5  A.  No.

6  Q.  Who they were?

7  A.  No.

8  Q.  How old they were?

9  A.  No.

10 Q.  And regarding the guidelines calculations, you did mention

11 to Mr. Healey that use of a minor was a plus two?

12 A.  I don't think we -- you mean use of a computer, I believe,

13 is what we were discussing.

14 Q.  Okay.  The use of the computer was specified in the

15 presentence report; correct?

16 A.  Yes.

17 Q.  Okay.  And that was his work phone and his personal phone?

18 A.  Yes.

19 Q.  Okay.

20    (Ms. Kovoor conferring with the defendant.)

21 Q.  And, again, you're basically stating that the guidelines in

22 child pornography cases have been criticized by the U.S.

23 Sentencing Commission, by Federal Courts, by the Bureau of

24 Prisons; correct?

25 A.  I have not heard anything about the Bureau of Prisons.

1  Q.  Okay.

2  A.  But the first two, yes.

3  Q.  And there have been research studies that show that they

4  are -- they treat individuals unfairly?

5  A.  Yes.

6           MS. KOVOOR:  Thank you.

7           THE COURT:  Any recross, Mr. Healey?

8           MR. HEALEY:  No, Your Honor.  Thank you.

9           THE COURT:  Okay.  Mr. Pimentel, the Court appreciates

10  your testifying, and you are excused.

11           THE WITNESS:  Thank you, Your Honor.

12           MS. KOVOOR:  Your Honor, I have one more witness.  It

13  would be probably a five-minute witness, if you want to do that

14  now or after lunch.

15           THE COURT:  I wanted to take a break.  We've been

16  sitting for an hour-and-a-half.  We're going to take a

17  15-minute break.

18           MS. KOVOOR:  Okay.  Thank you.

19      (Recess in proceedings from 11:33 a.m. to 11:51 a.m.)

20                        AFTER RECESS

21           COURTROOM DEPUTY:  Counsel and defendant please

22  approach the podiums.

23           THE COURT:  Ms. Kovoor, what is the nature of the

24  testimony of your other witness, is it mitigation?

25           MS. KOVOOR:  Yes, Your Honor.

66

```
 1              THE COURT:  I'd prefer to hear it later, then.

 2              MS. KOVOOR:  Oh, okay.  All right.  It just goes -- I

 3     was just going to be quickly questioning her as to background,

 4     how he was growing up.  That's all.

 5              THE COURT:  Does she need to be excused after that?

 6              MS. KOVOOR:  I think she's going to stay here the

 7     whole day.

 8              THE COURT:  Well, if she's going to stay, then I'd

 9     prefer it when I hear mitigation.

10              MS. KOVOOR:  Sure.

11              THE COURT:  Stay up here, please.

12              On a former day, the defendant pleaded guilty to

13     production of child pornography.  At that time, the matter was

14     referred to the United States Probation Department for a

15     presentence investigation and report.  The Court has received

16     the presentence report prepared December 17th, 2018.

17              The Court has also received and reviewed the following

18     documents relevant to sentencing:  The psychosexual evaluation

19     prepared on June the 6th, 2017 by clinical psychologist Ed

20     Connor and filed under seal with the Court on November 27th,

21     2017, that's document 40; the defendant's sentencing memorandum

22     filed on April 24th, 2019, document 81; and the amended

23     sentencing memorandum filed on April 26th, 2019, which is

24     document 83; the government's sentencing memorandum filed on

25     May the 3rd, 2019, which is document 84; a pro se sentencing
```

67

```
 1    memorandum with exhibits and letters received in my chambers

 2    e-mail on April 25th, 2019 and filed on May the 9th, 2019 as

 3    document 86.  Then the Court has recently received on May the

 4    20th, 2019 a post-addendum to the presentence report from the

 5    Probation Department; three victim impact statements received

 6    to date of May 20th, 2019 that -- they were received on May

 7    20th, 2019; an e-mail dated May 17th, 2019 from Cheryl DeVito,

 8    and that was typed; and then a handwritten letter dated May the

 9    10th, 2019 from defendant, Richard DeVito, which seemed to be

10    virtually identical to the e-mail that was sent from Cheryl

11    DeVito.

12         Let me ask counsel, have you received a copy of all

13    these documents?

14         Mr. Healey?

15         MR. HEALEY:  Yes, Your Honor.  If I may apologize, did

16    you mention the disk that we showed you in chambers?

17         THE COURT:  No, I did not.

18         MR. HEALEY:  Okay.

19         THE COURT:  Okay.  How do I describe that?  The Court

20    has viewed --

21         MR. HEALEY:  I can put an exhibit sticker on it and

22    label it Exhibit 1.

23         THE COURT:  Okay.  The Court has viewed what is

24    Exhibit 1, which how would you describe that?

25         MR. HEALEY:  I can give you the exact description,
```

1    Your Honor.  It is a disk containing the sexually explicit

2    images of five of the minor victims.

3              THE COURT:  Okay.

4              MR. HEALEY:  Of course, my computer locked.  I can

5    give you the names of the victims.

6              THE COURT:  I don't think that's necessary.

7              MR. HEALEY:  Okay.

8              THE COURT:  All right.  So you've received copies of

9    everything, Mr. Healey?

10             MR. HEALEY:  Yes, Your Honor.

11             THE COURT:  All right.  Ms. Kovoor, have you received

12   copies of everything we've mentioned?

13             MS. KOVOOR:  Yes, obviously not the pictures or photos

14   that you saw in chambers, but I know of them and I have

15   descriptions of them.

16             MR. HEALEY:  We have discussed it with her what we had

17   shown you.

18             THE COURT:  Okay.  And, Mr. DeVito, have you received

19   copies of all the documents I described?

20             THE DEFENDANT:  Not the last May 20th.

21             MS. KOVOOR:  The victim impact statements I have in my

22   possession, Your Honor.  I have not shared it with him as of

23   right now.

24             THE COURT:  Okay.  Well, I don't think it's critical

25   that he review them, but at the -- maybe at the lunch break he

1    can review those.

2            Other than that, you've seen everything else,

3    Mr. DeVito?

4            THE DEFENDANT:  Yes.

5            THE COURT:  All right.  And have you had an

6    opportunity to discuss all the documents with your attorney,

7    Ms. Kovoor?

8            THE DEFENDANT:  Briefly yesterday.

9            THE COURT:  All right.  Then let me first talk about

10   the factual findings for sentencing.

11           Defense counsel has put forth objections to the

12   presentence report.  I'll ask counsel to address these

13   objections momentarily.  First, however, I'd like to address

14   the other factual findings for sentencing.

15           And before the Court accepts the presentence report as

16   part of the sentencing facts in this case and proceeds to

17   address any additional sentencing facts the parties wish to

18   present, I want to put on the record the Court's method for

19   determining a sentence.

20           This Court considers the factors discussed in the

21   advisory sentencing guidelines along with other factors, such

22   as those contained in 18 U.S.C. Section 3553(a), in arriving at

23   a sentence.

24           Let me ask counsel, are any of the facts other than

25   those in the objections that are reported in the presentence

70.

```
 1    report disputed by the government or the defendant?

 2              Mr. Healey?

 3              MR. HEALEY:  Not from the government, Your Honor.

 4              THE COURT:  Ms. Kovoor?

 5         (Ms. Kovoor conferring with the defendant.)

 6              MS. KOVOOR:  No, Your Honor.

 7              THE COURT:  Ms. Kovoor, do you have any additional

 8    sentencing facts?

 9              MS. KOVOOR:  Besides Miss DeVito's testimony, no, Your

10    Honor.

11              THE COURT:  All right.  Mr. Healey, any additional

12    sentencing facts?

13              MR. HEALEY:  No, Your Honor.  I do have a CD that has

14    the full 900 pages of chats or the accounts that I can make

15    available, but I would not introduce any new evidence.  Just

16    what's in my sentencing memo.  I just wanted to make sure that

17    that was on the record if anybody had any questions about the

18    authenticity of it.  It doesn't sound like there is, but I have

19    those available if the Court would want to review them.

20              THE COURT:  And those were available to defense

21    counsel?

22              MR. HEALEY:  Yes.  They were provided in discovery.

23              THE COURT:  All right.  Then there being no objections

24    other than those previously mentioned to the factual statements

25    contained in the presentence report, the Court adopts those
```

1    statements as its finding of fact.

2            The defendant has entered a valid plea to Count 1 of

3    the indictment.  Accordingly, the defendant is adjudged guilty

4    in Case Number 1:16-CR-115 of production of child pornography.

5            Pursuant to 18 United States Code Section 3553(a) and

6    (c), the Court makes the following findings of relevant facts

7    significant to the imposition of sentence.

8            The defendant is guilty of violating 18 United States

9    Code Section 2251(a) and (e) which is a Class B felony and

10   subjects the defendant to a mandatory minimum of 15 years and a

11   maximum of 30 years imprisonment, a fine of up to $250,000, a

12   period of supervised release of up to life, a $100 special

13   assessment, and a $5,000 special assessment for the Justice for

14   Victims of Trafficking Act of 2015, and restitution and

15   forfeiture.

16           Let me next deal with the issue of objections.  Are

17   there any objections to the presentence report that have not

18   been previously raised?

19           MS. KOVOOR:  They've all -- they have been previously

20   raised, Your Honor, but I can summarize them for you.

21           THE COURT:  Well, I'm going to do that and see if you

22   have anything additional to say.

23           Anything, Mr. Healey?

24           MR. HEALEY:  No, Your Honor.

25           THE COURT:  All right.  Then the Court will now

1    address the defendant's objections.  And what I'll do is I'll

2    tell you what the objection is, I'll ask you if you have

3    anything additional to say on it, and then the Court will rule

4    on it.

5         Objections numbers one and two and bullet point I from

6    objection number six.  The defendant objects to the probation

7    officer's determination that the total offense level is 43, the

8    inclusion of the run-of-the-mill enhancements which they

9    alleged constituted double counting, and the creation of pseudo

10   counts.  Bullet point I states there are numerous improprieties

11   in the various pseudo counts and that the inclusion of the

12   pseudo counts is not justified.  Therefore, defense counsel

13   noted there is no need to pinpoint the discrepancies.  As such,

14   the defendant believes the removal of all of the pseudo counts

15   eliminates all of the factual mistakes alleged by the

16   defendant.

17        In objecting to the pseudo counts, the defendant also

18   objected to the five-level enhancement in accordance with

19   Sentencing Guideline Section 3D1.4 which is the grouping to

20   determine the combined offense level.  Defense counsel cites

21   the run-of-the-mill enhancements as the following:  Use of a

22   computer, number of images, and the age of the children

23   involved.  Mr. DeVito indicated his offense level should be 32

24   in the absence of the run-of-the-mill enhancements and pseudo

25   counts.  After a three-level reduction for acceptance of

1    responsibility, Mr. DeVito states his total offense level

2    should be 29.  An offense level of 29 combined with a criminal

3    history category of I results in a guideline imprisonment range

4    of 87 to 108 months.

5           Is there anything, Ms. Kovoor, you want to add to the

6    summary I've given of objection number one?

7       (Ms. Kovoor conferring with the defendant.)

8           MS. KOVOOR:  No, Your Honor.

9           THE COURT:  All right.  Anything you want to say in

10   regard to the objection, Mr. Healey?

11          MR. HEALEY:  No, Your Honor.

12          THE COURT:  All right.  Then the Court's response

13   through the probation officer is the defendant via the

14   statement of facts acknowledged that he knowingly employed,

15   used, persuaded, induced, or enticed Minor Victim A, an

16   eight-year-old female, to engage in sexually explicit conduct

17   for the purpose of producing a visual depiction of the conduct.

18   The defendant obtained the visual depictions of Minor Victim A

19   by having them transmitted to him via the internet.  In

20   addition, Mr. DeVito also acknowledged in the statement of

21   facts that he knowingly induced and persuaded at least 25 other

22   minors to send him similar videos and photographs over the

23   internet that depicted their genitalia or otherwise depicted

24   them engaged in sexually explicit conduct.  Lastly, Mr. DeVito

25   admitted via the statement of facts that he knowingly possessed

1    thousands of images and video files that depicted child

2    pornography and that the files depicted prepubescent children

3    under the age of 12 engaged in sexual acts with adults.  The

4    statement of facts was signed by the defendant and defense

5    counsel and is attached as part of the plea agreement in this

6    matter.  Therefore, the additional acts on the part of the

7    defendant is relevant conduct to the offense of conviction.

8         Therefore, in accordance with Sentencing Guidelines

9    Section 1B1.2(c), because the plea agreement specifically

10   established the commission of the additional offenses of

11   production of child pornography, which are the multiple pseudo

12   counts, and possession of child pornography, which is Pseudo

13   Count 2, it shall be treated as if Mr. DeVito had been

14   convicted of the additional offenses.  As such, the Court

15   believes the inclusion of the pseudo counts is appropriate.

16        With respect to the guideline calculation and creation

17   of the additional pseudo counts under Sentencing Guidelines

18   Section 2G2.1, the Court provides the following information:

19   Pursuant to Sentencing Guideline 2G2.1(d)(1), if the offense

20   involved the exploitation of more than one minor, Chapter

21   Three, Part D, which is multiple counts, shall be applied as if

22   the exploitation of each minor had been contained in a separate

23   count of conviction.  Mr. DeVito admitted to the fact that he

24   exploited at least 25 additional minors in the statement of

25   facts.  The creation of the pseudo counts as contained in the

75

1    presentence investigation report are thus not only supported by

2    the tenets of Sentencing Guidelines Section 1B1.2(c) because

3    the plea agreement specifically established the commission of

4    the additional offenses but also by the provisions of

5    Sentencing Guidelines Section 2G2.1(d)(1).  Therefore, the

6    probation officer contends that Minor Victim A should represent

7    Count 1 in the sentencing guideline calculation, and the

8    remaining victims should be treated as pseudo counts to Count 1

9    with respect to the charge of production of child pornography.

10          Pseudo Count 2 relates to the defendant's separate

11   cache of child pornography.  As noted above, Mr. DeVito

12   admitted to possessing child pornography in the statement of

13   facts and, thus, in accordance with Sentencing Guidelines

14   Section 1B1.2(c), the probation officer believes Pseudo Count 2

15   is also correctly presented in the presentence investigation

16   and report.

17          In relation to the objection to the run-of-the-mill

18   enhancements and their resulting double counting, the probation

19   officer provides the following information.  Sentencing

20   Guidelines Section 2G2.1 provides several specific offense

21   characteristics that could be applicable in cases involving the

22   production of child pornography.  In this case, the defendant

23   received an increase to his offense level due to several of

24   these specific offense characteristics.  Defense counsel

25   included the use of a computer, the number of images possessed

1    by the defendant, and the age of the children involved in the

2    offense as run-of-the-mill enhancements that result in double

3    counting.  The defendant does not argue that the enhancements

4    are not accurate but rather they should not apply because they

5    are run-of-the-mill.  The probation officer is aware of the

6    recent criticism related to the aforementioned enhancements as

7    they apply to non-production offenders.  However, in this case,

8    Mr. DeVito produced child pornography.  Therefore, the

9    enhancements are warranted.  It should be noted that Sentencing

10   Guidelines Section 2G2.1 does not contain an enhancement for

11   number of images.

12        In response to the assertion that the enhancements

13   result in double counting, the probation officer contends that

14   the enhancements correlate to distinct aspects of Mr. DeVito's

15   conduct and thus do not result in double counting.  For

16   example, the application for use of a computer under Sentencing

17   Guidelines Section 2G2.1, which is production of child

18   pornography, was applied for Minor Victim A and each of the

19   additional victims in the pseudo counts who interacted with

20   Mr. DeVito via the computer.  In each instance that the

21   defendant contacted a separate victim, it represented a

22   separate and distinct harm.  With respect to Pseudo Count 2

23   under Sentencing Guidelines Section 2G2.2, which is possession

24   of child pornography, the enhancement was utilized because

25   Mr. DeVito used his computer to download, view, and possess

77

1    additional images of child pornography that did not involve the

2    minor victims represented under the application of Sentencing

3    Guidelines Section 2G2.1.  Therefore, the use of the computer

4    enhancement under Sentencing Guidelines Section 2G2.2

5    represented a separate aspect of Mr. DeVito's criminal conduct

6    and does not result in double counting.

7            An enhancement for number of images is applicable with

8    respect to Pseudo Count 2 in accordance with Sentencing

9    Guideline Section 2G2.2(b)(7)(D).  However, this does not

10   represent double counting, as this enhancement is not

11   applicable to the other guideline calculations.  It should be

12   noted that in the event the Court were to remove the

13   run-of-the-mill enhancements for Pseudo Count 2, which is the

14   possession of child pornography, in light of the criticisms

15   pointed out by the defendant, it would not change the total

16   offense level as calculated by the probation officer.

17           All right.  I'm going to go on now to objection number

18   three and bullet point M, as in Mary, from objection number

19   six.  The defendant objects to the tone of the presentence

20   investigation report and claims the probation officer relied

21   too much on the sentencing guidelines to the exclusion of other

22   relevant and important sentencing factors.  Mr. DeVito asserts

23   that the probation officer treated the sentencing guidelines as

24   mandatory.  The defendant, through counsel, stated the

25   probation officer did not give due consideration and weight to

78

```
 1   the factors outlined in 18 U.S.C. Section 3553(a).

 2   Specifically, Mr. DeVito cites the sexual abuse he suffered as

 3   a child, his addiction to pornography, and the fact that he was

 4   exposed to pornography at a very young age.  He contends proper

 5   consideration of the aforementioned mitigating factors dictate

 6   a term of incarceration that is substantially lower than the

 7   recommendation contained in the presentence investigation

 8   report.

 9          Additionally, the defendant believes paragraph 417 in

10   its entirety should be stricken from the presentence

11   investigation report.  This position is described in bullet

12   point M under objection number six in defense counsel's letter.

13   Bullet point M refers to paragraph 416 of the initial

14   presentence investigation report, but it should be noted that

15   this paragraph is now 417 in the final presentence

16   investigation report.

17          Ms. Kovoor, do you want to comment on this objection?

18          MS. KOVOOR:  No, Your Honor.

19          THE COURT:  Mr. Healey, anything with regard to this

20   objection?

21          MR. HEALEY:  No, Your Honor.

22          THE COURT:  All right.  Then the probation officer's

23   response is that 18 U.S.C. Section 3553(a) states the Court

24   should consider the history and characteristics of the

25   defendant, the nature and circumstances of the offense, the
```

1     need to protect the public from future crime on the part of the

2     defendant, general deterrence, and the need to provide a

3     punishment that is sufficient but not greater than necessary to

4     achieve the goals of sentencing.

5         In paragraphs 416 and 417 of the final presentence

6     investigation report, the probation officer identified various

7     mitigating factors included in 18 U.S.C. Section 3553(a). The

8     probation officer cited the following mitigating factors for

9     the Court to consider: The defendant was previously dependent

10     upon alcohol. He suffers from anxiety and depression. He is

11     addicted to child pornography and potentially video games. His

12     parents had a volatile relationship. He experienced a solitary

13     childhood. He was inappropriately touched by his half-brother

14     on one occasion and forced to perform oral sex on his

15     half-brother. And he was exposed to adult and child

16     pornography at an early age.

17         However, in paragraph 418 of the presentence

18     investigation report, the probation officer also outlined

19     aggravating factors involved in this matter. Of concern to the

20     probation officer is the fact that the offense behavior in this

21     case is serious and far reaching. As noticed -- I'm sorry, as

22     noted in the presentence investigation report, the case

23     involved 30 minor females who were identified. However, case

24     agents also discovered an additional ten victims who have yet

25     to be positively identified. In the event the case agents were

80

1    able to positively identify the additional ten minors, they

2    would have represented an additional ten pseudo counts under

3    the guideline calculations.

4            In addition, the probation officer identified the fact

5    that the child pornography possessed by the defendant

6    represents a separate victim pool that was affected by

7    Mr. DeVito's conduct.  The defendant's illegal behavior reached

8    minors throughout the United States and Australia.

9            Lastly, the probation officer also identified the fact

10   that the nature of the offense is serious and the effects of

11   such events on the victims are likely serious and long lasting.

12           It should be noted Application Note 8 under Sentencing

13   Guideline Section 2G2.1 states an upward departure may be

14   warranted if the offense involved more than ten minors.

15   However, the probation officer did not recommend an upward

16   departure.

17           Pursuant to Federal Rule of Criminal Procedure 32, the

18   probation officer is required to identify any factors relevant

19   to the appropriate kind of sentence, the appropriate sentence

20   within the applicable sentencing range, and any basis for

21   departing from the applicable sentencing range.  Based upon the

22   aforementioned information, the probation officer asserts both

23   the available mitigating and aggravating factors in this case

24   have been presented for the Court's consideration.  And the

25   Court overrules that objection and that bullet point.  And that

1    was objection number three and bullet point M from objection

2    number six.

3         Next are the objections to numbers four and five.

4    Objection numbers four and five relate to the recommended

5    sentence of imprisonment and the term of supervised release

6    contained in the presentence investigation report.  The

7    defendant contends the probation officer's recommended term of

8    imprisonment does not take into account parsimony, violates the

9    mandate that the defendant's sentence conform to the type of

10   sentences given to other defendants who have committed similar

11   crimes, and is illegally disparate.  Mr. DeVito asserts he

12   should only be exposed to a maximum term of imprisonment of 108

13   months and that lifetime supervised release is inconsistent

14   with the conduct to which the defendant admitted in Count 1 of

15   the indictment.

16        Do you want to say anything with regard to those

17   objections, Ms. Kovoor?

18        MS. KOVOOR:  Your Honor, just that the rule of lenity

19   should be that any vagueness or lack of information should go

20   towards the defendant, and here, it seems like it's

21   continuously going for the government.  When I was here, I

22   heard Mr. DeVito state that he accepted responsibility and he

23   agreed to similar conduct with 25 other victims.  Now I'm

24   hearing 30, excess of 30, another ten.  And I have concerns

25   about we have no information regarding the pseudo counts,

82

1    regarding the duration of those offenses, whether it was with

2    the same five-day period as charged in the indictment for

3    Victim A, we don't know where this happened, or the ages, and I

4    just have always felt that tenet of the law is if there's any

5    confusion, vagueness, anything, it goes to the benefit of the

6    defendant, not the government.

7             THE COURT:  Mr. Healey, do you wish to respond?

8             MS. KOVOOR:  There is also, Your Honor, a case U.S.

9    versus Pharis, P-H-A-R-R-U-S, I believe, that we've cited in

10   the memorandum.

11            THE COURT:  How do you spell that?

12            MS. KOVOOR:  P-H-A-R-R-U-S.

13            THE COURT:  Thank you.

14            MS. KOVOOR:  Thank you.

15            THE COURT:  Mr. Healey?

16            MR. HEALEY:  Your Honor, I think there's kind of two

17   separate issues in there.  The one is how the Court goes about

18   deciding what the sentence is, and the other is what conduct

19   should he be held accountable for.

20            THE COURT:  Will you pull the microphone closer to

21   you?

22            MR. HEALEY:  The other is what conduct should he be

23   held accountable for.  And what Miss Kovoor said, I think she's

24   right to the extent that he admitted to 25 additional victims

25   in the factual basis.  It should stop with the 25.  We should

83

 1   not -- you know, I realized I referenced 33 in my sentencing

 2   memo and I should not.  It should just be the 25.

 3           But in regards to, you know, the parsimony of how the

 4   Court should go about determining the sentence, I think that

 5   I'm not sure it -- given the conduct in this case, whether it's

 6   25 or 33, I don't really think changes anything.  But she is

 7   correct to the extent that what he acknowledged in the plea was

 8   25, and that's the number the United States should stick to in

 9   this case.  So --

10           THE COURT:  All right.  Thank you.

11           The probation officer's response was as noted, the

12   probation officer explored both the mitigating and aggravating

13   factors associated with the defendant and the offense behavior

14   he committed.  Taking all of the available information into

15   account, the probation officer determined the aggravating

16   factors outweighed the mitigating factors when recommending a

17   term of imprisonment in this case.  As such, the probation

18   officer believes a sentence of 360 months in the Bureau of

19   Prisons followed by a lifetime of supervised release is

20   warranted due to the serious nature of the offense and the

21   number of victims affected by the defendant.  The recommended

22   term of imprisonment and term of supervised release are not

23   binding on the Court.

24           And I want to emphasize that, that what the probation

25   officer recommended is just that, a recommendation to the

1    Court; that the Court makes its own determination of the

2    sentence.

3          So the objections to numbers four and five are

4    overruled.

5          Objection number six.  Objection number six as

6    contained in the objection letter submitted by defense counsel

7    contained subparts that are outlined as bullet points A through

8    M.  As noted above, bullet points A through D and J through L

9    have been resolved.  The unresolved portions of objection

10   number six are outlined below.  However, it should be noted

11   that bullet point I was discussed with objections one and two

12   as they relate to the same topic, and bullet point M -- bullet

13   point M which was discussed with objection number three.

14         Bullet point E corresponds to paragraph 18 of the

15   presentence investigation report.  The defendant contends the

16   statement of facts does not include anything about

17   bestiality -- bestiality, bondage, or the types of sexual

18   penetration described in paragraph 18.  It further states the

19   plea agreement does not open the door to the consideration of

20   pseudo counts.

21         Bullet point F corresponds to paragraph 19 of the

22   presentence investigation report.  Mr. DeVito objects to the

23   word "instructed" as used by the probation officer and asserts

24   he never instructed a minor to engage in any specific conduct.

25   The defendant also addressed the fact that the probation

85

 1     officer included the word "bestiality" in paragraph 19 and

 2     believes the word "bestiality" should be stricken from

 3     paragraph 19 and anywhere else it is contained in the

 4     presentence investigation report.

 5          Bullet point G corresponds to paragraph 22 of the

 6     presentence investigation report.  The defendant noted the

 7     statement of facts does not speak to any other minor and that

 8     all references to Minor Victim B should be removed from the

 9     presentence investigation report.  Mr. DeVito also states the

10     word "instructed" should be removed from paragraph 22.

11          Bullet point H refers to paragraph 23 and the last

12     sentence of the paragraph that refers to a dog.  Mr. DeVito

13     asserts this information is totally contrary to the statement

14     of facts which by interlineation eliminates any involvement of

15     animals in the offense conduct.

16          Ms. Kovoor, any additional comments or objections

17     to --

18          MS. KOVOOR:  Just to comment, Your Honor.  You've had

19     a chance to review some of the videos and the chats that were

20     included in the government's memorandum.  You would see that it

21     was disturbingly brought up by the eight-year-old that her dog

22     licks her, do you want to see, and it was brought out by the

23     eight-year-old.  That's all we're saying.  We're not contesting

24     anything more than that we wanted it stricken from the

25     statement of facts regarding bestiality because it was -- there

86

1  was no instruction by the defendant regarding that.  It was

2  brought out by the eight-year-old during a Facetime

3  conversation.

4          THE COURT:  Thank you.

5          Mr. Healey, do you wish to respond?

6          MR. HEALEY:  Your Honor, I would just note that, yes,

7  in regards to the bestiality, that was not part of his plea,

8  but we would submit that, you know, that's our ability to

9  submit the entire facts or the evidence against Mr. DeVito to

10  the Court in this case.  So, you know, it did not calculate in

11  his guidelines, but it doesn't mean the Court's not permitted

12  to consider it for sentencing.

13          THE COURT:  All right.  The Court will overrule

14  objection number six.  Let me tell you why.

15          Paragraph 18, bullet point E, describes the child

16  pornography located on the defendant's iPhone and laptop

17  computer.  The probation officer met with the Assistant U.S.

18  Attorney and the FBI agent and reviewed the material possessed

19  by Mr. DeVito.  The information contained in paragraph 18

20  reflects the material and -- the material the probation officer

21  verified while in the presence of the FBI agent and the

22  Assistant United States Attorney.  Mr. DeVito acknowledged in

23  the statement of facts that he knowingly possessed thousands of

24  images and video files that depicted child pornography.  He

25  also acknowledged the files depicted prepubescent children

87

1   under the age of 12 engaged in sexual acts with adults.  The

2   defendant's possession of the additional cache of child

3   pornography encompasses the basis for Count 2 of the

4   indictment.  Therefore, in accordance with Sentencing

5   Guidelines Section 1B1.2(c), because the plea agreement

6   specifically establishes the commission of this offense, it

7   shall be treated as if Mr. DeVito had been convicted of the

8   additional count charging the offense of possession of child

9   pornography which represents Pseudo Count 2 in the sentencing

10  guidelines calculation.  Additionally, the probation officer is

11  not bound by the statement of facts and any or agreements -- or

12  any agreements between the parties.  Given that Mr. DeVito

13  admitted to this conduct in the plea agreement via the

14  statement of facts, the probation officer asserts it is

15  properly included in the presentence investigation report.

16          Paragraph 19, which is bullet point F, references the

17  probation officer's introductory summary of the offense

18  behavior related to Count 1 of the indictment.  The information

19  as presented in paragraph 19 was obtained from the FBI agent

20  and via the probation officer viewing the relevant discovery

21  materials related to the case.  Therefore, the probation

22  officer asserts the information is accurately presented in the

23  presentence investigation report.  And the Court has also

24  reviewed that evidence.

25          Paragraph 22, which is bullet point G, corresponds to

88

1    the information the probation officer included regarding Minor

2    Victim B who was the younger cousin of Minor Victim A.  The

3    defendant asserted that Minor Victim B should be removed as the

4    statement of facts does not speak to any other minor.  However,

5    in the statement of facts, Mr. DeVito admits that he knowingly

6    induced and persuaded at least 25 other minors to send him

7    similar videos and photographs over the internet that depicted

8    their genitalia or otherwise depicted them engaging in sexually

9    explicit conduct.  Minor Victim B is one of the minors

10   encompassed by the aforementioned quote from the statement of

11   facts.  Therefore, the probation officer believes this

12   information is correctly included in the report.

13          Paragraph 23, which is bullet point H, relates to

14   paragraph 23 of the presentence investigation report.

15   Specifically, the defendant objects to the inclusion of the

16   information that Minor Victim A sent Mr. DeVito a video of her

17   small doing licking her vagina.  The probation officer

18   recognizes the parties struck the information related to the

19   dog from the statement of facts.  However, in accordance with

20   the tenets of relevant conduct under Sentencing Guideline

21   Section 1B1.3, all acts and commissions -- I'm sorry, all acts

22   and omissions committed, aided, abetted, counseled, commanded,

23   induced, procured, or willfully caused by the defendant shall

24   be considered when determining the offense conduct and

25   subsequent sentencing guideline range.  The probation officer

89

1    and the Court, while in the presence of the FBI agent and the

2    Assistant U.S. Attorney, viewed the video of Minor Victim A

3    allowing her dog to repeatedly lick her genitals.  This video

4    was transmitted to Mr. DeVito, and he commented on the behavior

5    to Minor Victim A.  The video lasted several minutes.  The

6    probation officer contends the information is appropriately

7    contained in the report.

8            And as I said, that objection is also overruled.

9            I think that's the end of the objections.  Is that

10   correct, Ms. Kovoor?

11           MS. KOVOOR:  Yes, Your Honor.

12           THE COURT:  Mr. Healey, any more objections?

13           MR. HEALEY:  Yes -- no, Your Honor.

14           THE COURT:  Okay.  Then let me go over what the

15   suggested federal sentencing guidelines are.

16           Richard Lee DeVito pled guilty to one count of

17   production of child pornography, a Class B felony, in violation

18   of Title 18 United States Code Section 2251(a) and (e).  In

19   accordance with the provisions of Title 18 United States Code

20   Section 3553(c), the Court places on the record the following

21   statement of reasons.

22           The applicable Sentencing Guidelines Manual is the

23   2018 edition.

24           The defendant entered a plea of guilty to one count of

25   production of child pornography.  However, pursuant to

90

1    Sentencing Guidelines Section 1B1.2(c), the plea agreement

2    contains a stipulation that specifically establishes the

3    commission of additional offenses.  Therefore, they shall be

4    treated as if the defendant had been convicted of additional

5    counts charging those offenses.  Specifically, the statement of

6    facts established the defendant produced child pornography

7    involving at least 25 additional minor victims and established

8    that Mr. DeVito possessed child pornography of additional

9    prepubescent minors not associated with his criminal conduct

10    related to the production of child pornography.

11            Pursuant to Sentencing Guidelines Section 2G2.1(d)(1),

12    if the offense involved the exploitation of more than one

13    minor, Chapter Three, Part D, which is multiple counts, shall

14    be applied as if the exploitation of each minor had been

15    contained in a separate count of conviction.  Therefore, the

16    offenses against each of these victims in the production of

17    child pornography and the additional conduct related to the

18    possession of child pornography acknowledged in the plea

19    agreement will be the subject of pseudo counts and calculated

20    separately.

21            Pursuant to Sentencing Guidelines Section 3D1.1(a)(1),

22    when a defendant has been convicted of more than one count, the

23    Court shall group the counts resulting in conviction into

24    distinct groups of closely related counts by applying the rules

25    of Sentencing Guidelines Section 3D1.2.  In this case, the

91

defendant produced and possessed child pornography of multiple

different victims which represents separate instances of harm

to each victim as detailed in Application Note 4 under

Sentencing Guidelines Section 3D1.2.  As such, the counts are

not groupable under Sentencing Guidelines Section 3D1.2(b).

With respect to Count 1, which was Minor Victim A, the

base offense level for a violation of 18 U.S.C. Section 2251(a)

is found at Sentencing Guidelines Section 2G2.1.  Pursuant to

Sentencing Guideline 2G2.1(a), the base offense level is 32.

Four levels are added in accordance with Sentencing

Guideline Section 2G2.1(b)(1)(A) because the victim was less

than 12 years of age.

Pursuant to Sentencing Guidelines Section

2G2.1(b)(2)(A), two levels are added because the offense

involved the commission of a sex act.

The defendant knowingly misrepresented his identity to

the victim for the purpose of producing sexually explicit

material.  Therefore, two levels are added in accordance with

Sentencing Guidelines Section 2G2.1(b)(6).

And pursuant to Sentencing Guidelines Section 3B1.4,

two levels are added because the defendant used a minor to

commit the offense.

That makes the adjusted offense level for Count 1 42.

In an effort to consolidate the application of the

guidelines with respect to the pseudo counts, the probation

1    officer presented the pseudo counts for production of child

2    pornography and their corresponding applicable guideline

3    calculations in groups below in separate charts.  And the Court

4    is now going to describe the charts.

5           Bill or -- who's going to use the visualizer?

6           COURTROOM DEPUTY:  I will.

7           THE COURT:  Okay.

8           Would you please be seated, Ms. Kovoor and Mr. DeVito?

9           MS. KOVOOR:  Sure.

10          THE COURT:  First, the Court will display -- I can get

11   the lights.

12          The Court is displaying Pseudo Counts 1A, 1E, 1F, 1L,

13   1M, as in Mary, 1N, as in Nancy, 1O, 1R, 1T, 1U, 1W, 1X, and

14   1Y.  As you can see, the base offense level for each of these

15   counts was 32.  Because the victims were under the age of 12,

16   four points were added.  Because there was a misrepresentation

17   of identity, two levels were added.  That makes the adjusted

18   offense level for each of the counts in the above-listed chart

19   38.

20          Next are Pseudo Counts 1B, 1C, 1D, and 1V.  And,

21   again, the base offense level is 32.  Four points are added to

22   each of these because the victim was under the age of 12.  Two

23   points are added to each of these counts because there was a

24   sex act.  Two points are added to each of these counts because

25   of misrepresentation of identity.  And, finally, two points are

1    added for use of a minor.  That makes the adjusted offense

2    level for each of the counts in the above-listed chart 42.

3           Now for Pseudo Counts 1H, 1L, 1K, and 1Q, the base

4    offense level is 32 again.  The victim under the age of 12 adds

5    four points.  A sex act was performed which adds two points.

6    And there was misrepresentation of identity.  And that makes

7    the adjusted offense level for each of the counts in the

8    above-listed chart 40.

9           MS. HALL:  Your Honor, could I just bring one point?

10   You said this was applied to 1L.  That's actually 1I in the

11   chart.

12          THE COURT:  Oh, I'm sorry.  Okay.  For the record,

13   these were Pseudo Counts 1H, 1I, 1K, and 1Q.

14          Thank you.

15          Now for Pseudo Counts 1G, 1J, and 1AB, the base

16   offense level is 32.  The victims in those cases, in those

17   counts, were between the ages of 12 to 16, there was a sex act

18   performed, and there was a misrepresentation of identity.  Each

19   of those enhancements adds two points to the base offense

20   level.  So the adjusted offense level for each of the counts in

21   the above-listed chart is 38.

22          And, finally, in Pseudo Counts 1P, 1S, 1Z, 1AA, and

23   1AC, the base offense level is 32.  Two points are added to

24   each of these counts because the victim was between the age of

25   12 to 16 years old.  And two points are added for a

94

 1    misrepresentation of identity.  And that makes the adjusted

 2    offense level for each of the counts listed in the above-listed

 3    chart 36.

 4         And the court reporter will have a copy of the chart

 5    so that they'll be part of the record.

 6         Okay.  You can come back up now.  We're done with the

 7    visualizer.

 8       (Counsel and defendant complied.)

 9         THE COURT:  Next, I'm going to talk about Pseudo Count

10    2 which is possession of child pornography.  The guideline for

11    a violation of 18 U.S.C. Section 2252A(a)(5)(B) is found at

12    Sentencing Guidelines Section 2G2.2.  The base offense level

13    for that is 18 according to Sentencing Guideline 2G2.2(a)(1).

14         Two levels are added in accordance with Sentencing

15    Guidelines Section 2G2.2(b)(2) as the material possessed by the

16    defendant involved prepubescent minors that had not attained

17    the age of 12 years.

18         Pursuant to Sentencing Guidelines Section 2G2.2(b)(4),

19    four levels are added because the material depicted sadistic or

20    masochistic conduct.

21         Two levels are added in accordance with Sentencing

22    Guidelines Section 2G2.2(b)(6) because the offense involved the

23    use of a computer.

24         And Mr. DeVito possessed in excess of 600 images

25    containing child pornography; therefore, five levels are added

1    in accordance with Sentencing Guidelines Section

2    2G2.2(b)(7)(D), and that results in total points of 31.

3           Then the Court must make the multiple count

4    adjustment.  Pursuant to Sentencing Guidelines Section 3D1.4,

5    Application Note 2, the procedure for calculating the combined

6    offense level when there is one -- more than one group of

7    closely related counts is as follows:  First, identify the

8    offense level applicable to the most serious group and assign

9    it one unit; secondly, determine the number of units that the

10   remaining groups represent; three, increase the offense level

11   of the most serious group by the number of levels indicated in

12   the table corresponding to the total number of units.  Units

13   are assigned pursuant to Sentencing Guidelines Section

14   3D1.4(a), (b), and (c).  One unit is assigned to the group with

15   the highest offense level.  One additional unit is assigned for

16   each group that is equally serious or from one to four levels

17   less serious.  One-half unit is assigned to any group that is

18   five to eight levels less serious than the highest offense

19   level.  And any groups that are nine or more levels less

20   serious than the group with the highest offense level are

21   disregarded.

22          The offense level is increased pursuant to the number

23   of units assigned by the amount indicated in the table at

24   Sentencing Guidelines Section 3D1.4.  However, in a case in

25   which there are five or more units, the offense level is

1  increased by five levels.  In this case there were 27 units

2  applied; therefore, five levels are added to the offense.

3       The combined adjusted offense level is determined by

4  taking the offense level applicable to the group with the

5  highest offense level and increasing the offense level by the

6  amount in the table at Sentencing Guideline 3D1.4.  The group

7  with the highest offense level is Count 1 which is 42 points.

8  Therefore, five levels are added, making the combined adjusted

9  offense level 47.

10       Five levels are also added in accordance with

11  Sentencing Guidelines Section 4B1.5(b)(1) because the defendant

12  engaged in a pattern of activity involving prohibited sexual

13  conduct on at least two separate occasions.

14       The offense level determined under Chapters Two and

15  Three is 47.  Therefore, in accordance with Sentencing

16  Guidelines Section 4B1.5(b)(1), five levels are added, and the

17  resulting offense level is 52.

18       Mr. DeVito accepted responsibility in this case in

19  accordance with Sentencing Guidelines Sections 3E1.1(a) and

20  (b).  Therefore, the offense level is decreased by three

21  levels.

22       That makes the total offense level 49.  Pursuant to

23  Chapter Five, Part A, Comment Note 2, since the offense level

24  exceeds 43, the total offense level becomes 43.

25       The Court finds the defendant has a criminal history

1     category of I.

2              An offense level of 43 combined with a criminal

3     history category I results in a guideline imprisonment range of

4     life.  However, the statutorily authorized maximum sentence of

5     30 years is less than the minimum of the applicable guideline

6     range.  Therefore, in accordance with Sentencing Guidelines

7     Section 5G1.1(a), the guideline imprisonment range becomes 360

8     months which is 30 years.

9              Pursuant to Sentencing Guidelines Section 5C1.1(f), if

10    the applicable guideline range is in Zone D of the Sentencing

11    Table, the minimum term shall be satisfied by a sentence of

12    imprisonment.

13             The authorized term of supervised release is at least

14    five years and up to life pursuant to Sentencing Guidelines

15    Section 5D1.2(b)(2).

16             The defendant is ineligible for probation because it

17    is expressly precluded by statute in accordance with Sentencing

18    Guidelines Section 5B1.1(b)(2).

19             The applicable guideline fine range is 50,000 to

20    $250,000 pursuant to Sentencing Guidelines Section 5E1.2(c)(3).

21             There is a $100 special assessment which is mandatory.

22             Restitution is applicable in this case.  However, a

23    final restitution figure is still pending.

24             And there is also forfeiture.

25             Any questions on the guideline calculation before I go

98

1 on to the other factors that the Court considered under 18

2 U.S.C. Section 3553(a)?

3          MR. HEALEY: None from the government, Your Honor.

4          MS. KOVOOR: No, Your Honor.

5          THE COURT: All right. Then here are the sentencing

6 factors that the Court considered under 18 U.S.C. Section

7 3553(a).

8          When imposing sentence, the Court is required to

9 consider the provisions of 18 U.S.C. Section 3553(a) as well as

10 the proper application of the Sentencing Guidelines as

11 described in 18 U.S.C. Section 3553(a)(4) and (a)(5). The

12 Court must take into consideration the provisions of 18 U.S.C.

13 Section 3553(a)(1) which address the nature and circumstances

14 of the offense and the history and characteristics of the

15 defendant.

16          Mr. DeVito stands before the Court for sentencing on

17 one count of production of child pornography. The offense

18 behavior is serious and far reaching. In addition to the 25

19 victims involved in the instant offense, there are an

20 additional ten victims who have yet to be identified, and there

21 are numerous additional victims from the child pornography

22 possessed by the defendant. Mr. DeVito's conduct reached not

23 only minors throughout the United States, but also Australia.

24          Mr. DeVito persuaded numerous minor females to engage

25 in sexually explicit behavior at his direction. Mr. DeVito

1   instructed the minor victims to lasciviously display their

2   genitals and in some instances to insert markers, toothbrushes,

3   their fingers, or other objects into their anus and/or vaginas.

4   On some occasions, Mr. DeVito instructed the minors to take

5   actions that facilitated the criminal conduct.  For example, he

6   instructed Minor Victim A to pull aside Minor Victim B's shorts

7   and underwear, exposing her vagina and anus.  He then

8   instructed Minor Victim A to spread apart Minor Victim B's

9   genitals causing them to be lasciviously displayed.  Absent

10  Mr. DeVito's instructions, some of the images of Minor Victim B

11  would not have constituted child pornography.  Therefore, the

12  defendant utilized Minor Victim A to assist him in producing

13  child pornography.

14        In addition to the defendant producing child

15  pornography, he also possessed a large collection of additional

16  child pornographic images.  These images contained prepubescent

17  minors engaged in sexual acts with adult males, bestiality,

18  bondage, and the lascivious display of their genitals.  The

19  long-term psychological effect on victims of child pornographic

20  offenses is likely long term and extensive.

21        To date, the probation officer has received one

22  request for restitution.  However, the victim impact statements

23  in this case remain pending.  Therefore, restitution may be an

24  issue in the future.

25        The defendant is 34 years of age.

```
 1              I believe you're 35 now, aren't you?

 2              THE DEFENDANT:  35.

 3              THE COURT:  The defendant is 35 years of age, and the

 4      instant offense represents his first felony conviction.

 5      Mr. DeVito is married and has one child.  He is a college

 6      graduate and was gainfully employed at the time of his arrest.

 7      He was previously dependent upon alcohol and suffers from

 8      anxiety and depression.  Mr. DeVito also suffers from an

 9      addiction to child pornography and potentially video games.

10              The defendant's childhood involved a volatile

11      relationship between his parents and a life of solitude for

12      Mr. DeVito.  He had a few close friends, so he often

13      disappeared in the online world of video games and/or

14      pornography.  Mr. DeVito reported being inappropriately touched

15      by his half-brother on one occasion and alleged he forced

16      Mr. DeVito to perform oral sex on him.  His half-brother also

17      introduced him to adult and child pornography at an early age.

18              The defendant's base offense level is 43 and his

19      criminal history category is I which results in an advisory

20      guideline range of imprisonment of life.  However, the

21      statutory maximum term of imprisonment in this case is 360

22      months or 30 years.  Therefore, the guideline imprisonment

23      range becomes 360 months.

24              The probation officer considered both a downward and

25      upward variance in this case, both of which were discussed in
```

1    the objections.  However, it was determined that the

2    defendant's conduct overrides any mitigating information

3    related to his childhood.  Taking into account the factors

4    outlined under 18 U.S.C. Section 3553(a), the probation officer

5    believes a sentence of 360 months is appropriate in this case.

6            Pursuant to 18 U.S.C. Section 3553(a)(4), such a

7    sentence is consistent with the kinds of sentences established

8    for the category of offense committed.  It is believed a

9    sentence of 360 months imprisonment reflects the seriousness of

10   the offense, will adequately deter others from committing

11   similar offenses, and will protect the public from further

12   criminal behavior on the part of the defendant in accordance

13   with 18 U.S.C. Section 3553(a)(2).  As a result, a sentence

14   within the guideline range avoids unwarranted sentence

15   disparities among defendants with similar records who have been

16   found guilty of similar conduct pursuant to 18 U.S.C. Section

17   3553(a)(6).

18           Following imprisonment, the probation officer

19   recommended that the defendant be placed on supervised release

20   for a term of life.  This will provide an opportunity for the

21   Probation Department to assist him with reintegration into the

22   community after an absence as well as monitor his behavior.

23           Given the defendant's history, he could benefit from

24   participation in the following programs:  Substance abuse

25   program -- and I'm not sure if he needs that or not because

102

```
1    there was some discussion that he no longer uses alcohol --

2    mental health treatment, to include a sex offender treatment

3    program.  A lengthy term of supervision will help to ensure the

4    defendant completes treatment and does not fall into old

5    patterns of behavior.  It will also ensure he has access to the

6    needed resources to assist him in reintegrating back in the

7    community after a lengthy absence.

8          Do the parties have any questions about the statutory

9    provisions applicable to the imposition of sentencing -- of

10   punishment in this case or the suggested sentencing guidelines?

11         Ms. Kovoor?

12         MS. KOVOOR:  No, Your Honor.

13         THE COURT:  Mr. Healey?

14         MR. HEALEY:  No, Your Honor.

15         THE COURT:  All right.  Then we'll now proceed to

16   sentencing.  And at this time, the Court will entertain

17   anything the parties wish to say in mitigation or aggravation

18   of sentence.

19         Ms. Kovoor, you're first.

20         MS. KOVOOR:  Your Honor, I'd like to call Miss Cheryl

21   DeVito to the stand.

22         THE COURT:  I'm sorry, who?

23         MS. KOVOOR:  For mitigation, his mother.

24         THE COURT:  Okay.  Mrs. DeVito, would you please come

25   take the stand?
```

```
 1          (Courtroom deputy conferring with the Court.)

 2          COURTROOM DEPUTY:  Stand up there, raise your right

 3   hand, and be sworn in.

 4       (Witness complied.)

 5          COURTROOM DEPUTY:  You do solemnly swear that the

 6   testimony you're about to give in this case will be the truth,

 7   the whole truth, and nothing but the truth, so help you God?

 8          THE WITNESS:  I do.

 9          COURTROOM DEPUTY:  Please be seated.

10          THE COURT:  Ms. Kovoor, you may proceed.

11                         CHERYL DEVITO

12                      DIRECT EXAMINATION

13   BY MS. KOVOOR:

14   Q.  Cheryl, could you state your name for the record?

15   A.  Cheryl DeVito.

16   Q.  Okay.  What do you do for employment, Cheryl?

17   A.  I'm a licensed optician.

18   Q.  Okay.  You are the mother of Richard DeVito?

19   A.  Yes, I am.

20          THE COURT:  Would you pull the microphone over

21   towards you?  It moves.  There you go.

22   A.  Yes, ma'am.

23   Q.  He's your only child; is that correct?

24   A.  Yes.

25   Q.  Okay.  Could you explain your marriage to his father and
```

C. DEVITO - DIRECT

1  his half-siblings?

2  A.  We were married for 30 years.  There was a lot of animosity

3  between my stepkids and my son.  Due to the fact that we had to

4  make ends meet for two families blended together, we both

5  worked.  My son was kind of a latchkey child.  He was alone a

6  lot.  We tried to make everything fair between my stepkids and

7  my son.  We would go up constantly and keep the family together

8  on visits.

9  Q.  How old is Chris compared to Rick?

10 A.  He at the time was like 15 when I guess I -- we learned

11 about this.

12 Q.  You're referring to the sexual abuse?

13 A.  Yes.

14 Q.  You did not know at the time?

15 A.  No.

16 Q.  Okay.  Could you describe to the Court Rick's demeanor when

17 he was growing up?

18 A.  When he was young, till about six years old, he, I feel,

19 was a happy child.  At six, here again, because we were

20 working, both of us, he would become a latchkey child and be

21 alone.  He did go to a sitter, but then sometimes he would come

22 home and my husband would be tired from, you know, work too, he

23 worked nights sometimes, he would be sleeping.  My son would,

24 you know, have access, unfortunately, because we didn't have a

25 united front about how to put locks on computers, you know --

```
1    Q.  Was there a --

2    A.  -- and TV.

3    Q.  Was there an addiction to video games?

4    A.  Yes.

5    Q.  Okay.  Did you know about any addiction to pornography,

6    whether adult or child?

7    A.  No.

8    Q.  Okay.  Do you know whether he was depressed as a child?

9    A.  Yes.

10   Q.  Could you describe that to the Court?

11   A.  Well, I -- he always mentioned that he would love to have a

12   big family, but we could not afford that.  He already -- my

13   husband already had three children.  And Rick was our only one.

14   Q.  What was he like as a son growing up?

15   A.  Very good.  But, I mean, he -- the normal teenage years,

16   sometimes some adversity.  Here again, no united front between

17   my husband and myself, which I blame both of us, you know; we

18   were stubborn.  I would think that a rule would be good; he

19   would not agree.

20   Q.  All right.  There was some volatility in the home between

21   you and your husband; correct?

22   A.  Yes.

23   Q.  And that led to some police reports?

24   A.  Yes.

25   Q.  Domestic violence?
```

C. DeVITO - DIRECT

```
 1    A.  Yes.

 2    Q.  Other people witnessed it?

 3    A.  Yes.

 4    Q.  Mr. DeVito witnessed it when he was a boy?

 5    A.  Yes, he did.

 6    Q.  Did he come to your aid at times?

 7    A.  Yes, he did.  At one point my husband was coming after me,

 8    and my son came at him with a baseball bat, but he didn't do

 9    anything, trying to protect me.

10    Q.  Did he later on take care of his dad when he was dying?

11    A.  He did.  He loved his dad.

12    Q.  What was your dad -- what was his dad diagnosed with?

13    A.  He had a long, ongoing diabetes problem, noncompliant, then

14    developed Parkinson's-plus.  And what took him, which my son

15    helped me with for three months in the hospital, was multiple

16    myeloma.

17    Q.  Okay.  During that same period of time, was Rick going

18    through other stressors in his life?

19    A.  Yes.  My mother that lived with us and was -- he adored, my

20    mother lived with us for eight years along with my husband.

21    She passed away.  And Rick was her pride and joy, and he helped

22    me with her too.

23    Q.  When you say "helped," what do you mean?

24    A.  He would come after work and make sure that all her care

25    was taken care of.  Even though caretakers were obstinate and
```

1    didn't want to make things happen, my son stepped up to the

2    plate.

3    Q.  And the same thing for his father; is that right?

4    A.  Yes.

5    Q.  What did he do for his father?

6    A.  Same thing.  Going back and forth from hospital to rehab,

7    hospital to rehab.  He was there all the time fighting for his

8    dad's health care.

9    Q.  Did that create some problems with his marriage?

10   A.  I'm sure it did.

11   Q.  Okay.  He also had a child during that period of time;

12   correct?

13   A.  Yes.

14   Q.  How often was he working?

15   A.  It's like he was on call constantly.

16   Q.  Okay.  What was he doing for work?

17   A.  He was a materials manager at a manufacturing firm.

18   Q.  Okay.  Here in Florence, Kentucky?

19   A.  Yes.  Um-hmm.  Linamar.

20   Q.  Do you know how much he was making at the time?

21   A.  About 85,000.

22   Q.  Okay.  And that's at 33 years of age; correct?

23   A.  Yes.

24   Q.  Was providing for his wife and child?

25   A.  Yes.  And also he helped me too.

C. DEVITO - DIRECT

1    Q.  The Court can listen to your description of his

2    characteristics, his personal history.  Is there anything that

3    you want to tell this Court about your son?

4    A.  My son's a good man.  He is a human being that made many

5    mistakes and deplorable acts, yes, that hurt many.  It is not

6    my son, though.

7    Q.  Do you think he could benefit from treatment?

8    A.  Yes, I do.  I think he's been remorseful from the very

9    beginning and he wants treatment.

10   Q.  Does he sometimes seem angry and stressed and agitated?

11   A.  Yes.

12   Q.  Why is that?

13   A.  I think because of the situation he's in right now, he's

14   never experienced anything like that.

15   Q.  And neither have you?

16   A.  No.

17   Q.  He's a first-time offender and offended big?

18   A.  Yes.

19   Q.  Okay.

20   A.  I guess he goes big in every way, unfortunately.

21   Q.  Do you feel that he's remorseful?

22   A.  I feel he's very remorseful, and he has been from the

23   beginning.  He's not a liar.  He knows what we went through.

24   And here again, it's -- I'm not just blaming --

25   Q.  What?

```
 1   A.   -- my husband.  It's we were stubborn.  We were obstinate.

 2   Q.   So he lived a very solitary life?

 3   A.   Yes.

 4   Q.   And his time went into videos and ultimately pornography

 5   that you know now?

 6   A.   Yes.

 7   Q.   Okay.  Does he want treatment?

 8   A.   Yes, he does.

 9   Q.   He's asked for that?

10   A.   He's asked for that and has been denied by Butler County

11   when we tried to get extra treatment --

12   Q.   Thank you, Your Honor.

13   A.   -- there.

14   Q.   Thank you.

15   A.   Thank you.

16            THE COURT:  Mr. Healey, do you wish to cross-examine?

17            MR. HEALEY:  Can I just talk with Sarah for just a

18   second?

19            THE COURT:  Yes, sure.

20       (Mr. Healey conferring with Ms. Kovoor.)

21   BY MS. KOVOOR:

22   Q.   When did Mr. DeVito's Dad pass?

23   A.   2013.

24   Q.   Thank you.

25   A.   And may I say my mother passed away in 2016 and then his
```

C. DEVITO - DIRECT

1    uncle four days after he was taken in.

2              THE COURT:  Do you wish to cross-examine?

3              MR. HEALEY:  No, Your Honor.  Thank you.

4              THE COURT:  Okay.  The Court appreciates your

5    testimony, Ms. DeVito, and you are excused.

6              THE WITNESS:  Thank you.  All right.  Thank you.

7              THE COURT:  Thank you.

8              Ms. Kovoor.

9              MS. KOVOOR:  Do you want me to give a closing, Your

10   Honor, at this point?

11             THE COURT:  Yes.  Finally, allocution, yes.

12             MS. KOVOOR:  Well, Mr. DeVito does want to speak.

13             THE COURT:  Yes.  I want both -- I'm going to give

14   both of you the opportunity to speak.

15             MR. HEALEY:  May I speak, Your Honor?  Sorry.

16             THE COURT:  Yes, go ahead.

17             MR. HEALEY:  We have Minor Victim X's mother here.

18   She would like to give a statement.  I was wondering if maybe

19   she could do that now.  She's been here all morning.

20             THE COURT:  Yes.  I didn't realize that --

21             MR. HEALEY:  I don't know how much time she has.

22             THE COURT:  Yes.  I didn't realize she was here.  Yes,

23   let's do that.  I apologize for making her wait all day.  I

24   didn't realize she was here.

25             Thank you for coming, and I'm sorry I made you wait

```
 1    all day.

 2              MS. MILLER:  That's okay, Your Honor.

 3              THE COURT:  I'm going to have my courtroom deputy

 4    swear you in, if you don't mind.

 5              COURTROOM DEPUTY:  If you could please raise your

 6    right hand.

 7        (Ms. Miller complied.)

 8              COURTROOM DEPUTY:  You do solemnly swear that the

 9    testimony you're about to give in this case will be the truth,

10    the whole truth, and nothing but the truth, so help you God?

11              MS. MILLER:  I do.

12              THE COURT:  Would you be more comfortable on the

13    witness stand, or do you want to just stand there?

14              MS. MILLER:  No, Your Honor.  I'd like to stand.

15              MR. HEALEY:  Typically the victims, when they give

16    their impact statement, they aren't subject to like swearing in

17    and cross-examination, Your Honor.

18              THE COURT:  Well, no, I didn't intend for

19    cross-examination.

20              MR. HEALEY:  Okay.  I just wanted to make sure.  We

21    did not discuss that with her if that was the case.

22              THE COURT:  No.

23              MS. MILLER:  That's okay.  This is the truth anyway.

24              THE COURT:  There'll be no cross-examination --

25              MS. MILLER:  It doesn't matter.
```

112

1           THE COURT:  -- for a victim impact statement.

2           You may proceed.  Would you state your name for the

3    record?

4           Bill, do you have some tissues?

5           MS. MILLER:  Thank you.

6           My name is Sherie Elizabeth Miller.

7           Anything else?  Can I start?

8           THE COURT:  Sure.

9           MS. MILLER:  Okay.  My daughter is Victim X.  My

10   daughter was nine years old when she was violated.  My

11   daughter's life is forever changed because of his selfish acts.

12   He had no right to see her, take pictures of her, record her,

13   or expose her to his sick, disgusting, and illegal behaviors.

14          Please know that even though he might not have met my

15   daughter in person, he has done tremendous damage.  This has

16   been psychologically devastating to her.  This has severely

17   impacted our family.  I'm not going to go into detail about the

18   horrible ways he has hurt our lives.  I'm not going to give him

19   the satisfaction of knowing.  He doesn't deserve to know

20   anything more about my daughter.

21          He purposely and selfishly committed criminal acts

22   against my child and hundreds of other children.  His witness

23   testified he is smart, college educated, and was working in a

24   management position.  He was disgusted by his behavior, yet he

25   didn't get help.  He didn't stop.  He was smart enough to know

1    that he needed treatment, yet didn't get any.  He knew what he

2    was doing was wrong and criminal.  He knew his behavior would

3    have lifelong consequences to these children, yet he did it

4    anyway.  He chose his behavior.  Those children didn't get a

5    choice.  He is disgusting, but this shouldn't make his sentence

6    less than 30 years.  It should make it the maximum you could

7    possibly impose.

8            He violated my daughter and hundreds of others.  Their

9    images are now out there for the world to see.  We can't get

10   them back.  My daughter might be notified at any time for the

11   rest of her life as well as the other victims.  Our lives

12   changed when the FBI Crimes Against Children Division and

13   Victims Advocate came to our door.  He deserves to have his

14   life changed for the rest of his life.  He deserves more than

15   30 years.  He deserves 87 to 108 years, not months.

16           He is a first-time offender, but only because this is

17   the first time he was caught.  All of his victims should be

18   taken into consideration, not just Victim A.  Nothing about

19   what he did to my daughter or any of the other victims is

20   run-of-the-mill.  A good man, as his mom stated that he is,

21   does not commit crimes against children.

22           We've heard a lot about his sexual assault as a child.

23   I'm a victim of sexual assault as a child.  I'm also the victim

24   of sexual assault during my eight years in the military.  I

25   have never had any sexual photos, images of children, committed

1    any crimes against anyone, let alone children, even though I

2    have a past.  I got treatment.  I got treatment as an adult.

3    He could have done the same.

4           Your Honor, please sentence him for as -- for as long

5    as you possibly can.  Please give him the maximum sentence for

6    my daughter.  Please speak for all of the victims who can't.

7           Thank you for hearing my statement.  Thank you to the

8    FBI agents, victims advocates, attorneys, and everyone else

9    involved in catching pedophiles and making sure the victims get

10   justice.

11          THE COURT:  Thank you very much.  Thank you for

12   coming.

13          Anything else?  Are you going to read the other victim

14   impact statements?

15          MR. HEALEY:  I don't believe that will be necessary,

16   Your Honor.  Thank you.

17          THE COURT:  All right.  Ms. Kovoor, you and Mr. DeVito

18   are going to speak, if you want, so I don't care which order

19   you want to do it in.

20       (Ms. Kovoor conferring with the defendant.)

21          MS. KOVOOR:  Your Honor, I also have some character

22   letters I believe that were already provided to the Court, but

23   I can give another copy, if you like.

24          THE COURT:  Okay.  I think they were attached, yes, to

25   one of the submissions I got.

1        THE DEFENDANT:  Your Honor, I stand before you today

2   as a man who deeply regrets the actions and the pain and

3   suffering that I've caused.  As a father myself, I'm ashamed

4   and disgusted.

5        I apologize to the children I've hurt and regret I

6   could not bring myself to face my demons before and allowed

7   myself to inflict these harms.  I should have found strength to

8   seek help and properly address my sickness and sadness before

9   my downward spiral.  To escape the isolation and the mental

10  prison I had held myself in before, I allowed it to subject me

11  to the physical prison I'm in now.

12       I understand now that this isn't something I can do

13  alone.  That being said, I want to apologize to my wife, my

14  daughter, and my mother who I love very much who I've also hurt

15  by my actions and thank them for the support that they've

16  shown.  I acknowledge the harm I've done to others and hope I

17  will get a second chance to show everyone that I'm better than

18  this mistake and try to repair the harm that I've done.

19       Thank you, Your Honor.

20       THE COURT:  Thank you, Mr. DeVito.

21       Ms. Kovoor.

22       You may sit down, if you want, Mr. DeVito.

23     (The defendant complied.)

24       MS. KOVOOR:  Your Honor, I am a former state felony

25  prosecutor who did sexual assault crimes and then have done

1   defense work for the last 15 years. The federal system here

2   is -- I just find -- I'm dumbfounded because I saw Mr. DeVito

3   accept responsibility. At the time of the motion to suppress,

4   he stated clearly that he accepted. Not one child had to

5   testify. No one had to bring a child to court. And yet, that

6   acceptance of responsibility is not really giving him any

7   benefit because with the guidelines and how they're calculated

8   and these multiple enhancements, he's looking at lifetime for a

9   non-life offense, for a child pornography charge that is a

10  non-life offense statutorily.

11          He did not commit murder. He did not commit domestic

12  terrorism. But based on how these calculations and

13  enhancements are stacked up, some of them which are doubly

14  punitive, are part of the elements of the offense, he's looking

15  at a minimum of 15 years. This in a state court is -- people

16  are looking at probation or two or three years.

17          Even in the Sixth Circuit there's been U.S. v. Lowry,

18  U.S. v. Damron where individuals have sought out 25 other

19  victims and actually sought to meet with them and received more

20  mercy from the government than he has.

21          He stood here before you today as a man who is very

22  sorry for his conduct and is socially outcasted. I understand

23  any victim coming in here and stating what it did to her and

24  her family. However, there's been no evidence here there's

25  been hundreds of children. There's been no evidence that this

1    was captured in the clouds and never to be wiped off; that this

2    is permanent.  That is, I have never been provided information

3    regarding all of these pseudo counts as to their ages, their

4    jurisdiction, you know.  I have the affidavit of the police

5    officer, and we're talking five days of chats between him and

6    one individual.  There was absolutely information provided to

7    the Probation Department regarding the eight-year-old talking

8    to her cousin and other facts of that particular victim's case,

9    but regarding all these other pseudo counts, we don't know

10   whether -- what duration they were, whether it was the same

11   duration as the offense that he pled to, where this happened,

12   the ages of the children, whether there was in fact an identity

13   misrepresentation.  We don't know that.

14          And in this case, like other child pornography cases,

15   these guidelines are being used to imprison an individual like

16   him who's never, ever even been charged or arrested or alleged

17   that something he did anything wrong.  I don't even know if

18   he's had a previous traffic ticket before this, and he's

19   looking at a minimum of 15 years.  You could give him 15 years

20   where he would come out at the age of 50 years old, where we

21   all know where recidivism, it decreases just by age.  He's 35

22   now.  If he gets the minimum, he's 51 when he gets out.  His

23   three-year-old daughter is going to be an adult by that time.

24   We don't know what the health and existence of his mother will

25   be at that time.  But that's what we're begging for is the

1    minimum.  And this is for a first-time offender.

2         He doesn't dispute that he did something horribly

3    wrong; that it was vile.  What he's been upset with is sitting

4    in a cell for two-and-a-half years, and he's agitated and he's

5    frustrated because he does not understand how what he did

6    equates to somebody who's been charged with multiple rapes or

7    murder in terms of sentencing.  And that's why I had let

8    Mr. Pimentel here to show how these guidelines which were done

9    by Congress, people who are running for election, and not

10   supported by empirical evidence, not supported by research,

11   where there's been criticisms by the U.S. Sentencing

12   Commission, there's been criticisms by other federal judges.

13   For example, the use of a computer.  One federal judge likened

14   it to an OVI where you're charged with drinking while driving

15   and then you're charged with using a car.  The use of the age

16   of a child.  This is child pornography.  It's already part of

17   the element of the offense.

18        All I'm saying is that the accuracy of the presentence

19   investigation report that was provided by the Probation

20   Department is something that we had no ability to question

21   because just the federal child porn statutes, we could not -- I

22   could not view the actual child porn, I couldn't decipher the

23   ages, I don't have an investigator out there like in other

24   cases where I could determine, yes, that child was 14; yes, he

25   used a pseudo name.  I don't have that information.  I have to

1   take it -- I have to trust that that investigation was done

2   properly.

3         As I said previously, a lot of the vagueness, the

4   misinformation, the noninformation should go to benefit the

5   defendant, not the government in this case.  Since at the time

6   of plea when he stood here before you and he accepted

7   responsibility and stated that there was similar conduct with

8   25 other girls, and he specifically also wanted it stricken

9   that he instructed any child to have sexual conduct with an

10   animal, that should have been it.  But now it's 30, it's 33,

11   it's ten more; it's instruction to the child regarding the dog.

12   That was not part of what I -- and I was present there at that

13   time.

14         I just feel that not only are the Congressional -- are

15   these guidelines unfair to somebody like Mr. DeVito who is a

16   first-time offender but who captured videos or had Facetime

17   with young children.  It's just -- it doesn't make sense

18   because it's making a statute -- a child porn case like a life

19   offense charge.  It just -- it doesn't -- it's nonsensical.  It

20   doesn't make sense.  How can he have a life calculation for

21   something where the minimum is 15 and the maximum is 30?

22         They're flawed, and the resulting advisory guideline

23   range should not warrant the same weight that it might deserve

24   in other cases involving guideline provisions.  Federal Courts

25   have dealt with these anomalies and inappropriateness of

1    sentences, such as in the cocaine cases and crack cocaine.  And

2    this is so in the United States versus Henderson where the

3    Sentencing Commission court scholars have all repeatedly

4    criticized these guidelines.  In United States versus Dorvee, a

5    Second Circuit case in 2010, the Court stated that the

6    guideline is fundamentally different from most and that unless

7    applied with great care can lead to unreasonable sentences that

8    are inconsistent with 3553 and it requires engaging in an

9    in-depth analysis of the various flaws, including the

10   irrationality of certain enhancements.

11           I'm not going to belabor this Court.  We've heard this

12   from the probation officer who was an expert in this case.  But

13   using these guidelines makes no sense when this man is facing

14   15 years as a minimum.  After that, you could have him for

15   lifetime supervision.  And we've heard from the witnesses, both

16   Dr. Connor and the probation officer, that these tools, these

17   tools that the Probation Department has, works.  Polygraphs,

18   registration, continuous monitoring; they work.  And they would

19   work for somebody who's 50 years old at that time to make sure

20   that there's specific deterrence.  We know there's general

21   deterrence because most child pornographers don't even get

22   prison time.  If they do, it's minimum.  But here in his case,

23   given all of these pseudo counts and these multiple

24   enhancements that stacked, his minimum is 15 years.  If he gets

25   out at 50, you can control his behavior and monitor him and he

1    can get treatment sooner than later.  He can get treatment 13

2    years down the line versus 28 years down the line.  Because as

3    we heard, the Bureau of Prisons generally does the treatment

4    two years before they are brought back into the community.

5         Dr. Connor even said he would be a good candidate for

6    community treatment, meaning right away, if that was available

7    to him.  It's not.  He's ineligible for that by the statute.

8    It's so draconian, the statute and the penalties right now.

9    And this is because of the anticrime wave.  It's very easy to

10   say child pornographers should get life or the death

11   penalty, drug dealers should get the death penalty as we've

12   heard recently in the news.  It's very easy to say that because

13   it's popular.  Does it make sense?  Is it fundamentally fair?

14        And in terms of horizontal sentencing in this own

15   Circuit, there have been individuals that have done more than

16   Mr. DeVito has, have had actual hands-on contact, have reached

17   out to kids.  He never did.  He never intended to meet them,

18   never wanted to meet them, never stated so.

19        The widespread use of technology now also has not

20   caught up -- the law has not caught up with it.  We just heard

21   information, and it's in the sentencing memorandum as well,

22   that it was captured and is permanently there.  There's no

23   evidence to that.  This was Facetime conversations.  They're

24   gone as soon as the person ends the conversation.

25        He has a supportive family.  He's admitted his

1    conduct.  He wants treatment.  He has everything -- everything

2    that -- if there's any case that cries out for the minimum

3    sentence, this is it.

4         You can take into account as part of 3553 his age,

5    he's 35, 33 at the time of the offense; his personal

6    characteristics.  He was working as a manager in Florence,

7    Kentucky, auto manager.  Same job that his dad has.  He was

8    making $85,000 a year.  He was renovating two homes, taking

9    care of ill family members, taking care of his mother.  His

10   wife is still here supporting him.  That shows he must have

11   some redeemable qualities despite his sickness, and it is a

12   sickness.

13        And one of the other things I wanted to say was, and I

14   understand from victims' perspective that, you know, he should

15   have gotten help, it's very hard for somebody in our society to

16   say that I think about young girls.  I had a 15-year-old boy

17   who is valedictorian, baseball player, cry out for help in an

18   attempted suicide.  What happened?  They found pictures.  He

19   was charged.  This is what happens in our society.  He knew

20   that.  He went through depression, chronic depression, chronic

21   stress, and that's what led to him behaving the way he did.  I

22   think that he is intelligent enough of a man, has enough

23   support to really benefit from treatment here, and that's after

24   15 -- 13 years of being incarcerated.  For a man who's never

25   spent a day in prison before this charge, that's a huge amount

1   of time.

2          I ask you to look at the fairness of these guidelines,

3   how they're applied to him.  The use of the computer

4   enhancement, the use of the age, those are parts of elements of

5   the crime.  I don't under -- I'm befuddled.  I don't understand

6   how you can be charged with this and then get enhanced by an

7   element of the offense.  The sadomasochistic elements, the use

8   of a sexual act.  Well, this is child pornography.  There is

9   going to be lascivious conduct.  There is going to be genitalia

10  exposed.  So, again, I just feel it's doubly, triply punitive,

11  and grouping all of these yields an anomalous, unfair result.

12          And it really -- I mean, it doesn't separate the worst

13  from Mr. DeVito.  He can benefit from help.  He didn't go out

14  there and rape people or try to contact people, meet with these

15  girls.  He did something terribly wrong that will impact a lot

16  of people, a lot of girls for just like it impacted him.  And

17  he knows that.  But 15 years for that, that would show a

18  deterrence, both specifically and generally.  It would give him

19  rehabilitation time.  It would support the reason why we

20  sentence people like him.  To show punishment, yes, but to give

21  him time to rehabilitate himself, to then get treatment and

22  then to go out back into society as a changed person.

23          So I ask you to look at the history and

24  characteristics of this defendant and not just what he did.

25  But even with what he did compared to the U.S. v. Lowry, U.S.

1    v. Damron, other cases in this court where individuals have

2    gotten under ten years for worse conduct just because of the

3    charging and the pleaing involved.

4          There are multiple character letters there by Miss --

5    by members of the community.  I think it shows that there are

6    people who believe in him and that believe that if he got the

7    right help, that he could at least live a decent life.  I think

8    Dr. Connor has worked in federal prisons, has worked with sex

9    offenders, and what did he say?  No psychopathy, no sociopathy,

10   no narcissism.  I've worked with him for a year, and I've been

11   frustrated with him because he's obsessive-compulsive and he

12   writes notes and he is very detailed and he can be very --

13   but -- very demanding, but he's sitting in a cell with a toilet

14   there and a bed and something this man has never been used to

15   thinking about his case and hearing that this individual got

16   five years for rape where he is looking at a minimum of 15.

17   And I understand his frustration.

18         I ask you to really review Dr. Connor's testimony, and

19   the question was would he be amenable to treatment, and his

20   answer was absolutely, even within the community.  Somebody

21   like that, like I said, this case screams for the minimum, and

22   five years supervision to lifetime supervision, whatever the

23   Court deems appropriate.

24         Thank you.

25         THE COURT:  Thank you, Ms. Kovoor.

1                  How long are you going to be?

2                  MR. HEALEY:  Maybe 15 minutes, Your Honor.

3                  THE COURT:  We've been sitting almost two hours.

4  Let's take a break.

5                  MR. HEALEY:  Okay.

6                  THE COURT:  We'll take a 15-minute break.

7          (Recess in proceedings from 1:33 p.m. to 1:49 p.m.)

8                         AFTER RECESS

9                  THE COURT:  You may proceed, Mr. Healey.

10                  MR. HEALEY:  Thank you, Your Honor.

11                  Part of the problem here is Mr. DeVito doesn't

12  appreciate the seriousness of his offense.  He spent his entire

13  sentencing hearing, his pro se motions, comparing himself to

14  defendants who commit possession of child pornography offenses.

15  He ignores his manipulation of these young girls.  He ignores

16  how he got into their bedrooms through the internet, how he

17  instructed them to do vile acts.  He ignores how integral he

18  was to them sexually abusing themselves on these camera -- on

19  their cameras.  And these are videos that may live forever on

20  the internet.  We don't know, Your Honor.  There haven't been

21  any hit yet -- hits yet as far as distribution, but only time

22  will tell whether or not these videos have been shared with

23  others.  And just like you heard from Miss Miller, all those

24  other families are just waiting one day to find out whether or

25  not the sexual exploitation of their daughter is going to end

1    up in the home of some other pedophile who is doing Lord knows

2    what to those images.

3            To the extent that Ms. Kovoor raised, you know,

4    they've never had an opportunity to look at this evidence, Your

5    Honor, that couldn't be further from the truth.  When she says

6    we didn't make anything available to her, she was over at the

7    FBI.  We were showing her the videos.  There's just so many to

8    go through.  We have each and every one of the minors that we

9    provided to Probation listed.  We have their photos.  We

10   submitted it to you.  To the extent they want to challenge

11   it -- can I use the --

12           THE COURT:  The visualizer?

13           MR. HEALEY:  -- the visualizer for a second?

14           THE COURT:  Yes.  Sure.

15           Bill.

16           COURTROOM DEPUTY:  Hold on one second.

17           I'll get it, Kyle.

18           MR. HEALEY:  I don't want to mess it up.

19           This is Gxxxx, Your Honor.  This is Minor Victim A.

20   This is the girl that Mr. DeVito got the videos of her dog

21   licking her genitalia.  This is the girl that he instructed to

22   go perform oral sex on her father.  She's eight.  She lives in

23   Lubbock, Texas.

24           This is her cousin that he was trying to get her with.

25           This is Lxxxxxx Kxxxxxxx from Portage, Michigan.

1     These are her two friends, Mxxxx, also from Portage, and

2     Kxxxxxx from Portage.  These are the girls that Mr. DeVito had

3     inserting their fingers into each other butts.

4          He says he doesn't know who these kids are.  We made

5     this evidence available to him.  It's horrific.  We've shown

6     some of it to you, Your Honor.

7          This wasn't some innocent online possession of child

8     pornography.  That's not what he was up to.  He had a laptop

9     full of child pornography, Your Honor.  He had it in the back

10    of his truck when the FBI did the search warrant at the house.

11    It was what you would call the standard internet downloaded

12    child pornography.  Even some of the victims from those child

13    pornography videos put restitution claims in on this case, and

14    they subsequently withdrew them when they found out how many

15    production victims he had.  Had he just stuck to that laptop of

16    child pornography and just watched videos that other people

17    created, we would be having a much very different conversation

18    today, but that wasn't enough for him.  He found 30 kids

19    online, and he manipulated them to create child pornography for

20    him for his own viewing, for his own pleasure.  That's wholly

21    different than all these cases he puts before the Court.  His

22    sheer number of victims is wholly different, Your Honor.

23         He makes a big idea about Mr. Lowry and the sentence

24    that he got.  What he points out in his own motion, though, is

25    their cases really aren't similar.  Mr. Lowry just solicited a

1    bunch of people.  He didn't actually get child pornography from

2    all those kids, unlike Mr. DeVito.

3           He makes a big claim about Mr. Damron who got 200

4    years and he has a prior sex offense.  Your Honor, Mr. Damron's

5    guidelines were a level 39, ten levels lower than Mr. DeVito's.

6    Mr. Damron had one victim in his case.  He didn't have the

7    number that Mr. DeVito had.  That's why his sentence is lower.

8           He relies on U.S. v. R.V., Your Honor.  That's also a

9    possession of child pornography case where the Court gave a

10   huge reduction to a defendant in that case.  But there's

11   something the Court wrote in there that I think's important

12   because that Judge went through and classified what he viewed

13   as seven iterations of child pornography offenders from least

14   to worst.  He put the least as possession only of child

15   pornography users.  He then went to possession and involuntary

16   distribution.  He went to possession with intentional

17   distribution.  The next level is possession with intentional

18   distribution for commercial gain.  And then online

19   communications with minors without intent to engage in contact.

20   And then online communications with minors intending to engage

21   in contact.  And the last highest category, Your Honor,

22   production of child pornography.  Of those defendants, the

23   Court wrote, "Defendants in this category engaged, and are most

24   likely to engage in the future, in sexual exploitation of a

25   minor.  This group potentially constitutes a most serious and

1  dangerous category of child pornography offenders.  Defendants

2  in this category can be further differentiated based on factors

3  such as the type of images produced, the quantity, and their

4  role in the production.  Some involve photographing rapes of

5  young children by a parent and other relatives or friends of

6  the family.  Such incestuous relationships are particularly

7  hard to ferret out."

8         What Mr. DeVito fails to realize is he's in the last

9  category.  He's been trying to convince the Court that he's in

10  the first category, but he's not there.  His conduct is too

11  serious, his communications with these victims too many.  He

12  was too integral to the creation of these videos.

13         In reading his own pro se sentencing memo, it doesn't

14  take much to understand why his attorney didn't want that

15  fired -- or filed.  Miss Kovoor did a good job laying out a

16  very mitigating case for him in her memo.  Mr. DeVito filed his

17  pro se memo and washed all that away.  If you read his pro se

18  memo, Your Honor, it reads as if he's the victim of this

19  offense.  He minimizes his conduct.  He refers to these videos

20  as sexting.  And he refers to his conduct as asking.  He says,

21  oh, it's mitigating because I didn't threaten or extort these

22  women.  No, Your Honor, he didn't have to threaten or extort

23  them.  They were eight years old.  He just manipulated them.

24  That is in no way redeeming.

25         He says he just wants a fair and appropriate sentence,

1    Your Honor, and he, with I think the utmost irony, complains

2    that he's already been treated unfairly because he's been held

3    in jail over 800 days.  He takes no self-awareness for the fact

4    that he went through about seven attorneys in that span.  You

5    know, he acts -- he claims that, you know, we're treating him

6    as if he molested a bunch of kids.  I think things need to be

7    put in balance for him.  No one's treating him like he molested

8    that number of kids.  If he molested 25 kids, would we really

9    be here talking about a sentence between 15 and 30 years?  No

10   way.  If he molested 25 kids, we'd be talking in the hundreds

11   of years for that sort of conduct.

12           In another twist of irony in his memo, he complains

13   that, you know, his incarceration would cost the taxpayers a

14   lot of money.  He didn't have those same concerns when the

15   Court appointed Candace Crouse to represent him for free.  He

16   didn't have those same concerns when he requested to subpoena

17   the eight-year-old victim, Gxxxx, in this case and make her

18   come up from Texas so he could examine her about his conduct in

19   this case.  He wanted to question the eight-year-old, and he

20   wanted the taxpayers to pay for it because he said he didn't

21   have the money.  But in the sentencing memo, he has the nerve

22   to claim that the taxpayers shouldn't pay for his

23   incarceration; you should just let him out?

24           He also raises in his memo, Your Honor, that he had

25   these consent documents that he gave to search these Cloud

131

1    accounts and that led to the arrest or leads to 60 defendants

2    and he never got credit for that.  Your Honor, we never got the

3    consent documents back.  His lawyers never sent them to us.  We

4    spoke with Ed Perry about it.  Ed was like, "He signed them,

5    but I'm not allowed to send them to you yet."  He goes, "He's

6    got some stipulations about it."  I brought the whole letter we

7    sent Ed about the consent of, hey, Rick, if you want to get

8    ahead of this, this is what we can send you.  It laid out how,

9    hey, this consent is just you trying to accept responsibility

10   early.  He didn't want to do it.

11         The one good thing that I think we have in this case,

12   Your Honor, is the report by Dr. Connor.  I think Dr. Connor

13   did good work in evaluating Mr. DeVito.  I do think it's

14   helpful.  I think we need to limit how helpful it is, though,

15   because as Dr. Connor kind of explained, he had such a limited

16   view of the conduct that Mr. DeVito had engaged in.  He just

17   had the conduct from the complaint.  Well, after Rick was

18   arrested, we learned about all these other victims when we

19   started getting the search warrant evidence from OoVoo.  And

20   Dr. Connor testified here to you, Your Honor, about when, you

21   know, Mr. DeVito is sending the minors to go out and do things

22   to other minors, sending things out to your dad, that's

23   actually more troubling than the conduct he was led to believe

24   and how that may have impacted his evaluation.

25         Lastly, he talked about that cognitive distortion

132

 1    score and it's the justifications for his action.  And,

 2    candidly, I don't think we needed to see that report.  If you

 3    read Rick's filings, I mean, he feels like he's the victim

 4    here.  He's trying to justify what he's done; that the lawyers

 5    have been unfair, his lawyers have been unfair to him, the

 6    government has been unfair to him, the FBI has been unfair to

 7    him, and the Court's been unfair to him.  He's been the victim

 8    throughout these entire proceedings in his own mind.  But the

 9    reality is it's his conduct that got him here.  It's his

10    communications with these minors that got him here.

11            Your Honor, they've made much blame about, you know,

12    Mr. DeVito's previous sexual abuse.  As we laid out in our

13    sentencing memo, Your Honor, that is in no way mitigating for

14    this offense.  It talked about how he helped his dad when he

15    died; that created a lot of stress in his life.  Your Honor,

16    losing a father, terrible.  Unfortunately, it's something that

17    many Americans, many individuals will go through during their

18    life.  It happened in 2013, though.  He's committing this

19    offense in 2016.  How long of a grieving period do you get for

20    your -- for losing your father, and how would that in any way

21    justify the conduct that he engaged in?  There's no correlation

22    between the loss of a loved one and sexually abusing minors.

23            The defendant's legal ramblings even go a little

24    further off the rails.  I mean, he demands, you know, early

25    release under the Second Chance Act, Your Honor.  I probably

1  should have filed this with you, but under the Second Chance

2  Act, 2251, the production of child pornography statute, is

3  specifically excluded from being reduced under there.  It's

4  written in the statute, Your Honor.  It's 18 U.S.C.

5  3632(d)(4)(D)(xxxix).  There's a list of offenses, many

6  involving the exploitation -- many involving offenses against

7  children, that are specifically not eligible for reductions

8  under that Act.

9        He then wants access to TRULINCS in the Bureau of

10  Prisons.  Your Honor, under Bureau of Prisons policy, he's

11  plainly not eligible.  Their policy states, "For example,

12  inmates with personal history of or prior offense conduct or

13  conviction for soliciting minors for sexual activity, or

14  possession/distribution of child pornography through the

15  internet or other means, are excluded from program

16  participation based on their history."  He's not eligible for

17  this program, Your Honor.  Moreover, Dr. Connor said giving him

18  access to something like this would actually be a bad idea

19  until he's treated.  His own doctor testified, well, he can't

20  have a phone, he can't have access to those things; if he has a

21  computer, it's got to be locked.

22        I think the unfortunate thing about this case, Your

23  Honor, is Mr. DeVito's life showed a lot of promise.  He was

24  married, he had a kid, he had a good job.  There's no excuse

25  for this offense.  The number of victims, Your Honor, are too

1    many, the depictions too vile.  The guidelines in this case are

2    30 years.  His conduct is merited.

3          Nothing more, Your Honor.  Thank you.

4          THE COURT:  Thank you, Mr. Healey.

5          Is there anything else?

6          MS. KOVOOR:  No, Your Honor.

7          THE COURT:  All right.  The Court had more filings in

8    this case than it's had in any case before, both from the

9    defendant himself and his counsel and the government.  There

10   were letters of recommendation for the defendant which were

11   nice letters.  There was also the memo that he filed, the last

12   thing he filed, and I've got some immediate reactions to

13   Mr. DeVito's contentions.

14         First, Mr. DeVito completely failed to grasp the

15   seriousness of this case or the negative impact of his

16   predatory behavior on the child victims and their families.  In

17   his pro se sentencing memo, he refers to his conduct as

18   sexting.  He also blames the depths of an uncontrolled sickness

19   and sadness for the eventual discovery of a variety of social

20   media applications that led to online communication in which

21   sexually explicit texts and images were shared.  Indeed, he

22   still only admits to interacting with Minor Victim A between

23   August 6 and August 11th, 2016, stating exposing her to his

24   sickness, Richard was now no better than his own abuser and

25   deeply regrets losing control to the point another victim was

1    created.  He makes no mention of the numerous other children

2    and the numerous other videos he made.

3           Secondly, the cases he cites involve different crimes

4    than the production of child pornography to which he pled.

5    Specifically, the cases mentioned were Lowry and Damron.  Lowry

6    was a coercion and enticement of a minor, and Damron was sexual

7    exploitation of a minor.

8           Lowry, who pled guilty to one count of coercion and

9    enticement, was sentenced to 144 months imprisonment,

10   supervised release for life, and a $100 special assessment.  He

11   was 24 years old at the time of his offense.  He used his real

12   name on Facebook to solicit males for sexual encounters, and he

13   did not place an age limit on his solicitations.  And he

14   communicated with 26 grown men as well as 14 boys who turned

15   out to be ages 14 to 17, and he only ultimately had physical

16   conduct -- contact with one 17-year-old boy who had already

17   fathered a child.  And he offered money for nude photos from

18   the men or boys, but he did not instruct the men or boys

19   regarding the content of the photos, and no videos were

20   exchanged.

21          In contrast to that, Mr. DeVito, who pled guilty to

22   one count of production of child pornography, was 32 at the

23   time of his offense.  He posed as a 13-year-old boy using false

24   screen names and photo on websites like Musically, which are

25   known to be frequented by children, and targeted prepubescent

1   females age 7 to 12.  He enticed the children to meet him on

2   other more anonymous apps, including OoVoo and Kik.  So it

3   wasn't just use of a computer, it was use of a computer to use

4   the special enhancements that the computer has.  He provided

5   via video and/or explicit messaging explicit instruction in

6   pornography to at least 25 young children, age 7 to 12,

7   detailing exactly what he wanted them to do, including, but not

8   limited to, inserting household items into bodily cavities,

9   masturbating, engaging in pornographic acts with other young

10  children, engaging in a sex act with a dog, and encouraging one

11  child to masturbate in front of her father in an effort to get

12  the child to perform a sex act on her own father.  And he saved

13  video recordings and/or screen shots of all these activities

14  which the Court has viewed.

15          The Damron case, another case that Mr. DeVito cites,

16  where Mr. Damron was sentenced to 200 months imprisonment,

17  supervised release for life, he took sexually explicit photos

18  of one child, his girlfriend's five-year-old daughter with whom

19  he lived, and traded the still photo on Kik for five other

20  still photos depicting child pornography.  He did not attempt

21  to interact with any other children and interacted only with

22  adult males on Kik.

23          Instead, Mr. DeVito, who pled guilty to one count of

24  production of child pornography, electronically crept into the

25  bedrooms of more than 25 prepubescent females using apps which

1    he instructed many of them to download.  He provided graphic

2    pornography and instruction to more than 25 children.  He

3    enticed them to engage in multiple sex acts, including with

4    other young children and with at least one animal, and he saved

5    video recordings and/or screen shots of all these activities

6    which the Court has viewed.

7         I don't think there's -- there are not just 25 victims

8    involved in this case.  There's probably a hundred victims

9    because there's a ripple effect.  It affects not only the child

10   but her parents and her siblings; that that child is never

11   going to feel safe again from somebody like Mr. DeVito.  And

12   their families have to live with the feeling that they just

13   didn't do enough, even though they thought they did everything

14   they could to protect their child.

15        So this case is definitely out of the ordinary.  It's

16   far reaching, and it deserves a maximum sentence.

17        It's the duty of the Court to sentence the defendant

18   at this time.  However, counsel will have a final chance to

19   make legal objections before the sentence is actually imposed.

20        Pursuant to the Sentencing Reform Act of 1984 and 18

21   U.S.C. Section 3553(a), it's the judgment of the Court that the

22   defendant, Richard Lee DeVito, is hereby committed to the

23   custody of the United States Bureau of Prisons to be imprisoned

24   for a term of 360 months.  Upon release from imprisonment, the

25   defendant shall serve a term of supervised release of life.

1            Within 72 hours of release from imprisonment, the

2      defendant must report to the Probation Office in the district

3      to which he's released.

4            While in the Bureau of Prisons, it's recommended the

5      defendant participate in mental health treatment and sex

6      offender treatment; if he needs it, substance abuse treatment;

7      an apprenticeship program and any available educational

8      opportunities.

9            While on supervised release, the defendant must not

10     commit another federal, state, or local crime.  The defendant

11     shall be prohibited from possessing a firearm, ammunition,

12     destructive device, or dangerous weapon.  The defendant must

13     not unlawfully possess a controlled substance.  The defendant

14     must refrain from any unlawful use of a controlled substance.

15     The Court finds a low risk of future substance abuse on the

16     part of the defendant.  Therefore, pursuant to 18 U.S.C.

17     Section 3583(d), the Court waives the requirement of mandatory

18     drug testing.

19           The defendant must cooperate in the collection of DNA

20     as directed by the probation officer.

21           And the defendant must comply with the requirements of

22     the Sex Offender Registration and Notification Act, called

23     SORNA, as directed by the probation officer, the Bureau of

24     Prisons, or any state sex offender registration agency in which

25     the defendant resides, works, is a student, or was convicted of

1    a qualifying offense.

2            The defendant must comply with the standard conditions

3    of supervised release that have been adopted by this Court as

4    well as the following special conditions.  One:  The defendant

5    shall not possess or view sexually explicit material as defined

6    by 18 U.S.C. Section 2256(2)(A) and (B).

7            Two:  The defendant shall participate in a sex

8    offender treatment program, to include a sex offender risk

9    assessment, psychosexual evaluation, and/or other evaluation as

10   needed.

11           Three:  The defendant shall also be subject to

12   periodic polygraph examinations at the direction and discretion

13   of the probation officer and at the defendant's expense.  The

14   defendant shall follow the rules and regulations of the sex

15   offender treatment program as implemented by the Probation

16   Office.  The defendant shall sign all necessary authorization

17   forms to release confidential information so that treatment

18   providers, probation officers, polygraph examiners, and others,

19   as necessary, are allowed to communicate openly about the

20   defendant and his relapse prevention plan.

21           Four:  The defendant's residence and employment shall

22   be preapproved by the probation officer and in compliance with

23   state and local law.

24           Five:  The defendant is required to install software

25   to monitor computer activities on any computer the defendant is

1   authorized to use at the defendant's own expense.  The software

2   will record any and all activity on the defendant's computer,

3   including the capturing of keystrokes, application information,

4   internet use history, e-mail correspondence, and chat

5   conversations.  This software will be checked on a random

6   basis.  The defendant has no expectations of privacy regarding

7   computer use or information stored on the computer if

8   monitoring software is installed and understands and agrees

9   that information gathered by said software may be used against

10   the defendant in subsequent court actions regarding the

11   defendant's computer use and conditions of supervision.  The

12   defendant must also warn others of the existence of the

13   software program.  The defendant is prohibited from attempting

14   to remove, tamper with, or alter or circumvent in any way the

15   software program.  Furthermore, the defendant must comply with

16   the rules set forth in the computer monitoring participation

17   agreement.

18         Six:  The defendant shall submit and/or surrender any

19   media device to which he has access and/or control to a search

20   based on reasonable suspicious or contraband or evidence of a

21   violation of a condition of supervision.  A media device is

22   defined as, but not limited to, any device which is capable of

23   accessing the internet, storing images, texts, or other form of

24   electronic communication.

25         Mr. DeVito shall pay $10,400 in restitution to Minor

1    Victim P.  A determination with respect to any additional

2    restitution is pending receipt of additional information from

3    victims in this case.  Additional information will be provided

4    to the Court by the Probation Department once it is received.

5            While incarcerated, if the defendant is working in a

6    non-UNICOR or grade five UNICOR job, the defendant shall pay

7    $25 per quarter towards his restitution obligation.  If working

8    in a grade one to four UNICOR job, the defendant shall pay 50

9    percent of his monthly pay towards defendant's restitution

10   obligation.  Any change in this schedule shall be made only by

11   order of the Court.  Within 60 days of the commencement of the

12   term of supervised release, the probation officer shall

13   recommend a payment schedule to the Court to satisfy any unpaid

14   balance of the restitution.  The Court will enter an order

15   establishing a schedule of payments.

16           Pursuant to 18 U.S.C. Section 3612(f)(3)(A), the Court

17   waives the requirement of interest on any balance of the

18   restitution not paid within 15 days after judgment.

19           It is ordered the defendant pay a special assessment

20   in the amount of $100 which shall be due immediately.  The

21   probation officer does not believe the defendant has the

22   financial resources to pay the additional $5,000 special

23   assessment.

24           The defendant shall forfeit the following to the

25   United States:  An iPhone 6, Model A1549, IMEI, with a number

1    of numbers to follow; an HP Pavilion laptop of a certain model

2    and serial number; and all additional items that were seized,

3    including, but not limited to, all storage media, micro SD

4    card, eight millimeter videotapes, zip drives, CDs, mini CDs,

5    CDRs, DVDs, mini DVDs, floppy disks, VHS tapes, and cassette

6    tapes, documents, packages and photographs, and all

7    pornographic material, whether depicting adults or minors or

8    both, and all photographs which depict minors other than

9    photographs of clothed minor members of the defendant's family.

10            And, finally, the Court considers the sentence to be

11   just and reasonable in light of the defendant's conduct and the

12   applicable sentencing factors.

13            Mr. DeVito, I can make a recommendation as to which

14   prison facility you be sent to.  I know that you wrote in your

15   memo that you'd like to go to either Ashland or Lexington.  Is

16   that still your wish?  I'll recommend that.

17            THE DEFENDANT:  Yes.

18            MS. KOVOOR:  Yes, Your Honor.

19            THE COURT:  All right.  Do you want the Court to

20   recommend that you participate in the substance abuse program?

21       (Ms. Kovoor conferring with the defendant.)

22            THE COURT:  There are two programs.  There's a

23   500-hour program and a 40-hour residential program.

24       (Defendant conferring with Ms. Kovoor.)

25            MS. KOVOOR:  Yes, Your Honor.

1        THE COURT:  All right.  The Court will recommend both

2   programs.

3        I can recommend that he participate in any type of

4   apprenticeship program.  Do you want that?

5        THE DEFENDANT:  Yes.

6        THE COURT:  All right.  I'll also recommend that you

7   participate in the sex offender treatment program offered by

8   the Bureau of Prisons.

9        And do you want mental health treatment?

10       THE DEFENDANT:  Yes.

11       MS. KOVOOR:  Yes, Your Honor.

12       THE COURT:  All right.  The Court will recommend all

13   of those things.

14       Ms. Kovoor, do you have any objections as to why the

15   sentence should not be imposed as stated?

16       MS. KOVOOR:  No, Your Honor.

17       THE COURT:  Mr. Healey, any objections?

18       MR. HEALEY:  No, Your Honor.

19       THE COURT:  The sentence is thus imposed as stated.

20       Let me tell you about your rights on appeal.

21       Under some circumstances, a defendant has a right to

22   appeal the sentence.  However, a defendant may waive that right

23   as part of a plea agreement, and you have entered into a plea

24   agreement which waived some or all of your rights to appeal the

25   sentence itself.  Such waivers are generally enforceable, but

 1    if you believe the waiver itself is not valid, you can present

 2    that theory to the appellate court.

 3            If you can't afford a lawyer, you may apply, and one

 4    will be appointed to represent you on your appeal.

 5            You're further advised that in accordance with the

 6    provisions of Rule 4(b) of the Rules of Appellate Procedure,

 7    you must file your notice of appeal with the Clerk of the

 8    United States District Court within 14 days of the filing of

 9    this judgment.

10            The Court does hereby advise that if you so request,

11    the Clerk of this Court will prepare and file immediately a

12    notice of appeal on your behalf.  Do you wish the Clerk to do

13    that?

14            MS. KOVOOR:  Yes, Your Honor.

15            Also, if he could be appointed counsel for appeal.

16            THE COURT:  All right.  It's further ordered that the

17    defendant shall notify the United States Attorney for the

18    Southern District of Ohio within 30 days of any change in

19    resident or mailing address until the restitution imposed by

20    this judgment is fully paid.

21            I know that Mr. DeVito is in the custody of the United

22    States Marshal.  I'm going to remand him to the custody of the

23    Marshal.

24            Is there anything further to come before the Court in

25    this matter?

1          MS. KOVOOR:  Your Honor, could he -- I just wanted to

2    ask whether he could say good-bye to his wife and his mother?

3    That's defendant's request.  I'm just --

4          THE COURT:  The Marshals won't let me have any contact

5    with anyone.  Sorry.

6          MS. KOVOOR:  And I would want to order the transcript

7    and have appointed counsel.

8          THE COURT:  You want to order the transcript and what?

9    What else?

10          MS. KOVOOR:  And have counsel appointed for --

11          THE COURT:  And have counsel appointed.  Okay.

12          All right.  Good luck to you, Mr. DeVito.

13     (Proceedings concluded at 2:21 p.m.)

14                       - - -

15

16                  C E R T I F I C A T E

17      I certify that the foregoing is a correct transcript

18    from the record of the proceedings in the above-entitled

19    matter.

                          s/Julie A. Wolfer

20                      Julie A. Wolfer, RDR, CRR

                      Official Reporter

21

22

23

24

25

1                              INDEX

2                       Direct   Cross   Redirect   Recross

3  DEFENDANT'S WITNESSES:

4  EDWARD JOSEPH CONNOR, PSY.D
        (by Ms. Kovoor)        4              32
5       (by Mr. Healey)               23                38

6  ROGER PIMENTEL
        (by Ms. Kovoor)       39              63
7       (by Mr. Healey)               55

8  CHERYL DEVITO
        (by Ms. Kovoor)      103

9

10                            - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25